# EXHIBIT

# 2

HEALTH SERVICES AGREEMENT

THIS HEALTH SERVICES AGREEMENT (hereinafter referred to as "AGREEMENT") by and between the CLAYTON SHERIFF SHERIFF's OFFICE (hereinafter referred to as "SHERIFF") and CORRECTHEALTH CLAYTON, LLC (hereinafter referred to as "COMPANY"), is entered into to be effective as set forth in Paragraph 6.1, below.

WITNESSETH:

WHEREAS, SHERIFF is charged by law with the responsibility for obtaining and providing reasonably necessary medical care for inmates or detainees of the Harold R. Banke Jail Facility, also known as the Clayton County Jail, located 9157 Tara Boulevard, Jonesboro, GA  30326 (hereinafter called "JAIL") and,

WHEREAS, SHERIFF desires to provide health services to the Jail's inmates or detainees (hereinafter called "inmates") in accordance with applicable law; and,

WHEREAS, COMPANY provides correctional healthcare and healthcare management services and desires to provide such services for the SHERIFF under the terms and conditions contained herein; and

WHEREAS, the SHERIFF wishes to engage COMPANY to provide correctional healthcare and healthcare management services on behalf of the SHERIFF to the inmates and COMPANY has agreed to provide such services.

NOW THEREFORE, in consideration of the mutual covenants and promises hereinafter made, the parties hereto agree as follows:

ARTICLE I:  HEALTH CARE SERVICES

1.1   General Engagement.  SHERIFF hereby contracts with COMPANY to provide healthcare services to inmates in the physical custody of the JAIL.  This care is to be delivered to individuals under the custody and control of the JAIL, and COMPANY enters into this Agreement according to the terms and provisions herein.

1.2   Scope of General Services.  COMPANY shall provide or arrange for the delivery of medically necessary healthcare services in accordance with the terms of this Agreement for individuals under the custody and control of the SHERIFF at the JAIL, while such individuals are detained at the JAIL. The responsibility of COMPANY for the healthcare of an inmate commences with the commitment of an inmate to the custody of the JAIL. COMPANY shall provide on a regular basis:  nursing care, physician / midlevel provider care, mental health care, dental care, electronic health records, tele-health, medication administration, formulary and non-formulary pharmaceuticals, on-site radiology, non-capital medical equipment, medical supplies, office supplies, and medical waste disposal.

COMPANY will provide medical, mental health, dental, technical and support personnel consistent with the SHERIFF's Request for Proposal, RFP PKG #SO-02, dated April 18, 2018 (hereinafter referred to as "RFP" and attached as Exhibit A) and the COMPANY's Proposal, in response to the RFP, dated May 11, 2018 (hereinafter referred to as "Proposal" and attached as Exhibit B).  A summary of services to be provided by COMPANY is attached, hereto, as Exhibit C.

1.3    <u>Specialty Care Services.</u>  In addition to providing the general services described above, COMPANY by and through its licensed health care providers shall, at its own cost up to an Aggregate Cap as specified below, provide to inmates at the JAIL specialty medical services to the extent such are determined to be medically necessary by COMPANY.

When non-emergency specialty care is required and cannot be rendered at the JAIL, COMPANY shall make arrangements with the SHERIFF for the transportation of the inmates in accordance with this Agreement.

1.4    <u>On-Site Emergency Services.</u> COMPANY shall provide, at its own cost, on-site emergency medical care, as medically necessary.

1.5    <u>Injuries Incurred Prior to Incarceration; Pregnancy.</u> COMPANY will not be financially responsible for the cost of any medical treatment for health care services provided to any inmate prior to the inmate's commitment into the custody of the JAIL.  Furthermore, COMPANY is not financially responsible for the cost of services outside the JAIL for any healthcare treatment or health care services provided to medically stabilize any inmate presented at booking with a life threatening injury or illness or in immediate need of emergency medical care, if said inmate is not in the custody of the JAIL.

Once it has been determined by COMPANY's intake medical personnel that the inmate has been medically stabilized, and accepted by SHERIFF personnel into the custody of the JAIL, COMPANY will, commencing at that point, then become responsible for the medical treatment for health care services rendered at the JAIL, regardless of the nature of the illness or injury and whether or not the illness or injury occurred prior or subsequent to the individual's incarceration at the JAIL.  An inmate shall be considered medically stabilized when the patient's medical condition no longer requires immediate emergency medical care or outside hospitalization, and when any and/or all applicable medical clearances have been provided to the JAIL personnel, so that the inmate can reasonably be housed inside the JAIL.

It is expressly understood that COMPANY shall not be responsible for costs associated with the health care of any infants born to inmates.  COMPANY shall provide health care services to inmates up to, though, and after the birth process, but health care services provided to an infant following birth, other than those services that may be delivered in the JAIL prior to transport to a hospital, will not be the financial responsibility of COMPANY.  In any event, COMPANY shall not be responsible for the costs associated with the performing or furnishing of elective abortions.

1.6    <u>Inmates outside the Facility.</u>  The health care services contracted in the Agreement are intended only for those inmates in the actual physical custody of the JAIL.  This does not include inmates who are under guard in jails or prisons outside of the SHERIFF.  Such inmates are not to be included in the daily population count.  No person(s), including those who are in any outside hospitals who are not under guard, shall be the financial responsibility of COMPANY with respect to the payment or the furnishing of their health care services. Persons in the physical custody of other public safety or other law enforcement/penal jurisdictions at the request of SHERIFF are likewise excluded from the population count and are not the responsibility of COMPANY for the furnishing or payment of health care services.

Contract_Clayton_002

The cost of medical services provided to inmates who become ill or are injured while on such temporary release, work release, or escape status will not be the responsibility of COMPANY. However, inmates on work detail who are supervised by county personnel and become injured will be the responsibility of COMPANY as long as they are returned to the JAIL to be treated by COMPANY personnel. These inmates will be part of the daily census count.

1.7     Elective Medical Care. COMPANY is not responsible for providing elective medical care to inmates. For purposes of the Agreement, "elective medical care" means medical care, which, if not provided, would not cause definite harm to the inmate's well-being.  SHERIFF must review any referral of inmates for elective medical care prior to provision of such services.

1.8     Transportation Services.  To the extent any inmate requires off-site non-emergency health care treatment including, but not limited to, hospitalization care and specialty services, the SHERIFF will, upon request by COMPANY, its agents, employees or contractors, provide transportation as reasonably available provided that such transportation is scheduled in advance.  When medically necessary, COMPANY shall arrange for emergency ambulance transportation of inmates.

## ARTICLE II:  PERSONNEL

2.1     Staffing. COMPANY shall provide personnel reasonably necessary for the rendering of health care services to inmates at the JAIL.  The SHERIFF will screen COMPANY's proposed staff to ensure that they will not constitute a security risk. The SHERIFF shall have final approval of COMPANY's employees with regard to security/background clearance. COMPANY will provide staffing generally in accordance with Exhibit A, attached hereto.  This staffing plan assumes an inmate population of 1800.  COMPANY reserves the right to change staffing as the healthcare needs of the JAIL dictate. At the sole discretion of the COMPANY, some healthcare services may be provided via tele-health.

2.2     Licensure, Certification and Registration of Personnel.  All personnel provided or made available by COMPANY to render services hereunder shall be licensed, certified or registered, in their respective areas of expertise as required by applicable Georgia law.

2.3     SHERIFF's Satisfaction with Health Care Personnel.  If the SHERIFF, Chief Deputy, or Division Commander of the JAIL becomes dissatisfied with any health care personnel provided by COMPANY hereunder, or by any independent contractor, subcontractor or assignee, COMPANY, in recognition of the sensitive nature of correctional services, shall, following receipt of written notice from the SHERIFF, Chief Deputy, or Division Commander of the JAIL of the grounds for such dissatisfaction and in consideration of the reasons therefore, exercise its best efforts to resolve the problem.  If the problem is not resolved satisfactorily to the SHERIFF, Chief Deputy, or Division Commander of the JAIL within seventy-two (72) hours of notification, COMPANY shall remove or shall cause any independent contractor, subcontractor, or assignee to remove the individual about whom the SHERIFF, Chief Deputy or Division Commander has expressed dissatisfaction.  Should removal of an individual become necessary, COMPANY will be allowed reasonable time, prior to removal, to find an acceptable replacement, without penalty or any prejudice to the interests of COMPANY.

2.4     Use of SHERIFF Personnel and Inmates in the Provision of Health Care Services.  Neither SHERIFF personnel nor inmates shall be employed or otherwise engaged by either COMPANY in the direct rendering of any health care services.

Contract_Clayton_003

2.5    Subcontracting and Delegation.    In order to discharge its obligations hereunder, COMPANY will engage certain health care professionals as independent contractors rather than as employees. SHERIFF consents to such subcontracting or delegation.  As the relationship between COMPANY and these health care professionals will be that of independent contractor, COMPANY will not be considered or deemed to be engaged in the practice of medicine or other professions practiced by these professionals. COMPANY will not exercise control over the manner or means by which these independent contractors perform their professional medical duties.  However, COMPANY shall exercise administrative supervision over such professionals necessary to insure the strict fulfillment of the obligations contained in this Agreement.  For each agent and subcontractor, including all medical professionals, physicians, dentists, and nurses performing duties as agents or independent contractors of COMPANY under this Agreement, COMPANY shall provide SHERIFF proof, that there is in effect a professional liability or medical malpractice insurance policy covering the agent or subcontractor.

2.6    Discrimination.    During the performance of this Agreement, COMPANY, its employees, agents, subcontractors, and assignees agree as follows:

   a.   None will discriminate against any employee or applicant for employment because of race, religion, color, gender or national origin, except where religion, gender or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of the contractor.
   b.   In all solicitations or advertisements for employees, each will state that it is an equal opportunity employer.
   c.   Notices, advertisements and solicitations placed in accordance with federal law, rule or regulation shall be deemed sufficient for the purpose of meeting the requirements of the section.

2.7    SHERIFF's Policies and Procedures. COMPANY will operate within the requirements of the SHERIFF's Policies and Procedures, which directly relate to the provision of healthcare services, provided that such Policies and Procedures are provided to COMPANY in writing. Said policies and procedures may change from time to time, and, if so, COMPANY will be notified in writing and will operate within all policies or modifications thereof.

## ARTICLE III:  REPORTS AND RECORDS

3.1    Medical Records.  COMPANY shall cause and maintain complete and accurate medical records for each Inmate who has received health care services, in compliance with HIPAA.  Each medical record will be maintained in accordance with applicable laws.  The medical records shall be kept separate from the inmate's confinement record.  A complete legible copy of the applicable medical records shall be available at all times, to SHERIFF, as custodian of the person of the patient.  Medical records shall be kept confidential.  Subject to applicable law regarding confidentiality of such records, COMPANY shall comply with Federal Law, Georgia law and SHERIFF policy with regard to access by inmates and SHERIFF personnel to medical records.  No information contained in the medical records shall be released by COMPANY except as provided by policy, by a court order, or otherwise in accordance with the applicable law. COMPANY shall, at its own cost, provide all medical personnel necessary to maintain the medical records.  At the termination of this Agreement, all medical records shall be delivered to and remain with the SHERIFF.  However, SHERIFF shall provide

4

COMPANY with reasonable ongoing access to all pertinent medical records even after the termination of this Agreement for the purposes of defending or investigating litigation.

3.2    Regular Reports by COMPANY to SHERIFF.  If requested, COMPANY shall provide to SHERIFF, on a date and in a form mutually acceptable to COMPANY and SHERIFF, reports relating to services rendered under this Agreement.

3.3    Inmate Information.  Subject to the applicable Georgia law, in order to assist COMPANY in providing the best possible health care services to inmates, SHERIFF will provide COMPANY with information pertaining to inmates that COMPANY and SHERIFF mutually identify as reasonable and necessary for COMPANY to adequately perform its obligations hereunder.

3.4    COMPANY Records Available to SHERIFF with Limitations on Disclosure. COMPANY shall make available to SHERIFF, at SHERIFF's request, records, documents and other papers relating to the direct delivery of health care services to Inmates hereunder.  SHERIFF understands that written operating policies and procedures employed by COMPANY in the performance of its obligations hereunder are propriety in nature and will remain the property of COMPANY and shall not be disclosed without written consent.  Information concerning such may not, at any time, be used, distributed, copied or otherwise utilized by SHERIFF, except in connection with the delivery of health care services hereunder, or as permitted or required by law, unless such disclosure is approved in advance writing by COMPANY.  Propriety information developed by COMPANY shall remain the property of COMPANY.

3.5    SHERIFF Records Available to COMPANY with Limitations on Disclosure.  During the term of this Agreement and for a reasonable time thereafter, SHERIFF will provide COMPANY at COMPANY's request, SHERIFF's records relating to the provision of health care services to inmates as may be reasonably requested by COMPANY or as are pertinent to the investigation or defense of any claim related to COMPANY's conduct.  Consistent with applicable law, SHERIFF will make available to COMPANY such inmate medical records as are maintained by SHERIFF, hospitals and other outside health care providers involved in the care or treatment of inmates (to the extent SHERIFF has any control over those records) as COMPANY may reasonable request.  Any such information provided by SHERIFF to COMPANY that SHERIFF considers confidential shall be kept confidential by COMPANY and shall not, except as may be required by law, be distributed to any third party without the prior written approval of the County.

3.6    Confidential and Proprietary Information. Notwithstanding anything herein this Agreement to the contrary, neither party shall be deemed to have waived any attorney-client, statutory peer review, or work product privilege, or to have transferred or waived any proprietary right in its assets, including but not limited to proprietary rights to its electronic medical records software system, CorEMR.

## ARTICLE IV:  SECURITY

4.1    General. COMPANY and the SHERIFF understand that adequate security services are essential and necessary for the safety of the agents, employees, and subcontractors of COMPANY as well as for the security of inmates and JAIL personnel, consistent with the correctional setting.  JAIL personnel will take all reasonable steps to provide sufficient security to enable COMPANY to safely and adequately provide the health care services described in this Agreement.  It is expressly understood

5

by the SHERIFF and COMPANY that the provision of security and safety for the COMPANY personnel is a continuing precondition of COMPANY's obligation to provide its services in a routine, timely, and proper fashion. This provision, however shall not be considered to and shall not be construed to be a waiver of any defense, including sovereign or official immunity, to any claim against county by an inmate, employee of company or any other person in anyway whatsoever.

4.2    Security During Transportation Off-Site.    The SHERIFF will provide prompt and timely security as medically necessary and appropriate in connection with the transportation of any inmate between the JAIL and any other location for off-site services as contemplated herein.

## ARTICLE V:  OFFICE SPACE, EQUIPMENT, INVENTORY AND SUPPLIES

5.1    General.  SHERIFF agrees to provide COMPANY with reasonable and adequate office and medical space, facilities, and telephone equipment with dedicated line in the medical area.  COMPANY will be responsible for internet connectivity.  This connection will be for sole and exclusive use by the medical staff. SHERIFF will pay for utilities (gas, electric, water, phone lines, long distance telephone service).  Further, SHERIFF will provide necessary maintenance and housekeeping of the office space and facilities.  Further, SHERIFF shall provide for all other personal needs (non-medical) of inmates while in the Facility including, but not limited to, daily housekeeping services, dietary services, building maintenance services, personal hygiene supplies and services, and linen services. SHERIFF will not be liable for loss of or damage to equipment and supplies of COMPANY, unless such loss or damage was caused by the negligence of the SHERIFF and / or SHERIFF's employees.

With regard to telemedicine, COMPANY will provide for all necessary equipment and any necessary internet / connection line, as set forth above.  In the event, the JAIL obtains a new Jail Management Software System, SHERIFF will be responsible for ensuring that the Jail Management Software (JMS) provides an interface, which integrates with COMPANY's EHR to populate the EHR with patient demographics and location data only.

COMPANY will provide medical supplies, office supplies, medical waste removal, and non-capital medical equipment (i.e. less than $500).  SHERIFF will be responsible for any capital medical equipment (i.e. more than $500).

5.2    Delivery of Possession.    SHERIFF will provide to COMPANY beginning on the date of commencement of this Agreement, possession and control of all medical and office equipment and supplies in place at the JAIL's health care unit.

At the commencement of service by COMPANY an inventory of all supplies, medical and office equipment as described herein will be completed in writing by SHERIFF personnel. This inventory will be reviewed and approved in writing by the authorized agent of the SHERIFF as well as the COMPANY.

At the termination of this or any subsequent Agreement, COMPANY will return to the SHERIFF possession and control all supplies, medical and office equipment, in working order, reasonable wear and tear accepted, which were in place at the JAIL's health care unit prior to the commencement of services under this Agreement. Any such return will require written confirmation, executed by the Jail Administrator of the JAIL, for proper acceptance.

Contract_Clayton_006

## ARTICLE VI:  TERM AND TERMINATION OF AGREEMENT

6.1    Initial Term.  The initial term of this Agreement will be August 1, 2018 at 12:01 a.m. through midnight on July 31, 2020.  This Agreement is renewable under like terms for four (4) - one (1) year terms, subject to negotiation of the service component and agreed-upon compensation adjustments, including compensation escalator as set forth below, unless either party delivers written notice of non-renewal to the other party at least ninety (90) days prior to the expiration of the then-existing term.

6.2    Termination for Cause

   A.   By SHERIFF.  Failure of COMPANY to comply with any material section or part of this Agreement will be considered grounds for termination of this Agreement by the SHERIFF. SHERIFF will provide written notice to COMPANY specifying the effective date of termination, such being no less than sixty (60) days from the delivery of notice. However, upon receipt of the written notice of termination, COMPANY shall have thirty (30) days to cure the default as expressly identified in the notice. If COMPANY provides adequate explanation for the default or timely cures the default and performs to the satisfaction of the SHERIFF, the sixty (60) day notice shall become null and void and this Agreement will remain in full force and effect. In any event, SHERIFF will pay for services rendered by COMPANY up to the point of termination.

   B.   By COMPANY.  Failure of SHERIFF to comply with any material section or part of this Agreement will be considered grounds for termination of this Agreement by COMPANY. COMPANY will provide written notice to SHERIFF specifying the effective date of termination, such being no less than sixty (60) days from the delivery of notice. However, upon receipt of the written notice of termination, SHERIFF shall have thirty (30) days to cure the default as expressly identified in the notice. If SHERIFF provides adequate explanation for the default or timely cures the default and performs to the satisfaction of the COMPANY, the sixty (60) day notice shall become null and void and this Agreement will remain in full force and effect. Notwithstanding the above, if the breach involves the failure of the SHERIFF to make any payment due hereunder, COMPANY may terminate this Agreement on five (5) days' notice, provided that said breach is not cured during said notice period.

6.3    Termination Without Cause. Notwithstanding anything to the contrary contained in this Agreement the SHERIFF or COMPANY may, without prejudice to any other rights it may have, terminate this Agreement without cause by giving ninety (90) days' written notice to the other party by certified mail, return receipt requested at the address provided in this Agreement. The SHERIFF shall pay for services rendered up to the date of termination.

6.4    Responsibility for Inmate Health Care.  Upon termination of this Agreement, all responsibility for providing health care services to all inmates, including inmates receiving health care services at sites outside the JAIL, will be transferred from COMPANY to SHERIFF.

## ARTICLE VII: COMPENSATION

Contract_Clayton_007

7.1 <u>Base Compensation & Per Diem Compensation</u>. SHERIFF will pay COMPANY an annualized base compensation of ▮▮▮▮▮▮▮ This will be due in monthly payments of ▮▮▮▮▮▮ This amount includes an annualized aggregate cap of ▮▮▮▮ as defined below. This compensation level assumes a maximum inmate population of 1800 inmates.

COMPANY will invoice SHERIFF during the month prior to the month of service. SHERIFF agrees to pay COMPANY within thirty (30) days of receipt of the invoice. In the event this agreement should terminate on a date other than the end of a calendar month, compensation to COMPANY will be prorated accordingly for the shortened month.

7.2 <u>Per Diem</u>. When the daily inmate census exceeds 1800, SHERIFF agrees to compensate COMPANY $2.25 per inmate per day for each inmate in excess of 1800.

This per diem is intended to cover additional costs in those instances where minor, short term increases in the inmate population result in the higher utilization of routine supplies and services. However, the per diem is not intended to provide for any additional fixed costs, such as new staffing positions, which might prove necessary if the inmate population increases to more than 1800 inmates. As such, if the census increases by 20% and is sustained, the parties agree to negotiate in good faith for additional staffing and associated compensation in order to continue to provide services to the increased number of inmates and maintain the quality of care consistent with COMPANY's Proposal and this Agreement.

7.3 <u>Compensation Escalator</u>. Annually, the compensation paid to COMPANY, including base compensation and per diem rate, shall be adjusted by the Consumer Price Index-Urban Consumers (CPI-U), Medical Care Component (MCC) for the Southern Region of the United States. Annually, on the anniversary date, the COMPANY's proposed adjustments shall go into effect unless the Parties have entered into a written agreement with an alternative cost adjustment. The CPI-U price adjustment will become effective annually, on the first day of August, but the increase will be calculated based on the CPI-U for the month of October in the year immediately preceding.

7.4 <u>Change in Standard of Care or Scope in Services</u>. The compensation above reflects the scope of services as outlined herein and the current community standard of care with regard to correctional healthcare services. If there is any change in or modification of the local, national (e.g. NCCHC, ACA) or community standards of care or scope of services, court order, ruling or interpretation, state or federal law or statute or interpretation thereof that results in sustained and material increase in costs (e.g. treatment of Hepatitis C, TB, HIV/AIDS, etc.), coverage of costs related to such changes are not included in the contract price and would need to be negotiated with the SHERIFF. Further, if the mission and/or purpose of the JAIL changes substantially, the SHERIFF agrees to negotiate with COMPANY in good faith for any change in services.

7.5 <u>Late Payments</u>. The SHERIFF shall pay COMPANY interest on all undisputed payments hereunder that are not paid when due, as specified above. Interest shall accrue from the date the original payment was due at a rate of one percent (1%) per month until the payment is made in full. The SHERIFF shall bear the costs of any legal or collection fees and expenses incurred by COMPANY in attempting to enforce SHERIFF's payment obligations hereunder.

7.6 <u>Aggregate Cap</u>. The SHERIFF acknowledges and agrees that it shall be responsible for payment of all costs and expenses associated with the provision of certain covered services, when such costs

Contract_Clayton_008

and expenses exceed $300,000.00 (the "Annual Aggregate Cap Amount") in any twelve (12) month period. These expenses will be applied to the Aggregate Cap on a monthly basis by allocating $25,000.00 in any one (1) month period. The Aggregate CAP amount shall be pro-rated for any partial twelve (12) month period under the Agreement. SHERIFF will reimburse the COMPANY for 100% of all costs greater than the Annual Aggregate Cap.

Examples of expenses to be applied to the CAP include, but are not limited to: specialty care, such as hemophilia, cancer and dialysis; off-site healthcare services, including emergency room services, inpatient/outpatient services, hospitalizations, off-site physician services, and emergency transportation services; laboratory services; and advanced diagnostics. Further, the parties agree that any services that are traditionally provided off-site by third parties, which COMPANY provides at the JAIL at a lower or cost-neutral price will be included in the Aggregate Cap.

7.7     Third Party Reimbursements. On behalf of the SHERIFF, COMPANY will seek reimbursement for services rendered under this Agreement from any available third party and will provide documentation of these efforts upon request. The SHERIFF shall cooperate with COMPANY in these efforts. COMPANY is only to be compensated once for their services. Third-party payments will be deducted from payments otherwise due. COMPANY shall submit records needed to obtain reimbursement to the SHERIFF from third-party insurers as requested by the SHERIFF. COMPANY will promptly account to SHERIFF with respect to all reimbursements received and provide supporting documentation to SHERIFF's satisfaction.

## ARTICLE VIII:  LIABILITY AND RISK MANAGEMENT

8.1     Insurance and Bonds. At all times during this Agreement, COMPANY shall maintain all applicable insurance coverages for its work at the JAIL, as specified in Section 18 of the RFP. Further, COMPANY will maintain all required bonds, as specified in Section 19 of the RFP.

8.2     Indemnification.  COMPANY shall indemnify, defend and hold SHERIFF harmless from and against any and all claims against SHERIFF based on COMPANY's performance of its obligations hereunder; provided, however, that COMPANY will not be responsible for any claim arising out of the SHERIFF or its employee or agent preventing an inmate from receiving medical care ordered by COMPANY or its agent or in failing to promptly present an ill or injured inmate to COMPANY for treatment. SHERIFF shall defend, and hold COMPANY harmless from and against any and all claims against COMPANY arising out of the performance by SHERIFF, its employees, agents, officers, or contractors in connection with SHERIFF's obligations hereunder or other conduct. This provision, however, shall not be considered and shall not be construed to be a waiver of any defense, including sovereign or official immunity, to any claim against county by an inmate, employee of company or any other person in any way whatsoever.

## ARTICLE IX:  MISCELLANEOUS

9.1     Independent Contractor Status.  The parties acknowledge that COMPANY is an independent contractor engaged to provide health care to Inmates at the JAIL under the direction of COMPANY management.  Nothing in this Agreement is intended nor shall be construed to create an agency relationship, an employer - employee relationship, or a joint venture relationship between the parties.

Contract_Clayton_009

9.2     Court Appearance by COMPANY Employees.  In the event COMPANY's personnel are required to devote time with regard to litigation or threatened litigation by or on behalf of SHERIFF this shall be part of their service time pursuant to this agreement. SHERIFF shall be responsible for reasonable costs of substitute personnel to fill positions, which would be vacant due to such court or trial appearance requirements.

9.3     Notice. Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or sent by certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party at the following address or to the other person at any other address as may be designated in writing by the parties:

        (a) SHERIFF:         Sheriff Victor Hill
                                      Clayton County Sheriff's Office
                                      9157 Tara Boulevard
                                      Jonesboro, GA  30236

        (b) COMPANY:       CorrectHealth Clayton, LLC
                                        ATTN:  Carlo A. Musso, M.D.
                                        3384 Peachtree Road, NE, Suite 700
                                        Atlanta, GA  30326

Notices shall be effective upon receipt regardless of the form used.

9.4     Entire Agreement.  This Agreement constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof.  No modifications or amendment to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto.  All prior negotiations, agreements and understandings with respect to the subject matter of this Agreement are superseded hereby.

9.5     Amendment.  This Agreement may be amended or revised only in writing and signed by all parties.

9.6     Waiver of Breach.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be constructed to be, a waiver of any subsequent breach of the same or other provision hereof.

9.7     Other contracts and Third-Party Beneficiaries.  The parties acknowledge that COMPANY is neither bound by nor aware of any other existing contracts to which SHERIFF is a party and which relate to the providing of medical care to inmates at the JAIL.  The parties agree that they have not entered into this Agreement for the benefit of any third person or persons, and it is their express intention that the Agreement is intended to be for their respective benefit only and not for the benefit of others who might otherwise be deemed to constitute third-party beneficiaries hereof.

9.8     Severability.  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

9.9     Cooperation. On and after the date of this Agreement, each party shall, at the request of the other, make, execute and deliver or obtain and deliver all instruments and documents and shall do or cause to be done all such other things which either party may reasonable require to effectuate the provisions and intentions of this Agreement.

9.10    Renegotiation. The parties intend that this Agreement shall comply with all applicable laws, rules and regulations of all governmental and regulatory authorities. Accordingly, the patties agree to renegotiate, in good faith, any term, condition or provision of this Agreement that any applicable or regulatory authority, or counsel for either party hereto determines to be in contravention of any regulation or law or agency interpretation thereof. In conducting the negotiations, the parties shall consult and negotiate with each other in good faith and recognizing the mutual interests, attempt to reach a just and equitable solution satisfactory to both parties.

9.11    Force Majeure. In case performance of any terms or provisions hereof shall be delayed or prevented because of compliance within any law, decree or order of any governmental agency or authority of local, State or Federal governments or because of riots, public disturbances, strikes, lockouts, differences with workers, fires, floods, Acts of God or any other reason whatsoever which is not within the control of the parties whose performance is obstructed and which, by the exercise of reasonable diligence, said party is unable to prevent; the party so suffering may, at its option, suspend, without liability, the performance of its obligations hereunder during the period such cause continues.

9.12    Incorporation of Documents. By executing this Agreement, the SHERIFF and COMPANY incorporate into this Agreement the provisions found in the RFP (Exhibit A) and the Proposal (Exhibit B). In the event there are any conflicts among the provisions found in this Agreement, the RFP, and the Response, the provisions of this Agreement will be given effect over any inconsistent provisions found in the RFP and in the Response. Further, if this Agreement does not contain a provision, then the provisions found in the Proposal will be given effect over any inconsistent provisions found in the RFP.

9.13    Assignment. No party to this Agreement may assign this Agreement, or any part thereof, without the written consent of the other party.

9.14    Time of Essence. Time is and shall be of the essence of this Agreement.

9.15    Authority. The parties signing this Agreement hereby state that they have the authority to bind the entity on whose behalf they are signing.

9.16    Binding Effect. This Agreement shall be binding upon the parties hereto, their heirs, administrators, executors, successors and assigns.

9.17    Cumulative Powers. Except as expressly limited by the terms of this Agreement, all rights, power and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

Contract_Clayton_011

9.18    Governing Law.  This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Georgia, except as specifically noted.

9.19    Jurisdiction and Venue.  Should any disputes regarding this Agreement arise and require legal action, the proper jurisdiction and venue for said legal action will be Clayton County, Georgia.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, by and through their duly authorized officers, the day, month and year given below.

CLAYTON SHERIFF SHERIFF'S OFFICE ("SHERIFF")

By: _____

Title: _____SHERIFF_____

Print Name: _____VICTOR HILL_____

Date: ____08-14-18_____

CORRECTHEALTH CLAYTON, LLC ("COMPANY")

By: _____

Title: _____CEO_____

Print Name: _____STACY M. SCOTT_____

Date: ____8-29-18_____

Contract_Clayton_012

EXHIBIT A - RFP

Contract_Clayton_013

EXHIBIT B – PROPOSAL

14

<u>EXHIBIT C – SUMMARY OF SERVICES</u>

A.   SCOPE OF SERVICES. As more fully set forth below and in the RFP and Response, COMPANY shall provide the following services:

1. Receiving /Screening
2. Comprehensive Health Assessment
3. Mental Health Evaluation
4. Daily Triage of Medical Services Requests
5. Sick Call/Provider On Call Service
6. Specialty Services
7. Medication Distribution
8. Infirmary Operations
9. Health Education
10. Nursing Services
11. Pharmaceutical/Prescription Supply and Management
12. Medical Records Maintenance
13. Clinical Services
14. Office/Administration Support
15. Mental Health Services
16. Dental Care
17. Ancillary Services (labs and x-ray)
18. Chronic and Convalescent Care
19. Emergency Services Arrangement
20. Off Site Services and Follow Up Care
21. Hospital Care Arrangements
22. Medical Observation Unit Care
23. Inpatient Hospitalization and Follow Up Care
24. Psychological Services
25. Optical Services
26. Detoxification Program
27. Medical Supplies & Equipment
28. Medical Quality and Assurance/Improvement
29. Management Information System
30. Cost Containment Program
31. Consultation Services
32. Maintenance of NCCHC Accreditation

B.   ELECTRONIC MEDICAL RECORD. During the term of this Agreement, COMPANY shall provide its electronic medical records software and program (CorEMR) for use at the JAIL, and COMPANY shall not charge to the SHERIFF software licensing fees related thereto. The SHERIFF will fully cooperate with COMPANY in connection with the implementation of CorEMR, inclusive of providing COMPANY a data extract from the current Jail Management System and internet connectivity.

C.   GRIEVANCE PROCEDURES. COMPANY will comply with SHERIFF's certified grievance procedures under the Civil Rights of Institutionalized Persons Act (CRIPA) 42 U.S.C. 1997e.

D.   HEALTHCARE DECISIONS. COMPANY shall have sole responsibility in all matters of medical,

15

mental and behavioral health, and dental healthcare judgment.

E.   STAFFING. COMPANY shall provide medical, mental and behavioral health, dental, technical and support personnel as necessary for the rendering of healthcare services to Inmates at the JAIL in accordance with the staffing plan attached and incorporated herein as Attachment D. COMPANY reserves the right to review the staffing and, with the participation and approval of the SHERIFF, which shall not be unreasonably withheld, make necessary adjustments in staffing and compensation in order to accommodate any additional staff positions which may be needed to serve an increased Average Daily Population ("ADP") of inmates at the JAIL. The ADP shall be calculated by adding, for a given month, the daily Inmate population contained in the SHERIFF's daily status reports and dividing such sum by the number of days in the month.

F.   STAFFING LEVELS WAIVER. Actual staffing needs may be affected by medical emergencies, riots, and other unforeseen circumstances. In any such event, the parties shall negotiate in good faith with respect to changes in such staffing requirements. Any such changes must be in writing and signed by the SHERIFF and COMPANY.

G.   HEALTH EDUCATION AND TRAINING. COMPANY shall conduct an ongoing health education program and training for the SHERIFF as outlined in the Response.

H.   HEALTHCARE REPORTS. COMPANY shall provide monthly and quarterly reports as outlined in the Response.

I.   MEETINGS. COMPANY shall meet regularly with, and as requested by, the SHERIFF or its designee concerning procedures within the JAIL and any proposed changes in health- related procedures or other matters.

J.   TRAINING FOR SHERIFF DEPUTIES/JAILERS. COMPANY will establish a training program for the SHERIFF Deputies and Jailers in accordance with the needs mutually established by the SHERIFF and COMPANY.

K.   HEALTH EDUCATION. COMPANY shall conduct an ongoing health education program for the Inmates of the JAIL.

L.   ACCREDITATION. COMPANY must maintain the JAIL's current accreditation by the National Commission on Correctional Health Care ("NCCHC"). This obligation shall include the providing of written reports, on-site reviews, preparation of forms and application and attendance at meetings as required by the SHERIFF. COMPANY shall not be responsible for NCCHC requirements not under COMPANY's direct control or within the scope of the COMPANY services to be provided pursuant to the Agreement.

16

EXHIBIT D – STAFFING MATRIX

| Personnel | FTE | Hrs/Wk |
|---|---|---|
| **Day Shift** | | |
| Health Services Administrator | 1.00 | 40 |
| Director of Nursing | 1.00 | 40 |
| Chronic Care / Infectious Disease Coordinator | 1.00 | 40 |
| Medical Records Management | 1.00 | 40 |
| Medical Records Clerk | 2.40 | 96 |
| Administrative Assistant | 1.00 | 40 |
| Medical Director | 1.00 | 40 |
| Chronic Care Physician | 0.20 | 8 |
| Midlevel Provider (PA/NP) | 1.00 | 40 |
| OB/GYN | 0.20 | 8 |
| Orthopedics | 0.05 | 2 |
| Optometry | 0.05 | 2 |
| Dentist | 0.80 | 32 |
| Dental Assistant | 0.80 | 32 |
| Registered Nurse (RN) | 5.20 | 208 |
| Licensed Practical Nurse (LPN) | 9.15 | 366 |
| Certified Medical Assistant (CMA) | 3.80 | 152 |
| Paramedic | 1.40 | 56 |
| Clinical Nurse Specialist | 0.60 | 24 |
| Psychiatric Nurse Practitioner | 1.00 | 40 |
| Psychiatrist | 0.05 | 2 |
| MH Professional (LCSW) | 4.00 | 160 |
| Case Manager (Discharge Planning) | 1.00 | 40 |
| **Total Hours / FTE – Day Shift** | 37.70 | 1508 |
| **Evening Shift** | | |
| Registered Nurse (RN) | 2.80 | 112 |
| Licensed Practical Nurse (LPN) | 7.75 | 310 |
| Certified Medical Assistant (CMA) | 1.40 | 56 |
| Paramedic | 1.40 | 56 |
| **Total Hours / FTE – Evening Shift** | 13.35 | 534 |
| **Night Shift** | | |
| Registered Nurse (RN) | 1.40 | 56 |
| Licensed Practical Nurse (LPN) | 2.80 | 112 |
| Certified Medical Assistant (CMA) | 1.40 | 56 |
| Paramedic | 1.40 | 56 |
| **Total Hours / FTE – Night Shift** | 7.00 | 280 |
| **Weekly Total** | | |
| **Total Hours / FTE – Per Week** | 58.05 | 2322 |

17

## AMENDMENT
## HEALTH SERVICES AGREEMENT

The HEALTH SERVICES AGREEMENT between the CLAYTON SHERIFF SHERIFF's OFFICE (hereinafter referred to as "SHERIFF") and CORRECTHEALTH CLAYTON, LLC (hereinafter referred to as "COMPANY"), originally entered into on August 1, 2018 is hereby amended effective August 1, 2019. The terms of the Agreement will change, as stated below. All other provisions of the Agreement will remain the same.

### ARTICLE II: PERSONNEL

2.1    Staffing. COMPANY shall provide personnel reasonably necessary for the rendering of health care services to inmates at the JAIL. The SHERIFF will screen COMPANY's proposed staff to ensure that they will not constitute a security risk. The SHERIFF shall have final approval of COMPANY's employees with regard to security/background clearance. COMPANY will provide staffing generally in accordance with Exhibit D, attached hereto. This staffing plan assumes an inmate population of 1800. COMPANY reserves the right to change staffing as the healthcare needs of the JAIL dictate. At the sole discretion of the COMPANY, some healthcare services may be provided via tele-health.

### ARTICLE VI: TERM AND TERMINATION OF AGREEMENT

6.1    Term. The initial term of this Agreement will be August 1, 2019 at 12:01 a.m. through midnight on July 31, 2020. This Agreement is renewable under like terms for four (4) - one (1) year terms, subject to negotiation of the service component and agreed-upon compensation adjustments, including compensation escalator as set forth below, unless either party delivers written notice of non-renewal to the other party at least ninety (90) days prior to the expiration of the then-existing term.

### ARTICLE VII: COMPENSATION

7.1    Base Compensation & Per Diem Compensation. SHERIFF will pay COMPANY an annualized base compensation of ▮▮▮▮▮▮▮ This will be due in monthly payments of ▮▮▮▮▮▮ This amount includes an annualized aggregate cap of ▮▮▮▮ as defined in the original Health Services Agreement. This compensation level assumes a maximum inmate population of 1800 inmates.

COMPANY will invoice SHERIFF during the month prior to the month of service. SHERIFF agrees to pay COMPANY within thirty (30) days of receipt of the invoice. In the event this agreement should terminate on a date other than the end of a calendar month, compensation to COMPANY will be prorated accordingly for the shortened month.

7.2    Per Diem. When the daily inmate census exceeds 1800, SHERIFF agrees to compensate COMPANY $2.27 per inmate per day for each inmate in excess of 1800.

This per diem is intended to cover additional costs in those instances where minor, short term increases in the inmate population result in the higher utilization of routine supplies and services. However, the per diem is not intended to provide for any additional fixed costs, such as new staffing positions, which might prove necessary if the inmate population increases to more than 1800 inmates. As such, if the census increases by 20% and is sustained, the parties agree to negotiate in

good faith for additional staffing and associated compensation in order to continue to provide services to the increased number of inmates and maintain the quality of care consistent with COMPANY's Proposal and this Agreement.

7.3   Compensation Escalator.   Annually, the compensation paid to COMPANY, including base compensation and per diem rate, shall be adjusted by the Consumer Price Index-Urban Consumers (CPI-U), Medical Care Component (MCC) for the Southern Region of the United States. Annually, on the anniversary date, the COMPANY's proposed adjustments shall go into effect unless the Parties have entered into a written agreement with an alternative cost adjustment. The CPI-U price adjustment will become effective annually, on the first day of August, but the increase will be calculated based on the CPI-U for the month of October in the year immediately preceding.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, by and through their duly authorized officers, the day, month and year given below.

CLAYTON SHERIFF SHERIFF'S OFFICE ("SHERIFF")

By: _____

Title: SHERIFF

Print Name: VICTOR HILL

Date: 09-05-19

CORRECTHEALTH CLAYTON, LLC ("COMPANY")

By: _____

Title: CHIEF LEGAL OFFICER

Print Name: STACY M. SCOTT

Date: 9/4/19

2

Renewal_Clayton_002

## EXHIBIT D – STAFFING MATRIX

| Personnel | FTE | Hrs/Wk |
|---|---|---|
| **Day Shift** | | |
| Health Services Administrator | 1.00 | 40 |
| Director of Nursing | 1.00 | 40 |
| Chronic Care / Infectious Disease Coordinator | 1.00 | 40 |
| Medical Records Management | 1.00 | 40 |
| Medical Records Clerk | 2.40 | 96 |
| Administrative Assistant | 1.00 | 40 |
| Medical Director | 1.00 | 40 |
| Chronic Care Physician | 0.20 | 8 |
| Midlevel Provider (PA/NP) | 1.00 | 40 |
| OB/GYN | 0.20 | 8 |
| Orthopedics | 0.05 | 2 |
| Optometry | 0.05 | 2 |
| Dentist | 0.80 | 32 |
| Dental Assistant | 0.80 | 32 |
| Registered Nurse (RN) | 5.20 | 208 |
| Licensed Practical Nurse (LPN) | 17.80 | 712 |
| Certified Medical Assistant (CMA) | 2.10 | 84 |
| Paramedic | 2.10 | 84 |
| Psychiatric Nurse Practitioner / Clinical Nurse Specialist | 1.60 | 64 |
| Psychiatrist | 0.05 | 2 |
| MH Professional (LCSW) | 4.00 | 160 |
| Case Manager (Discharge Planning) | 1.00 | 40 |
| **Total Hours / FTE – Day Shift** | 45.35 | 1814 |
| **Night Shift** | | |
| Registered Nurse (RN) | 4.20 | 168 |
| Licensed Practical Nurse (LPN) | 6.30 | 252 |
| Paramedic | 2.10 | 84 |
| **Total Hours / FTE – Night Shift** | 12.60 | 504 |
| **Weekly Total** | | |
| **Total Hours / FTE – Per Week** | 57.95 | 2318 |

3

Renewal_Clayton_003