## RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
## 1:24-CV-01945-ELR - JOHNNIE LAMBERT

```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF GEORGIA
                   ATLANTA DIVISION


RAHEEM PETERKIN,

     Plaintiff,




vs.                          CIVIL ACTION NUMBER
                             1:24-CV-01945-ELR




VICTOR HILL and
CORRECTHEALTH CLAYTON
LLC,

     Defendants.
--------------------------/
```

**CERTIFIED COPY**

The deposition of JOHNNIE R. LAMBERT, RN, CCHP-A, LHRM, an expert-witness in the above-entitled cause, taken pursuant to Notice and agreement, before Kyle J. Saniga, Certified Court Reporter and Notary Public, at the Law Offices of Twenge + Twombley LLC, 311 Carteret Street, Beaufort, South Carolina 29902, on the 24th day of July 2025, commencing at or about the hour of 10:03 A.M.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

        VIA VIDEOCONFERENCE

        ZACK W. GREENAMYRE, ESQUIRE
        Mitchell, Shapiro, Greenamyre & Funt LLP
        881 Piedmont Avenue
        Atlanta, Georgia 30309
        404.812.4751
        zack@mitchellshapiro.com


FOR THE DEFENDANT, VICTOR HILL:

        VIA VIDEOCONFERENCE

        MICHAEL D. HOFFER, ESQUIRE
        Cruser & Mitchell, LLP
        275 Scientific Drive
        Suite 2000
        Peachtree Corners, Georgia 30092
        404.737.8443
        mhoffer@cmlawfirm.com


FOR THE DEFENDANT, CORRECTHEALTH CLAYTON LLC:

        IN-PERSON

        CHELSEA N. MURPHY, ESQUIRE
        Lavender Hoffman LLC
        750 Hammond Drive
        Building 2
        Atlanta, Georgia 30328
        404.414.1904
        chelsea.murphy@lhefirm.com


ALSO PRESENT:
        Ashley Francis


                - - -



**COASTAL COURT REPORTING & VIDEO SERVICES**
        800-791-1100        www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                         3

I N D E X

                                                          PAGE

EXHIBIT INDEX ----------------------------- 4

OPENING REMARKS AND STIPULATIONS ----------- 5

DIRECT EXAMINATION:
    By Ms. Murphy ------------------------- 5
CROSS-EXAMINATION:
    By Mr. Hoffer ------------------------- 74
CROSS-EXAMINATION:
    By Mr. Greenamyre --------------------- 76
REDIRECT EXAMINATION:
    By Ms. Murphy ------------------------- 83
RECROSS-EXAMINATION:
    By Mr. Greenamyre  -------------------- 92
FURTHER REDIRECT EXAMINATION:
    By Ms. Murphy  ------------------------ 96

CERTIFICATE ------------------------------- 99
DISCLOSURE -------------------------------- 100

ERRATA ---------------------------------- 101-103



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    4

D O C U M E N T A R Y   E V I D E N C E

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| DEFENDANT'S EXHIBITS | | |
| DX-1 | Curriculum vitae of Johnnie R. Lambert, RN, CCHP-A, LHRM (4-pages) | 9 |
| DX-2 | JR Lambert Correctional Health Consulting, LLC Report (8-pages) | 27 |

-------------------------

D O C U M E N T A R Y   E V I D E N C E

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| PLAINTIFF'S EXHIBITS | | |
| PX-1 | CorrectHealth policy and procedure on restraint & seclusion - Bates Stamped Restraint_and_Seclusion_001 through Restraint_and_Seclusion_003 (3-pages) | 76 |



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    5

MS. MURPHY: This is going to be the deposition of J.R. Lambert taken pursuant to agreement of counsel and for all purposes permitted under the Georgia Civil Practice Act and I just ask that we reserve all objections except for those going to form until the deposition's first use.

MR. GREENAMYRE:  Agreeable from plaintiff's perspective.

MR. HOFFER:  Agreeable from defendant Hill's perspective.

MS. MURPHY:  All right.

JOHNNIE R. LAMBERT, RN, CCHP-A, LHRM having been produced and first duly sworn as a witness, testified as follows:

DIRECT EXAMINATION

BY MS. MURPHY:

Q    Ms. Lambert, my name is Chelsea Murphy. We met earlier today but I'm the attorney for Correcthealth and I'm going to be the one asking most of the questions today, obviously I'm here in person.  And then, of course, I'll give the other folks a chance if they want to ask you any questions.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                       6

A    Okay.

Q    Is it okay if I call you Ms. Lambert?

A    Yes.

Q    Okay.  Can you tell us your full name for the record?

A    It's Johnnie.  My middle name is Roberta Lambert.

Q    Okay, perfect.  And have you ever given a deposition before?

A    Yes, I have.

Q    Okay.  Approximately how many depositions have you given.

A    Probably three in the last 50 years.

Q    Okay.

A    So --

Q    When was the last time you gave one?

A    The last one was more than -- it was approximately nine years ago.

Q    Okay.  Well, just a few ground rules just in case -- I know Zack probably's gone over these things but if you need a break, it's not a marathon, just let me know, we'll take a break.

And if we can, just try not to speak over each other for our court reporter's sake. She'll be grateful.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

And if I remind you or if Zack reminds you, we're not trying to be rude we're just trying to make sure that she gets a clean record.

A    Okay.

Q    Okay.  And then the last thing is if you will answer the questions out loud with yes, no and then an explanation instead of uh-huh, huh-uh or shaking your head, again, that would be easier for our court reporter to take down a clean transcript.

A    Okay.

Q    Perfect, all right, okay.  And what kind of case were you last deposed in?

A    It was a correctional case for a plaintiff against a jail.

Q    Okay.  Have you ever testified on behalf of a defendant?

A    Yes.

Q    Okay.  And when's the last time you did that?

A    Oh probably 15 years ago.

Q    Okay.  And was that a defendant -- was that a correctional medicine --

A    No, it wasn't.  It was regular



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                8

medicine.

Q    Okay.  And what kind of case was that in?

A    It was a wrongful death case in a hospital.

Q    Okay.  Was that here or was that in Georgia?

A    No.  It was actually in Ohio.

Q    Okay.

A    And it wasn't -- I wasn't a witness.  I was just testifying just --

Q    You weren't a witness.  You were --

A    I wasn't an expert witness --

Q    Okay.

A    I was just --

Q    Got ya, all right, okay.  Have you ever been sued before?

A    No.

Q    Have you ever been part of a lawsuit before, other than in your expert work and that one -- last one you just told me about?

A    In 1977, yes.

Q    Okay.  And can you just generally tell me what that was about?

A    It was a wrongful death lawsuit against



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    9

a hospital that I was working at at the time.

Q    Okay.

A    And I happened to be one of the nurses on duty.

Q    Understood, all right.  And I'm just going to mark this.  This is her CV.  I'm going to mark it as Defendant's Exhibit 1.

(Whereupon, Defendant's Exhibit Number 1 was marked for identification.)

BY MS. MURPHY:

Q    And I'm just going to hand you a copy of this.  And if you will, just take a look at it and tell me, is this your most recent CV?

A    Yes, it is.

Q    All right.  And I just want to go through it briefly.

It says here that from December 19 2019 to present.  Can you give me an overview of what you've been doing?

A    I have been writing policies and procedures for jails and prisons.

I've been doing training for correctional nurses and in jails and prisons.

I've been -- what else?  Continued as



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

quality improvement working with continuous quality improvement.

I also assisted in creating an electronic health record for a jail system.

I've done auditing for the National Commission on Correctional Healthcare as a surveyor lead surveyor.  So I've done surveys in jails and prisons throughout the country.

However, for the commission I also was a member of the Board of Directors of the NCCHC certificate board.  So over the -- since 2019 I'm doing -- I manage a share point site for a client and I write policies and procedures for various states and various jails, prisons.

Q    Okay.  And when you say you write policies and procedures --

A    Yes.

Q    -- are you writing healthcare policies and procedures?

A    Healthcare.

Q    Okay.  Healthcare policies and procedures?

A    Yes.

Q    Okay.  And can you help me understand what types of policies and procedures you're



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                   11

writing?

Are you writing -- for example, are you writing clinical type policies and procedures? Are you writing administrative policies and procedures? What type of policies and procedures are you helping them track?

A    It's a combination of the two. I write entire manuals, policy manuals based on all of the healthcare standards that are current for whatever jail or prison is requesting them.

So I coordinate the healthcare policies with the jail policies so that they match so that there is no conflict between the policies and procedures.

Q    When is the last time that you were working clinically as a nurse in a jail?

A    Clinically in a jail it has been I would say about seven years.

Q    Okay. And what were you doing seven years ago?

A    I was actually a regional clinical operations supervise -- vice president of a correctional healthcare company. And I was in the jail training nurses on clinical guidelines and how to do sick call and how to do nursing



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

duties when it came to working in the jail.

But as a floor nurse, clinically, as a -- my last floor nurse job was in 1998.

Q    Okay.

A    So.

Q    And what years were you operating as the clinical operations I guess specialist at this jail?

A    I was -- well, it was several jails.

Q    Okay.

A    It was actually -- I was working both private healthcare company and I was a clinical operation vice president for five years for Centurion Corporation and ten years I worked for Armor Healthcare Corporation.

Q    Okay.

A    I worked for Armor from the time that they actually started the company until ten later.

Q    Okay.  So when you were working for Centurion help me understand what your day-to-day looked like.

A    Okay.  I traveled from facility to facility.  I helped -- if they got a new contract I helped to go in and get Centurion up



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    13

and running in the contract.

I did training of nurses for positions that they were coming into.

I wrote the policies and procedures policies and procedures for the clinical side. I worked with the physicians to make sure that the clinical guidelines were in place and I assisted with writing and implementing clinical guidelines nursing protocols and policies.

Q     Okay.  When's the last time that you cared for a restrained inmate?

A     Personally?

Q     Yes.

A     It was probably in 2003.

Q     Okay.

A     Yeah.

Q     And where were you in 2003?  What were you doing?

A     I was at Dekalb County.

Q     And who was employer then?

A     At that time it was Correctional Medical Services.

Q     Okay.

A     And I was the health services administrator but I also did some hands-on care



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                14

while I was there.

Q    Okay, all right.  And I know this is reaching really far back but -- potentially, might be this 2003 -- but when's the last time you cared for an inmate that was in custodial restraints?

A    About that same time.  We did both.

Q    Great.  And how often, when you were with Centurion in May 2015 to 2019, were you doing specific training for the nurses on restraints and --

A    That was one of the things.

Q    Okay.  What else were you training on?

A    Oh we trained them on nursing protocols, how to do sick call.  Communication with patients, nursing ethics, policies and procedures, infection control.

Q    Okay.

A    So I was part of a team, so, you know, there were there were several us who --

Q    Okay.

A    -- worked together.

Q    And were you specifically providing training on the application of restraints and monitoring patients during that timeframe who



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

were in restraints?

A    Yes.  Yes.

Q    Okay.  And about how often were you providing education I guess and training on restraint procedures during that time frame?

A    We usually trained them at the onset of the contract.

And then if there were issues with -- if CQI brought up issues concerning restraints or if they brought up issues they would report them to clinical operation and then we would go -- I say 'we' because it might be me and it might be another nurse would go to that facility and retrain nurses.

Q    Okay.  And just if you can give me an estimate how often were you called to do that?

A    Probably four or five times over the time I was at Centurion.

Q    Okay.  And while you were training them on the restraint process, you were -- the training program didn't involve actually restraining a restrained inmate, right?

A    No.

Q    Okay.

A    No.



Q    It was more of an educational --

A    It was educational.

Q    -- exercises?

A    Yes.

Q    Okay, all right.  How long have you been reviewing medical cases or helping with legal type cases?

A    15 years.

Q    And has that primarily been as an expert?

A    Yes.

Q    And is that primarily in sort of medical malpractice type cases?

A    It's more -- not so much medical malpractice.

When I first took the legal nurse consultant training I did one medical malpractice course -- case that I worked with but usually it was correctional and it was on the -- it was actually usually on the defendant's side because I was a surveyor for NCCHC and we couldn't do plaintiff cases at that time.

Q    Okay.  And what -- can you just tell us what is NCCHC?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

A     National Commission on Correctional Healthcare.  It is a national organization that accredits jails, prisons, detention centers.

Q     Okay.

A     ICE.

Q     Right.

A     You know.  And it's kind of the foundation for correctional healthcare.

Q     All right.  And is that a requirement?

A     It's not required.  It's voluntary accreditation.

Q     Okay.  And can you just give me an overview of what you've reviewed in preparation For today?

A     I reviewed the trial transcript and I focused on Mr. Hakeem's testimony and Victor Hill's testimony.

I reviewed the medical records.

I reviewed, you know -- of course I pule up some information concerning the use of restraints and what's going on with restraint chairs, information on the restraint chair specifically that was used.

I also reviewed Dr. Clopton's deposition.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    18

Q    Okay.  Anything else?  Did you review city any policies and procedures?

A    Yes, I did.

Q    All right.  Did you review the Correcthealth policy?

A    Yes, I did.

Q    Okay.  And did you review any policies from the jail?

A    Yes.

Q    Okay, all right.  And when were you first retained in this case, do you remember?

A    It was 2024.  I don't remember the exact date.

Q    Do you know how plaintiffs got -- found you?

A    I was re -- another colleague of mine referred me to the plaintiff's --

Q    Okay.

A    -- attorney.

Q    All right.  And haven't been to the Clayton County Jail, have you?

A    No.

Q    Okay.  And have you met with Mr. Peterkin at all?

A    No.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                     19

Q    Have you spoken with any witnesses?

A    No.

Q    Did you review any grievances or complaints that were submitted through the kiosk system by Mr. Peterkin?

A    No.

Q    Do you know whether or not there were any grievances?

A    I have no idea.

Q    Is there anything that you think you need to complete your opinions in this case or do you think you've reviewed everything you need?

A    I think I've reviewed what I need because I focused on the medical -- the healthcare piece of it.

Q    All right.  And if you can for me, will you go ahead and just sort of outline what your opinions are in this case.

A    Yes.

Q    Okay.

A    Mr. Peterkin was apparently brought into the facility for -- for a charge and he came through Intake.

     He was -- in Intake he was calm.  He



was cooperative.  He was, you know, doing everything that he was supposed to be doing and then he was suddenly placed in a restraint chair by order of the sheriff.

My opinion of that is that a restraint chair is never to be used as punishment.

That's one of the cardinal points of the restraint policies, whether it's for American Correctional Association or National Commission that you can't punish somebody for what they did before they came to jail by placing them in a restraint chair.  So that in itself, you know, is a problem.

Then once he was in the restraint chair I reviewed the medical records and I didn't see any records of any nursing rounds or any nursing observation of him except there was a documentation for approximately 1 p.m. that he was in the chair and that's it.

And then there was another documentation three hours later that the patient was complaining of chest pain and the doctor was called and the doctor assessed him.

I did not see any physician notes that stated -- that described what the physician's



conclusion was.  All I saw was one nursing note at I think it was about 4:30 that they had obtained an order for medication due to the patient's complaints of chest pain and his blood pressure being elevated.

Q    And based on your opinion, what does the Standard of Care require for the nursing staff at that time?

A    The Standard of Care requires that when a patient is placed in a restraint chair, regardless of whether it's for clinical reasons, such as behavioral health and mental health or it's for security reasons, medical staff is supposed to evaluate the situation.  They're supposed to review the patient's records and make sure that is there are no contraindications to that patient being in the restraint chair.

It's not their job to determine whether Security puts someone in restraints, that's up to Security and we don't make those kinds of decisions in medical.  But it is our job to observe the patient and make sure that they're safe while they're in the chair.  That they're not suffering from physical pain.  That they're not suffering in any way.



Q    Okay.

A    So the purpose -- it's also a standard that if a patient's in a chair for more than -- for two hours that nursing should go and assess that patient, make sure the circulation is okay. Make sure there aren't any issues, check his vital signs and make sure that the patient is medically stable.

Q    And I'm going to backup just a little bit.  You're credentialed.  You're a nurse, is that right?

A    Yes.

Q    Okay.  And tell me about your schooling.  What type of licensures and degrees do you have.

A    I went to -- I graduated from nursing training in 1974 with a diploma --

Q    Okay.

A    -- in nursing.  At that that Bachelors and baccalaureate degrees were almost nonexistent.

I know the diploma in nursing, I returned to college and continued to get certifications in nursing.  So I became certified as a psychiatric nurse and I was also



certified as a cardiac intensive care nurse.

And over the years I worked in hospitals and intensive care, cardiac care, emergency room.

And, you know, I would take -- I took course. I never went back and got a bachelor's degree but I continued to take -- do training.

I came into Corrections in 1997 and -- actually when I moved to South Carolina and I went to work at Allendale Correctional Facility and as the -- as a floor nurse and night -- the night nurse.

And then I started working with the National Commission on Correctional Healthcare.

I started going to their conventions and taking courses through them and I also got certified as a -- what they call it -- they used to call it agitated delirium but they don't call it that anymore but I was certified as a trainer for impaired breathing in Corrections, so -- through the Americans for Effective Law Enforcement and IPICD, which is the Institute for Prevention of In-Custody deaths.

So I remain active with them and I remain active with the commission. And I belong



to the ACA and I attend conferences and workshops and training.

Q    Okay.  You still -- you are still licensed as a nurse?

A    Yes.

Q    Okay.  And you've been licensed as a nurse since when?

A    1975.

Q    And has that licensure remained constant?

A    Yes.

Q    Okay.  And what states are you licensed in?

A    I have -- right now I'm just licensed in South Carolina.  I have a multi-state license, which covers the majority of the states.

At one time I was licensed in Georgia, South Carolina an Florida and Alabama.

Q    Okay.

A    But after the -- what they call the nursing compact they made it very easy that if you have a license in a state you may work in another state as long as you are -- your primary address is in the state that you're in.  So my



license is now in South Carolina.

Q    Okay, understood, okay.  I'm going to go back to where we were.

A    Okay.

Q    So we've talked about it looks like three of the issues, three of your opinions so far.

You wrote you take issue with the fact that Mr. Peterkin was placed in restraints initially you believe that was done for punitive purposes, is that right?

A    Yes.

Q    Okay.  And Number 2, you have some concerns about whether nursing rounds were completed in a regular timely manner?

A    Yes.

Q    All right.  And the next opinion is you are concerned that when the nurses -- when he was placed in restraints you said that the nurse had a duty or the medical staff had a duty to review and assess him for any contraindications?

A    Yes.

Q    Was that done in this case?

A    Not that I was -- I could see.

Q    Okay.  Any other opinions that we



haven't --

A    Well, the issue is that he was restrained in a restraint chair with handcuffs on.

Had the nurses been checking him regularly they would have picked that up right away and done something about it but instead he sat there in handcuffs until -- you know, for at least three hours in the restraint chair, which is, you know, something that even the restraint chair manufacturer says should not be and it's in their own policy.  It's in the Clayton County policy that restraint handcuffs are to be removed.

So, as far as the nursing piece of it, I don't know -- you know, I wasn't able to tell, from the documentation, exactly where he was held.  Whether he was held in Intake or whether he was held in the infirmary is kind of -- it was very confusing the way the documentation was written.

And there wasn't any indication in the medical chart as to what time he was removed from the restraint, which should have been there even according to their own policy.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                27

Q    All right.  Any other -- any other opinions that we need to discuss?

A    Well, I'm trying to think of my report.

Q    I have a copy of it.

A    My report?

Q    Yeah -- would you look to review that?

A    Let me see it.

Q    Okay.  I'm going to mark it as Exhibit 2.

A    Okay.

        (Whereupon, Defendant's Exhibit
        Number 2 was marked for
        identification.)

        THE WITNESS:  Of course the reason for the restraints, the use of force is -- the standards and, you know, I always fall back on the standards because they really are the underlying principal for correctional healthcare.

        The standards very clearly state that before a person is restrained, whether it's for clinical use or whether it's for correction -- you know, for security I'll say, security use, the standards are very clear that



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                 28

it is a measure of last resort if the patients is in danger of hurting himself or others.

And that there should be attempts to deescalate before we resort to putting someone in restraints. And there was no deescalation because there was no agitation.

So, you know, that -- you know, again, that's my opinion.

The facility policies and procedures and what they do as far as the nonmedical side is beyond, you know, my scope but just if they were following their own policy there was no reason for them to put this patient in restraints and they definitely should have removed his handcuffs.

Q    Okay, all right. Any other -- if you want to take a look, take a second, look through your report --

A    Okay.

Q    -- and tell me if there are any other criticisms then we'll kind of, you know, go through them obviously.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    29

A    You know, and the things that I included in here is that best practices are part of the basis for the standards and the standards are very clear that once the patient is calm they can be removed from restraint.

So, if you put a calm patient in a restraint chair it kind of defeats -- you know, it doesn't make any sense, quite frankly.

And, you know, as a medical staff person I would have at least voiced my opinion that the patient should not be in the restraint chair.  The patient is calm.  The patient is cooperative.  There's no reason for him to be there.

Q    Okay.  Any other --  any other criticisms?

A    No, I don't think so.

Q    All right.  Can you define the Standard of Care for me?  Do you know what we're looking fro when we talk about Standard of Care?

A    We looking at the National Commission On Correctional Healthcare standards for health services in jails.

At that time it was the 2018 edition. And the American Correctional Association is


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

standards for adult -- there's so many.  They have 15 books.  Standards of care for adult local detention facilities.

And the ACA standards take up -- encompass security, medical, administration and everything.

NCCHC focuses on healthcare.  That's their primary focus.

But both sets of standards are facility standards.  They don't just, you know, accredit the healthcare units or accredit this or accredit that.  They credit the facility based on whatever standards they're going to be adhering to.

If facility also has ICE patients, they're required to follow NCCHC standards even if they're not accredited.

Q    Okay.  And when we talk about Standard of Care in medical cases, in medical legal cases, it's typically defined as what nurses would do, nurses or doctors would do under like or similar circumstances.

So when we talk about Standard of Care I think what I'm trying to ask you is do these standards that you're discussing, do you believe



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    31

those set the Standard of Care?

A    They don't set the Standard of Care. They do not -- you know, they don't tell doctors how to practice medicine.

Q    Right.

A    They don't tell nurses how to practice nursing.

What they do is create a matrix so that the policies can then be written and the procedures can be written and the clinical guidelines can be written.

The clinical guidelines are usually written by physicians and they're based on national standards of care, like, you know, medical standards.

And people in -- who are incarcerated are -- do the same type -- the same level of medical care in jail as they would get in the community.

So we say that the incarcerated individual is entitled to have a community standard of care when they're in the jail.

So the standards are generally the same standards that your private doctor would follow either -- you know, ACOG or any of the medical



societies.

We use CDC guidelines.  We use guidelines from the American College of Internal Medicine, you know.  We follow all of those guidelines.

Q    Sure.  So you agree that the Standard of Care is what nurses would do or doctors would do under like or similar circumstances and these standards that you're discussing are guidelines, like you said, sort of help and form the Standard of Care?

A    Yes.

Q    Fair?

A    Yes.

Q    Okay, all right.  You're not a physician?

A    No.

Q    Okay.  And you're not going to comment on the Standard of Care for doctors, right?

A    The standard yes but not the practice of medicine.

Q    Okay.  And I want to be clear, under Georgia law you are not a doctor?

A    Correct.

Q    Okay.  And you cannot opine on the



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    33

Standard of Care for doctors, what doctors would do --

A     Yes.

Q     -- under like or similar circumstances, is that correct?

A     Yes.

Q     Okay.  You agree that there's a difference between the custodial-ordered restraints and restraints that are used for medical purposes?

A     It's -- that's a yes and no question. There is a difference because custodial restraints are ordered by custody for whatever reason.  Usually it's because of someone's behavior out of control or something is going on with the -- with the person.

Clinical restraints are ordered for -- usually for mental health reasons.  The patient is a danger to himself or others.

But the similarity is that either set of restraints is to be used if patient is a danger to himself or other people inside the jail.

And so there -- the difference is who orders the restraints and what's going on with



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                 34

the patient.

Q    Okay.  So clinical -- no, strike that.
Custodial-ordered restraints are ordered and placed by the jail officers as a safety measure?

A    Yes.

Q    Presumably?  Okay.  And then medically-ordered restraints or clinically-ordered restraints are ordered by a physician or an advance practice provider often times to prevent the inmate from harming themselves or others due to some type of mental illness?

A    Right.  It's a safety issue.

Q    Got it.  And but even medical-ordered restraints, those restraints are placed by officers, correct?

A    Yes.

Q    Okay.  And they can only be removed by officers?

A    No.  Well yes.  I'm sorry.  They can be -- they can only be removed by officers at the order of the physician or the advanced-level practitioner.

Q    Okay.  And custodial-ordered restraints



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

-- strike that.

So with both custodial-ordered restraints and medically-ordered restraints, the person with the key to the restraint chair is an officer?

A    Correct.

Q    It is a custodial employee?

A    Correct.

Q    Okay, all right.  Nurses do not have a key to take off restraints?

A    Right.

Q    All right.  Doctors typically do not have the key, correct?

A    No, they don't.

Q    All right.  And it has to be done by an officer or sort of security person?

A    Yes.

Q    All right.  The nurse's job I think I heard you say earlier during the custodial restraint process includes a pre-restraints assessment?

A    Yes.

Q    It includes periodic assessment during the restraint process?

A    Yes.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

Q    Okay.  And I think what you're telling me and I'm just trying to sum it up to advocate for the inmates needs if they have some sort of problem?

A    Yes.

Q    All right.  A nurses does not have authority to remove restraints?

A    No.

Q    Let me rephrase that.  A nurse does not have the authority to remove restraints, correct?

A    Correct.

Q    If the officers deem it unsafe to release an inmate from restraint the nurses and the doctors have no authority to mandate removal?

A    Correct.  Unless the patient is in patients distress.

Q    Understood.  And you agree that the jail safety and security takes priority?

A    For the most part, yes, unless someone was in physical distress.  In need of emergency care.

Q    So, just to put that --

A    Security is --



Q    Yeah.  Put that in perspective, I'm just going to rephrase it and you tell me if you agree.

A    Okay.

Q    You agree that jail safety and security take priority unless there is some type of medical emergency or --

A    Yes.

Q    -- something like that?

A    Yes.

Q    Okay, great.

A    Even with -- Security and Medical have to work hand and glove.  Neither one can function without the other.

So any decision made by Security will ultimately effect Medical and any decision made by Medical will ultimately effect Security.

So they have to work together regardless of the circumstances.  If it's a clinical restraint, Security becomes involved because they actually are the people who are putting the person in the restraints and taking them out when they calm down.

If it's a custodial restraint, Medical still has an obligation to be notified and to



know that the person's in restraints and to do some sort of monitoring of that patient while he's in restraints because restraints can be deadly.

Q    Can we agree that -- can we agree that the sheriff is the top authority in the jail?

A    Yes.

Q    Over every function of the jail, correct?  They have the top --

A    Yes.

Q    They are the top --

A    Yes.

Q    -- of the chain?

A    Yes of that jail.

Q    All right.  Can we agree that patient care comes before documentation?

A    Oh absolutely.

Q    Can we agree that documentation doesn't set the Standard of Care.  The Standard of Care is what nurses or doctors would do under like or similar circumstances, right?

A    I don't understand the question.

Q    Sure.  Sure.  Let me see if I can rephrase it for you.

When you talk about the Standard of



Care, it's what nurses or doctors would do under like or similar circumstances not what they would document under like or similar circumstances, true?

A    If they're adhering to the Standard of Care they're documenting.  If they're not documenting then there's no doc -- there -- you know, there's --  you've heard the saying, I'm sure, that if it's not documented it's not done. So there's no way of nothing whether they're adhering to the standard of care if they're not documenting it.

Q    Well can we rely on --

A    So documentation is part of the Standard of Care.

Q    Document -- I understand what you're saying and but the Standard of Care is what nurses and doctors would do under like or similar circumstances?

A    Yes.

Q    And I think what you're saying is they would document --

A    Yes.  That's part of the standard.

Q    It's part of the standard is what you're telling me.



And but what I'm trying to understand is that the Standard of Care, as it comes to medical care to a patient --

A    Yes.

Q    -- does not have anything to do with what you're documenting?

MR. GREENAMYRE:  Objection, form.

THE WITNESS:  It does.  Because every standard spells out that documentation that this will be documented.

So, if I'm a nurse and I'm taking care of a patient, whether I document at that moment or an hour later or two hours later, I still have to document what I did for the patient.

BY MS. MURPHY:

Q    Can we agree, as a nurse, there are a lot of things you do for a patient that are not documented?

A    Oh certainly.

Q    Okay.

A    Yeah.

Q    Okay.  But that doesn't mean that you



weren't caring for the patient?

A    Right.

Q    Are you aware that in this case, in this context Mr. Hill testified that the deputies were supposed to be doing 15-minute checks?

A    Yes.

Q    Okay.  Do you know whether they did those 15-minute checks?

A    I don't know.

Q    Okay.  If we assume this is true, they're doing 15-minute checks, it's reasonable for our nurses and our physician to rely on the deputies to relay any complaints or medical issues that Mr. Peterkin's voicing to them?

A    I would not say that.  I wouldn't agree with that.

Q    Okay.  Tell me why.

A    The nurses still have an obligation to monitor patients who are in restraints.

And if they're monitoring -- there's a difference between the way a deputy interacts with an incarcerated person and a nurse interacts with an incarcerated person.

So the deputies would -- are doing what



they think they should be doing, which is looking at him, is he breathing?

The nurses are looking at is he -- is his blood pressure elevated?  Are his ankles swelling?  Is his diaphoretic?  Does he look like he's having medical issues in the chair.  So there's a big different between monitoring someone and having the deputy to report their observation.  The deputies are not trained medically.

Q    Agreed.  And I understand what you're saying.

A    Yes.

Q    What I'm trying to ask is is it reasonable for the nurses if Mr. Peterkin is complaining of pain, if he's complaining of a medical problem, can we reasonably rely on the deputies to let us know?

A    Yes.  I would hope so, yes.

Q    All right.  Not in place of a nurse?

A    Yeah.

Q    Right?  You understand?  Okay, all right.  Let's see.  Okay.  I'm going to go back a little bit.

All right.  Your first issue or



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    43

criticism was that Mr. Peterkin should not have been placed in the restraint chair in the first place based on his disposition, true?

A    Right.

Q    Okay.  And we can agree that the nurses and the medical staff did not place him in the restraint chair?

A    Correct.

Q    This was a custodial-ordered restraint?

A    Yes.

Q    Okay.  Whether or not this restraint chair was being used for punishment or for -- because he was showing signs of violent behavior, that's not within the nurses or the doctors or the correctional medicine scope of practice?

A    Right.

Q    Okay, all right.  And you testified earlier that you didn't see in the record -- strike that.

I think I believed you testified earlier that the nurses had a duty to sort of do a pre-restraint evaluation?

A    Yes.

Q    And we can agree that in this case a



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

pre-restraint evaluation was done?

A    Nope.  I did not see a pre-restraint evaluation.

What I did see was an intake screening. And, you know, the only thing -- and I hate to use the word 'assume' -- the only thing I can assume is that they utilized the intake screening as the pre-restraint evaluation.

But in the majority of cases there's actually a separate document that's completed letting someone know that someone's been -- being put in restraints or seclusion because when they go send it's usually done.

That -- when that happens, the medical staff has been notified by officer so and so that this patient is going into restraints and that the nurses have reviewed the medical record.  There are no contraindications.  That should have been spelled out in the medical record.

Q    But we can agree there was an assessment done of Mr. Peterkin prior to placing the restraints?

A    At 10:30, yes.

Q    Okay.  And we can agree that his vital



signs were obtained?

A    Yes.  During his intake, yes.

Q    And --during his intake.  And that he -- and assessments were completed sort of like a history and physical?

A    Yes.

Q    Both of those were completed prior to placing in restraints?

A    Yes.

Q    Okay.  And in that assessment, did you identify any contraindications to placing -- medical contraindications to placing the restraints?

A    No, I did not.

Q    All right.

(Whereupon, a break was taken from 10:52 A.M. until 10:59 A.M.)

BY MS. MURPHY:

Q    And we can agree that Mr. Peterkin was placed in the restraint chair around 1 o'clock, is that right?

A    As far as I know, yes.

Q    Okay.

A    The nursing documentation said he was



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    46

placed --

Q    Okay.

A    -- at 1 o'clock.

Q    So we can agree that -- the nurse, do you remember her name?

A    No.

Q    Eunice Champion.  Does that sound familiar?

A    Yeah.

Q    Okay.  Did she -- can we -- we can agree she documented that Mr. Peterkin was placed in the chair, in the restraint chair at approximately 1?

A    Right.

Q    Okay.  And -- all right.  So we can assume that she saw him at that time, true, Ms. Champion?

A    No.

Q    No?  How would she know he was placed in the chair?

A    They could have called her and said he was in the chair.

Q    Okay.

A    We don't know that.

Q    Okay, understood.  But we know she's



the one that documented he was placed in the chair.

We know -- one second.  All right.

And in her documentation it says is the inmate violent?  She says no.

A    Uh-huh.

Q    And this is actually Marney Miller, excuse me, not --

A    Okay.  I --

Q    Marney Miller.

A    I don't remember her.

Q    Okay.  Yeah, it's the nurse but her name is Marney Miller, okay, all right.

So 12:59 placed in the chair.  We can agree on that?

A    Yes.

Q    Okay.  And we can agree that she documented that he was not violent, true?

A    Yes.

Q    Okay.  And the type of restraint, chair?

A    Yes.

Q    Okay.  And the reason for restraint is sheriff's --

A    Sheriff.



Q    -- request?

A    Yes.

Q    Okay.  So we can agree that these are custodial restraints?

A    Yes.

Q    All right, okay, all right.  And your second criticism was essentially or your second concern was whether or not Mr. Peterkin was assessed by the medical team on a regular basis?

A    Yes.

Q    Okay.  How often was he supposed to be assessed?

A    It varies from facility to facility but it's something -- the frequency of monitoring for custody restraints is something that's supposed to be defined by the medical director working with the jail administration.

So it's something that they're supposed to define and put in policy.

Q    Is it fair to say that with custodial restraints, really with any restraints it's probably inmate specific?

A    Not necess -- no, it's not inmate specific.  Because it doesn't matter whether the inmate is mental health inmate I mean for --  or



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                49

-- how do I say it?

Mental health restraints, if they use restraints and many places just don't use clinical restraints -- if they use restraints it's usually a person is in a bed with a four-point restraint.  They tend to not use the chair as a restraint for clinical restraint.

So, if they use restraints and depending on the contract, you know, if it's a privately contracted, it could be that medical staff sit with the patient while they're in restraints and it could be that security staff sits with the patient constantly while they're in restraints and they document every 15-minutes on the -- what's going on with that patient.  Is he calm?  Is he sleeping?  Is he -- you know, what's happening.

Q    And what was the standard in this case?

A    In that case the policy was not written.

There was nothing in the policy that specified the amount of time that Medical should be -- use in spending, going and checking the patient.  The policy was not clear.

The policy did not even support the



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    50

sheriff's policy and so the policies were kind of different.

Q    What does the sheriff's policy -- what does it say?

A    The sheriff's policy says that patients put in restraints if they're a danger to self or others.

That Medical's notified when the sheriff -- when the patient is put in restraint chair.  That Medical will -- sorry -- will check the patient periodically.

But there's no timeframe in the sheriff's policy and that Medical will be notified when the patient is taken out.  The patient is taken out of restraints as soon as possible once they've regained control.

Q    Does the sheriff's policy indicate how often the sheriffs officers or the officers are checking on the patient?

A    I believe it does, yeah, as I remember.

Q    Okay.

A    Do you have a copy?

Q    I don't know if I have a copy of that one actually.

I don't have a copy of the sheriff, the



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT          51

sheriff one.  To the best of your knowledge --

A     Yeah.

Q     -- is it every 15 minutes?

A     Every 15 minutes, yes.

Q     Okay, all right.  And we know in this case that Medical was notified and he was placed in restraints.

A     Right.

Q     We know that, right?

And we do know whether -- whether or not it was every 15 minutes or whether or not it was every three hours we know that Medical did, indeed, check on Mr. Peterkin, right?

A     We know that they checked on him at 4 something.  3 -- 3:59 I think it was the time.

Q     And do you also remember Dr. Clopton testifying that his nurses would check around the -- around the wrists every hour?

A     Yes.

Q     Okay.  Dr. Clopton testified to that, right?

A     Yes.

Q     Okay.  Do you recall that Victor Hill testified that the nurses in Medical would check on the inmates who were restrained?



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    52

A    Yes.

Q    Okay, all right.  And we know that -- we know that at 3 o'clock vital signs were or 3:50 vital signs were completed by the medical team, is that right, for Mr. Peterkin?

A    3:58 or.

Q    3:54?

A    Agree.

Q    Sound right?

A    Something like that, yeah.

Q    Okay.  So at 3:54 he had another set of vital signs taken, true?

A    Yes.

Q    And at that time his heart rate was elevated and his blood pressure was elevated?

A    Yes.

Q    Okay.  And the appropriate response to that would be to notify the physician?

A    Right.

Q    The physician was notified?

A    Right.

Q    Okay.  By Jennifer Smith Franklin, correct?

A    Yes.

Q    Okay.  And at that point in time we



know from Mr. Peterkin that or from Mr. Peterkin and from Dr. Clopton that Dr. Clopton came and assessed Mr. Peterkin?

A     Yes.

Q     And at that time Dr. Clopton ordered medication?

A     Yes.

Q     He ordered blood pressure medication?

A     Yes.

Q     And he ordered aspirin?

A     Yes.

Q     And he -- let's see.  He ordered two blood pressures medications?

A     Yeah, Metoprolol  and --

Q     Norvasc?

A     Norvasc.

Q     Okay.  And those were, indeed, given?

A     Yes.

Q     Okay, all right.  We know at 4:30 that Jennifer Franklin received from Intake a restraint chair per orders of Sheriff Hill, true?  That's in the documentation?

A     Yes but that's the confusing part.

Because at 4:30 this was after he had been in the restraint chair, received medication



an then Jennifer wrote this note that patient was received from Intake in the restraint chair already.

And it's kind of like, well, there was a note before that said he went into restraints at 1.  So what time did he actually -- was he actually, you know, put in the chair.

Q    Okay.  I understand --

A    Yeah.

Q    -- the concern.  But we know he was in the chair --

A    The documentation is off.

Q    Or maybe it's just difficult to understand the wording?

A    Yes.

Q    Okay.  But we know at 4:28 that he's in the chair, true?

A    Yes.

Q    Okay.  We know that she went to assess him at 4:28 because she says I then went to assess inmate?

A    We know that's the time she documented but apparently she had assessed him at 3:59.

Q    Okay.

A    And document 4:28.


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

Q    Or potentially she did his vital signs at 3:54.

A    Yes.

Q    3:58 and then assessed him at 4:28?

A    Possible, yes.

Q    Okay, okay.  So, we know that Jennifer did an assessment, true?

A    Yes.

Q    We know that she's the one that documents that Dr. Clopton came in and gave stat orders for medications?

A    Yes.

Q    Okay.  And we know that she notified the officer of inmate's condition?

A    Yes.

Q    Okay.  And that condition was that he was complaining of discomfort?

A    Yes.

Q    All right.  And so our nurse spoke to -- according to this record our nurse goes, assesses Peterkin, speaks to him.  He voices discomfort and she addresses that by notifying officers.

A    Yes.

Q    That meets the, Standard of Care,



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

doesn't it?

A    Yes.

Q    Okay.  And she asks the officer to reposition him, true?

A    Yes.

Q    So she's advocating for this patient?

A    Yes.

Q    Okay.  And they, indeed, did reposition his arms?

A    Yes.

Q    And his hands, okay, all right.  She re-took his vital signs a second time, is that right?

A    Yes.

Q    All right.  And his heart rate had come down, true?

A    Yes.

Q    All right.  And he --  she documents he appears to be stable and that he did have relief from the medications.

A    Yes.

Q    Okay.  So that tells us that she checked on him after the medication was given to make sure that it was effective?

A    Yes.



Q    All right.  And that's -- that is the Standard of Care, isn't it?

A    Yes.

Q    Okay.  And she notes the inmate remains in chair alert.  Zero symptoms of any distress at the time.  Agreed?

A    Yes.

Q    Okay, all right.

Let's see.  All right.  Based on that note there's no reason to believe that he's suffering, in any way, that the nurses could impact?

A    Right.  He wasn't in distress.

Q    Okay.

A    No.

Q    Okay.  And can we agree that in this case the nurses and the doctor, they had no reason to ask -- no medical reason to ask the officers or Victor Hill to take this inmate out of restraints?

A    No, other than his having chest pain and, you know, elevated blood pressure.

You know, they're not going to request that he be removed from restraints because it's -- you know, custody restraints.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                58

Q    Right.  There's no --

A    They're just going to say if -- you know, if there had been an emergent situation they would have asked for him to be taken out so they could take care of him but otherwise no.

Q    Okay.  So based on the information we have in front us on the deposition testimony there was no medical reason to advocate to get this -- Mr. Peterkin out of restraints?

A    Right.

MR. GREENAMYRE:  Objection, form, go ahead.

BY MS. MURPHY:

Q    Do you intend to opine on causation what caused -- well first of all, what are Mr. Peterkin's injuries, if any?

A    Mr. Peterkin says that he has, you know, said that in his testimony that he had injuries to his wrists and scarring from the handcuffs being behind him for that number of hours in the chair.

Q    Okay.  And again, the nurses don't place handcuffs?

A    Correct.

Q    Nurses don't remove handcuffs?



A    Correct.

Q    Handcuffs are not a medically -- it's not a -- it's not medical equipment?

A    Right.

Q    Okay.  And we don't have keys to the handcuffs?

A    Right.

Q    Okay, all right.  All right.  Any other injuries that you're aware of?

A    Not that I'm -- not injuries.  I know that he testified that he urinated on himself while he was in the chair.  That he wasn't allowed to use the bathroom and that he was, you know, in pain in his wrists and, you know, had some cuts and scarring on his wrists.

But as far as, you know, of course his blood pressure went up and that was an issue for him, you know.  It could be dangerous, especially because I think he said a couple of times I'm a big guy.  And so, blood pressure, elevation, rapid pulse, chest pain, you know, those are all -- you know, could be serious issues.

Q    Okay.  Are you saying --

A    But, you know, at that point --



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    60

Q    His blood pressure was addressed?

A    His blood pressure -- that's what I was going to say, his blood pressure was addressed. His pulse was addressed.  He was given medication.

Now, I don't know what -- whether they took him out of the chair at that time.  I have no idea.

Q    Okay, all right.  And you don't know whether or not the chair caused his blood pressure to be high?

A    I can't for sure.

Q    Right.

A    No.

Q    Right.  Because we know he had a history of chronic --

A    Yes.

Q    -- hypertension, right?

A    Yes.

Q    Okay.  And we know that he also had a history of not taking his blood pressure medications?

A    I don't know that.

Q    If you review the medical records does it suggest, later on in the record, that he is

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

noncompliant with his medications.  He self-admits that?

A    He said that he hadn't had his blood pressure medicine for three weeks.

Q    Okay.

A    But that was -- there --

Q    So for three weeks he was noncompliant?

A    There was a gap between the time that he was admitted and the nurses documented that he was released on December 10th.

Q    Right.

A    And he wasn't released.  And there's a gap in the medical record from December 10th until December 19th.

And the only way it was caught was that the pharmacy nurse received his order for medication and couldn't find the patient because he had been documented it as released, which means that he was out of the system.

So from the 10th until whatever date it was that they discovered that he was still there and they had the wrong number or something on -- he did not have his medication but he was in the facility.  He wasn't receiving his medication.

Q    Okay.



A    And there's nothing for that time period.

Q    Okay.  That's your understanding from what?  Where did you learn that from?

A    Reading the medical records.

Q    Okay.

A    Because my first though was that he had been released and rearrested because he was -- the nurse in the chart documents that he's released on 12-10.

Q    Uh-huh.

A    Everybody canceled, okay.

Then if you go to 12-19 in the medical record --

Q    Uh-huh.

A    -- suddenly he has an intake screening done again.

Q    Uh-huh.

A    And he has -- you know, and then he says, I haven't had my medicine in --

Q    Right.

A    -- three weeks.

Q    Right.

A    So I -- at first I thought, you know, you know, in fact I asked, was he released and



readmitted?  No.  He was there the whole time.

So he was there for a long time without receiving medicine or without being treated and if he was documenting -- if the electronic health record said the patient's released --

Q    Uh-huh.

A    -- anything that comes like sick call requests or, you know, anything, even medicines --

Q    Uh-huh.

A    -- might be sent back to the pharmacy --

Q    Uh-huh.

A    -- and ignored because the guy's gone?

Q    And we don't know how -- how the nurses or the medical staff came to believe he was releahed?

A    I have no idea.

Q    Okay.  We can agree that when he was arrested, when he initially came to the jail on the 8th was hypertensive?

A    Yes.

Q    Okay.

A    He was.

Q    All right.  Let's see.  All right.  How



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                  64

often does the Standard of Care require the nurses to evaluate an inmate in custodial restraints?

A    The Standard of Care says that after two hours, at least, a minimum.

Q    Two hours?

A    Two hours they should be reevaluated.

And then if the patient is going to remain in those restraints longer than two hours, then the physician and the administrator need to determine whether it's acceptable.

But, you know, patients can stay in restraints for longer than that, sometimes up to, you know, 12 hours if they're behavior is just not controllable.

Q    Okay.  We can agree that -- I know we -- you testified earlier that Mr. Peterkin said that he urinated on himself.

A    Yes.

Q    Can we -- we can agree that the officers were the ones that had to take him to the restroom?

A    Yes.

Q    Okay.  That's not really a medical duty?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    65

A    No but -- no, huh-uh.

Q    Okay.  You don't plan to opine on Mr. Peterkin's claims that he has PTSD?

A    No.

Q    You're not going to opine on that?

A    No.

Q    Okay.  And you're -- are you trained specifically in like law enforcement or jail operations?

A    Yes.

Q    Okay.  And tell me about that.

A    My training in -- you know, first of all, when I first began to work in Corrections I received four weeks because it was South Carolina correctional officer training.

Q    Uh-huh.

A    Because you had to even as a nurse.

Q    Okay.

A    You had to do correction officer training.

And then wherever I went, when I went into jails I received training, law -- not law enforcement but jail training in jail procedures and policies, you know, jail orientations at every jail.



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT            66

And as a regional staff member I traveled from prison to prison to prison to prison.  And so, you know, I would get frequent reminders of jail training.

Q    Okay.

A    So, I also went to -- I'd go to conferences with the Americans for Effective Law Enforcement and they do jail and prison or --

Q    Okay.

A    -- training also, so --

Q    But you've never placed custodial restraints?

A    No.

Q    Okay.

A    No, no, no, no.

Q    All right, all right.  And you'd agree that medical providers, they don't have the legal authority to override custodial use of restraints?

A    They don't have the authority but they do have the ability to, you know, voice concern if they're being used improperly.

Q    And our nurses did that, didn't they?  Our nurse said, I think this guy needs to be repositioned because he's uncomfortable, right?



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                67

A    Three hours later, yes.

Q    Yeah.  And we don't know when she found that out, true?

A    Right.

Q    And we don't know when he voiced that concern?

A    No.

Q    Okay, all right.  You agree that Victor Hill testified specifically that the medical providers performed pre and post evaluations of inmates?

A    I did read that, yes.

Q    Okay, all right.  And you're aware that Clopton specifically testified he personally evaluated Peterkin and that the nurses routinely conducted safety checks?

A    Yes, I saw that, yeah.

Q    Okay.  Can we agree if they did, indeed, perform those safety checks that --

A    No.  Oh I'm sorry.

Q    I'm not finished.  Yeah, let me Finish. Can we agree if they did, you assume they did perform those safety checks as Dr. Clopton testified that they met the Standard of Care?

MR. GREENAMYRE:  Objection to



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                68

form.

BY MS. MURPHY:

Q    You can answer.

A    If they had documented that they performed the safety checks I would agree that they met the Standard of Care.

Q    If we assume that the nurses did, indeed, do these safety checks, even if they did not document it, can we agree that that meets the Standard of Care for -- Standard of Care for clinical -- clinical care.  Not documentation, clinical care?

MR. GREENAMYRE:  Objection to form.  Go ahead.

THE WITNESS:  I'm having trouble answering your question because the Standard of Care includes documentation.

And if they done them they should have documented them.

BY MS. MURPHY:

Q    Can we -- sorry.

A    The didn't document them.  They didn't do it.

Q    I'm asking you to assume they did do



them.

A    Okay.  So you want me to assume that they --

Q    Yes.

A    -- those checks?  Okay.

Q    Yes.

A    If they had done those checks?

Q    Whether they documented it or not, that would meet the Standard of Care?

A    Yes.

Q    I understand --

A    No.  I'm sorry.

As a surveyor I would not accept that as them having met the Standard of Care.

Q    Okay.  And what about as a nurse working in a facility such as -- you know, we're not talking about standards of some committee or --

A    Right.

Q    -- right?  What we're talking about is what nurses would do under like or similar circumstances.

Can we agree that if they did, indeed, check just like Dr. Clopton testified that they did, that they met the Standard of Care?



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    70

MR. GREENAMYRE:  Objection to form.  Go ahead.

THE WITNESS:  I'm sorry, I wouldn't believe it unless I saw it documented.

BY MS. MURPHY:

Q    Okay.  I'm asking you to assume it.

A    Okay.

Q    I'm asking you to assume it.

A    I know.  You want me to assume it.  I never assume --

Q    It was done.

A    Okay.

Q    It doesn't matter -- I'm asking you to assume.

A    All right.  If it was done, yes, they would have met the Standard of Care.

Q    Thank you.  Thank you.  All right.  Let's see.

And you're aware that Dr. Clopton testified that when he evaluated Peterkin he didn't have any -- other than what he documented in his -- you know, other than what was documented in the nursing assessment about the heart rate and blood pressure, he did -- Dr.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

Clopton, there's no indication that Dr. Clopton saw any skin compromise or any complaints were observed based on his testimony?

A    Based on his testimony that's what he said.

Q    Sorry guys.  I'm just kind of clicking through my outline just to make sure I cover everything.

MR. HOFFER:  I'll have a couple questions so.

MS. MURPHY:  Okay.

MR. HOFFER:  Just as a heads up that you may get another chance.

BY MS. MURPHY:

Q    Okay.  So we can agree Clopton testified he found no signs of distress, trauma or complaints from Peterkin other than the blood pressure and heart rate?

A    That's what he testified, yes.

Q    Okay.  And can you just give me an overview of how you've been paid, so far in this case?  Are you being paid hourly?

A    Hourly, yes.

Q    Okay.  And approximately how much time have you spent so far?



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                72

A    I can look.

Q    Sure.  Take your time.

MR. GREENAMYRE:  If you haven't already seen our -- the invoice, Chelsea, I can send you that.

MS. MURPHY:  Okay.  I think I have it.  I don't need you to send it I just -- I'd like for her to just testify to it.

THE WITNESS:  Okay.

MR. GREENAMYRE:  Understood.  Just making sure you're not missing anything.

MS. MURPHY:  Thanks.

THE WITNESS:  I'll have to find my billing.  I'm sorry.  I think I was supposed to --

BY MS. MURPHY:

Q    That's okay.  What was -- what's your hourly rate?

A    250.

Q    Okay.  And approximately how much time do you think you've spent so far?

A    Probably maybe 20 hours.

Q    And have you billed all of your

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100     www.coastalcourt.com

invoices to date?

A    No.  I haven't billed for what's this?
July.  I bill on the 1st.

Q    And how much time do you think you've
spent in July?

A    I have no idea.  I could pull it up if
you give me a second.

Q    And I can pull it up.  It took a minute
for that zip drive to download.  It'll take me a
second.

A    Did you find it?

Q    Not yet.

A    Oh okay.

Q    I have it but --

MR. GREENAMYRE:  We will -- of
course, also I mean, you know, still
ask your questions Chelsea but we will
of course also, you know, send you an
updated one as well as an invoice for
today.

MS. MURPHY:  Okay.

THE WITNESS:  Okay.

BY MS. MURPHY:

Q    Thank you.

A    Because I don't usually use it on my



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT          74

phone so.

Q    Got ya.

A    I'm sorry.

Q    No, that's okay, that's okay, all right.  Have you ever worked for Correcthealth?

A    No, I have not.

Q    Okay.  And -- all right.  Have you ever done consulting work or anything outside of, you know, legal, legally testifying, have you done anything for CorrectHealth?

A    No.

Q    Okay.

MS. MURPHY:  I think that's all the questions I have for right now.  I'm just going to look through everything if you want to go ahead.

MR. GREENAMYRE:  Sure.  I don't know if -- you know, I think maybe the proper order is Mr. Hoffer gets to go first if you have any questions.

MR. HOFFER:  I've got maybe one or two.

CROSS-EXAMINATION

BY MR. HOFFER:

Q    Hi, Ms. Lambert.



A    Hi.

Q    My name is Michael Hoffer.  Hi.  I represent one of the defendants, sheriff -- former Victor Hill in this case.  And just really one or two questions.

And you testified about the restraint chair is not to be used for punishment, correct?

A    Yes.

Q    And I'm kind of summarizing your testimony as I heard it today, it's not your opinion that the moment an inmate becomes calm upon being restrained that he must be released from the restraints, is it?

A    No.

Q    In other words -- okay, yeah.  If somebody's put in restraints then they're restrained?

A    Right.

Q    So -- right.  So they're -- law enforcement or the jail, the nonmedical the -- you know, my clients, the sheriff and correctional folks or I guess just the correctional folks, if they put someone in the restraint chair, there is some amount of time that that person can be held in the restraint



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                 76

chair before they may be need to make a decision about reevaluating him for release from the chair, correct?

A    Yes.

Q    Okay.

MR. HOFFER:  That's it.  No other questions.

MR. GREENAMYRE:  Okay.  I've got a couple questions.

CROSS-EXAMINATION

BY MR. GREENAMYRE:

Q    First, can we agree or do you disagree, tell me, does the Standard of Care require medical personnel to follow their own written policies and procedures?

A    Absolutely, yes.

Q    Okay.  Well, I don't think you were shown CorrectHealth's policy and procedure about the restraint chair so I would like to do that. And can we mark this as Plaintiff's 1.

(Whereupon, Plaintiff's Exhibit Number 1 was marked for identification.)

BY MR. GREENAMYRE:

Q    This is the restraint and seclusion



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                77

policy.  It is Bates labeled restraint seclusion 1 through 3.

Okay.  So I want to look on the second page and I can -- let me know if I've got to, you know, zoom in or --

A    I've got it.

Q    -- look like.

MS. MURPHY:  I gave her a copy.

THE WITNESS:  I have a copy.

BY MR. GREENAMYRE:

Q    Okay, perfect.  Okay.  So 3 says, health status monitoring will be documented on the restraint flow sheet to include visual checks by health trained personnel or healthcare staff at 15-minute intervals and a more in-depth evaluation every two hours.  Do you see that?

A    Yes.

Q    Okay.  Did you see any evidence that Correcthealth did 15-minutes visible checks?

MS. MURPHY:  Object to the form. You're misstating --

THE WITNESS:  Number 3 --

MS. MURPHY:  You're misstating the context of this --

THE WITNESS:  Yeah.


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                  78

MS. MURPHY:  -- document.

THE WITNESS:  Number 3 applies to clinically-ordered restraints but custody-ordered restraints starts with Number 7.

BY MR. GREENAMYRE:

Q    Well I see -- tell me about this.  Right?

A    Yeah.

Q    Because I see 1 is clinically-order restraint.

And then I mean I don't see that one applies elsewhere.  Is it your understanding that there -- and I mean do you see any written policies here that says how often someone should be checked in for custody-ordered restraints?

A    No.

MS. MURPHY:  Object to the form.

BY MR. GREENAMYRE:

Q    And you see 1, which is called clinically-ordered restraint or seclusion, correct?

A    Yes.

Q    Okay.  Okay.  If there were 15-minute checks done by Correcthealth staff, does it make

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

it better or worse, from your perspective, that nothing was said or done about Mr. Peterkin being handcuffed in the chair until at least three hours after he was put into the chair?

MS. MURPHY:  Object to the form.

BY MR. GREENAMYRE:

Q    You can answer.

A    Okay.  It would make it worse because they would be observing him handcuffed behind his back in the restraint chair and not reported or not say anything about it to Corrections.

Q    Okay.  To the extent 3 applies to custody-ordered restraints or just to custody and clinical-ordered restraints, right, would you agree that medical staff should facilitate toileting at two-hour intervals?

MS. MURPHY:  Object to the form. You can answer.

THE WITNESS:  They should ask the security staff to allow the patient to -- if the patient's able to.

If the person's calm enough and able to navigate to toileting, you know, it would be incumbent upon them to request that the person be allowed



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    80

to use the restroom especially if they
say I need to use the restroom.

BY MR. GREENAMYRE:

Q    If you look at 8, it says if staff
perceives improper use or application of
non-clinical restraints they will communicate
their concerns immediately to the health service
administrator or designee.

A    Yes.

Q    Are you aware of any Correcthealth
personnel at any time at the Clayton County Jail
communicating, making any communication under
paragraph 8 about Mr. Peterkin or anybody else?

MS. MURPHY:  Object to the form.
Go ahead.

THE WITNESS:  Not based on medical
records and not based on the
testimony --

BY MR. GREENAMYRE:

Q    Okay.

A    -- of Dr. Clopton.

Q    And if staff perceived improper use of
nonclinical restraints, they had an obligation
to say something about it, correct?

A    Yes.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

Q    All right.  I want to talk for a second about the timing of -- you know, contained in the medical records and just as an initial matter to sum up some of what you said earlier, some of the timing in this medical record is a little confusing.  Is that fair?

A    Yes.

MS. MURPHY:  I'm just going to object to the extent you're leading your witness.

MR. GREENAMYRE:  Understood.

BY MR. GREENAMYRE:

Q    I'm going to represent to you that there is testimony and from both Mr. Hill and Mr. Peterkin backed up by please reports that Mr. Peterkin was taken to the Clayton County Jail in the early morning hours of December 8th 2019, right?

So well before -- and that he was put into the restraint chair very quickly after. Okay.

A couple questions that I want you -- that I want to ask related to that assumption.

First, should time entries in medical records be accurate?

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    82

A    Yes.

MS. MURPHY:  Object to the form.
Go ahead.

BY MR. GREENAMYRE:

Q    If Mr. Peterkin was put into the restraints chair let's say midnight, 2 A.M., something like that, on December 8th 2019 and he was not assessed at all by Correcthealth until 1 p.m., would that make the situation better or worse?

A    Worse.

Q    Okay.  Why?

A    Because if he were put in the restraint chair in the wee hours of the morning, by 1 p.m. he's been in there for 12 hours.

Unfortunately, the piece that is missing is the medical evaluation before he goes into the restraint chair, were there contraindications to that.

It's not uncommon for people to be out of control when they're arrested, and, you know, be placed in a chair in the sally port and brought in but at that time, once they're cleared for admission to the facility someone from Medical needs to do an evaluation, do an



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

intake, do a screening, do something to make sure that putting them in the chair is not harming them physically.

Q    And I will show you but not make an exhibit of this -- but you were asked earlier about the timing of the intake screening at approximately 10:20 A.M.

A    Yes.

Q    And if, in fact, Mr. Peterkin was put into the restraint chair in the wee hours of the night, if you assume those facts, does intake receiving the screen would be before or after he was put in the chair?

A    It would have been after.  Long after. It would have been outside of the standards.

Q    Okay.

MR. GREENAMYRE:  I think that's all the questions I have.

MS. MURPHY:  All right.

REDIRECT EXAMINATION

BY MS. MURPHY:

Q    You agree that nursing -- nurses cannot do an assessment of a patient in the restraint chair or prior to the restraint chair unless they're notified that the gentleman is going to



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    84

placed --

A    Correct.

Q    -- in the restraint chair?

A    Right.

Q    Okay, all right.  Earlier you told me that -- I understood from you -- that taking the patient to the restroom or the inmate to the restroom from the restraint chair was an officer's job and a custodial-restraint type of process, right?

A    Yes.

Q    Okay.  So it is not incumbent upon the nurse to take him out to go to the restroom true?

A    No.  It would have to be the nurse and the officer, whether it's clinical or custody.

Q    In this case --

A    The officer has to take the patient to the bathroom.

Q    In this case, is there any medical indication or clinical reason why the nurse would have to tell the officer that this gentleman needs to go to the restroom?

A    Yes.

Q    An officer doesn't know that somebody



has to go to the restroom periodically?

A    Well if the -- if the person didn't ask the officer and they asked the nurse when the nurse is checking them, can I go to the restroom, then the nurse would need to tell the officer.

Q    Okay.  But the nurse is not required, by the Standard of Care, to tell the officer to take the inmate out who has no problems that we know of with urinating or any medical problems with, you know, his ladder, any other things, it's not incumbent upon the nurse to remind the officer as -- in intervals that this inmate might need to go to the restroom absent being asked by the inmate?

A    There is -- no.

Q    Okay.

A    I would say no.

Q    Okay.

A    Okay.

Q    Thank you.

A    Before --  yeah, I would say so.

Q    Great, all right.  I'm going to go -- let me find that policy.

All right.  And earlier you



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                86

appropriately pointed out -- I'm referring to the policy, Plaintiff's Exhibit 1.  And this is the Clayton County Jail Policy and Procedure For Restraint and Seclusion, correct?

A    Uh-huh.

Q    And that's what you're looking at?

A    Yes.

Q    Okay.  And this is for January 2019, right?

A    Yes.

Q    All right.  And if we go to Subsection Number 3 you correctly informed us that this 15-minute interval section pertains to clinically-ordered restraints, true?

A    Yes.

MR. GREENAMYRE:  Objection to form.

BY MS. MURPHY:

Q    And I want to jump down to Number 7, okay.  It says custody-ordered restraints.

A    Yes.

Q    Okay.  And you would -- when reading this policy, you'd agree that the policy that applies to the CorrectHealth staff when somebody is in custody-ordered restraints, this is the



section that applies to them, true?

A    Yes.

Q    Okay, all right.

A    The --

Q    Go ahead.

A    The way the policy is written is sort of confusing.

This custody-ordered restraint should be a section of it -- by itself so that you could delineate what's clinical, what's custody.

But yes, everything that falls under custody-ordered restraints is what we're looking at -- is what I would be looking at.

Q    Okay, all right.  And it says, first sentence, healthcare staff do not participate in the restraining or seclusion of inmates for disciplinary or administrative reasons.

A    Right.

Q    True?  Okay.  And it goes onto say -- and we can go through these.

It says the staff will review the health record for any contraindications or accommodations required and will advise the appropriate security staff of any pertinent information, true?



A    Yes.

Q    Okay.  And we know in this case, you've already testified there weren't any contraindications that you know of, true?

A    Correct.

Q    Okay.  And we know that our nurse did seek an accommodation by requiring them -- asking them to move their hands -- move his hands appropriately, true?

A    After the fact.

Q    After -- yes, after his hands --

A    -- were --

Q    -- were --

A    He had been in restraints for a number of hours.

Q    True.

A    Yes.

Q    I understand what you're saying.

A    Yes.

Q    But I just want to make sure my question gets answered.

Our nurse did an accommodation, seek an accommodation in moving the patients hands?

A    Yes.

Q    Okay, all right.  And she did that by



advising the security staff, true?

A    Yes.

Q    All right, okay.  And it says -- and I think this was the point I was trying to get out earlier -- it says monitor the health and safety of inmates placed in nonclinical restraints or seclusion on a regular basis at intervals agreed on by the facilitate administrator, medical director or health -- mental health services and the health services administrator.

And there are not specific intervals documented here, true?

A    Correct.

Q    And does this part of the policy suggest to you that it may be specific to the inmate?

A    No.  It's specific to -- it should be specific to the policy.

Q    Okay.

A    In other words, this policy is written -- you know, the facility administrator, the medical director, mental health have to determine, they have to make a decision how often are custodial restraints going to be monitored by Medical.



Q    Can we agree --

A    It should be spelled out.

Q    Can we agree that a patient let's say with hypertension that's been treated for hypertension might be monitored -- who was restrained -- might be monitored more often than a patient that has no medical conditions?

A    Yes.

Q    Okay.  So it can be patient specific, true?

A    It can be but there should be some timeframe.

Q    Okay.  And let's see.  And then the last one is that the staff will immediately notify appropriate custody staff if the health or the restrained inmate is at risk.

A    Yes.

Q    Okay.  And we know, in this case that again -- well Dr. Clopton evaluated him, true?

A    He testified that he did.

Q    And we know that in response to his evaluation he ordered medications?

A    Yes.

Q    And the medications were administered?

A    Yes.



Q    Okay.  And we also know that -- we also know, again, that our nurse advocated for this patient and asks that his hands be placed in a more comfortable position?

A    Yes.

Q    All right.  And Number 8, moving down, it says, if staff perceives im -- we already went over this -- improper use or application of nonclinical restraints they will communicate their concerns immediately to the health services administrator or designee?

A    Yes.

Q    Okay.  If the staff doesn't have any concerns there's no need to do that, true?

A    Right.

Q    And in this case we know, again, that the nurse and Dr. Clopton -- Dr. Clopton was involved in his care and treatment, true?  In Mr. Peterkin's care and treatment?

I'm going to strike that.  I'm going to ask a different question.

A    Okay.  You see my wheels spinning.

Q    All right, okay, all right.  We know that our nurse, she communicated concerns to Dr. Clopton --



A    Yes.

Q    -- about Mr. Peterkin's blood pressure and complaints?

A    Yes.

Q    Okay.  And we also know that this nurse communicated with the officers about Mr. Peterkin's restraint?

A    Yes.

Q    Okay.  And there's no need to go to the health services administrator or the doctor if the officer actually repositions the person?

A    Correct.

Q    Okay, all right.

MS. MURPHY:  I think that's all I've got.  I appreciate your time.  Do you guys have anything else?

MR. GREENAMYRE:  I've got one more or --

THE WITNESS:  Yes.

MR. HOFFER:  I don't.

MR. GREENAMYRE:  Two lines of questioning.

RECROSS-EXAMINATION

BY MR. GREENAMYRE:

Q    So on Number 8, would the use of the



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                93

restraint chair as punishment if medical staff was able to observe that, give rise to an obligation to communicate concerns about the -- that improper use of restraints?

A    Yes.

Q    Okay.

A    If they -- if they -- if they knew.  If they --

Q    Sure.

A    You know, again, the way you phrased it.  If they observed it.  If they knew that that was what it was being used for, yes.

Q    Sure, okay.  And then, you know, I want to go back to Plaintiff's Exhibit 1 again, the policy at the heart of this an try to parse this ambiguity a little bit.

So is it your understanding that from 1 down to 6 all that only applies to clinically-ordered restraints?

A    Yes.

Q    Okay.  And then from 7 on down, that only applies to custody-ordered restraints?

A    Yes.

Q    Okay.  Would it maybe change your opinion about that if you look at 9 and 10 that



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                94

pertain to clinically-ordered restraints and not custody-ordered restraints?

A    Well, it does and it doesn't.  This policy is almost word-for-word taken from the NCCHC manual, the standards manual.

Q    Okay.

A    So unfortunately, what isn't in this policy is the site specificity for the policy.

So, just putting the name Clayton County Jail is fine.  But what is the site's policy on custody restraints?  That's not in here.

And it would -- in order to make a policy site specific, which would say this is what we do at Clayton, okay.

Q    Uh-huh.

A    If someone's in the chair Nursing checks the patient every hour or every two hours or every 15-minutes or they're rolled into the infirm ery and they're monitored by Nursing then that would guide the nurses to know what they're supposed to do and they would be trained on that.

But unfortunately, this policy does not -- really 7B is a very general statement that



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

it's facility administrator and the medical director who decide how often but the -- it doesn't say how often.

And so, you know, it just needs to be -- it's not clear.  It's just not clear.

Q    Fair to say that a reasonable policy would provide more detailed guidance to medical staff about appropriate intervals for not only clinical restraints but also custodial restraints?

A    Yes.

Q    All right.

MR. GREENAMYRE:  That's all I have.

MS. MURPHY:  Okay.  I know I'm going to have a couple more questions.  Just give me a second.  Can we take a break just for one second.  For like five minutes?

MR. GREENAMYRE:  That's fine. Yeah.

(Whereupon, a break was taken from 11:56 A.M. until 12:02 P.M.)

FURTHER REDIRECT EXAMINATION

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    96

BY MS. MURPHY:

Q    Just for reference purposes, you testified earlier that typically there would be a specific interval in the policy for custodial restraints?

A    Yes.

Q    And what -- typically what are some of those intervals that you see at different facilities?

A    Sometimes it's every hour.  Sometimes it's every 15 minutes.

Some facilities actually require anybody in any kind of restraint to be put in the medical unit so they're observed constantly.

And the other -- some facilities have camera observations and then the people make rounds periodically.  But for medical the minimum is two hours, you know.

Q    Okay.

A    If you're in for to hours you need to be evaluated.

Q    Okay.  Thank you.  All right.  So if the healthcare staff in this case did everything that you have said they were supposed to do to meet the Standard of Care, they checked on this



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT               97

inmate at specific intervals.  They did a
pre-assessment, a post-assessment when he was
released.  They notified custodial staff that he
was uncomfortable, can we agree that this -- Mr.
Peterkin very likely could have had the same
outcome?

MR. GREENAMYRE:  Objection, form.
Go ahead.

BY MS. MURPHY:

Q    Because the officers have the keys,
right?

A    Right.

Q    And nurses can advocate.  Nurses can
check on patients.  They can check on inmates
but the nurses do not have the ability to
release these restraints, true?

A    Right.

Q    And you testified earlier that the head
of the jail, the one that's the ultimate
decision maker is the sheriff, right?

A    Yes.

Q    Okay.  And in this case we know who
restrained Mr. Peterkin --

A    Yes.

Q    -- was the sheriff, right?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

A    Yes.

Q    Okay.

MS. MURPHY:  No more questions.

MR. GREENAMYRE:  Thank you so much.  I appreciate everybody's time today.

MADAM COURT REPORTER:  Can I get you all to put your orders on the record?

MS. MURPHY:  Sure.  I'll have an E-Tran with exhibits expedited.

MR. GREENAMYRE:  Non-expedited read and sign.

MR. GREENAMYRE E-Tran non-expedited please.

(RESERVED SIGNATURE.)

(Whereupon, the deposition of Johnnie R. Lambert, RN, CCHP-A, LHRM, was concluded at approximately 12:04 P.M.)



C E R T I F I C A T E

STATE OF GEORGIA:

CHATHAM COUNTY:

I, Kyle J. Saniga, Court Reporter and Notary Public in and for the above county and state, do hereby certify that the foregoing testimony was taken before me at the time and place herein-before set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth, that thereupon the foregoing testimony was later reduced by computer transcription; and I certify that this is a true and correct transcript of my stenographic notes so taken.

I further certify that I am not of counsel to either party, nor interested in the event of this cause.

*Kyle J. Saniga*
_____
Kyle J. Saniga, CCR

Notary Public, B-2038

Savannah, Georgia



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    100

D I S C L O S U R E

Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I was contacted by my office of Coastal Court Reporting, Inc. to provide court reporting services for this deposition.

I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

I have no contract/agreement to provide reporting services with any party to the case, any counsel in the case or any reporter or reporting agency from whom a referral might have been made to cover the deposition.

I will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

----------------------------
Date: July 27, 2025
Kyle J. Saniga, CCR, B-2038



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100    www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                101

ERRATA

CAPTION: RAHEEM PETERKIN vs.
          VICTOR HILL and CORRECTHEALTH
          CLAYTON LLC,

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the COASTAL COURT REPORTING DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath. Signed on the _____ day of

_____, 2025.


_____
          JOHNNIE R. LAMBERT, RN,
          CCHP-A, LHRM (Deponent)


SWORN TO and subscribed before me
THIS _____ day of _____, 2025


NOTARY PUBLIC:  _____
My commission Expires: _____



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                    102

                    DEPOSITION ERRATA
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____
Reason for
change:_____
Page No._____Line No._____Change to:_____
_____


SIGNATURE:_____DATE:_____
    JOHNNIE R. LAMBERT, RN, CCHP-A, LHRM


 **COASTAL COURT REPORTING & VIDEO SERVICES**
            **800-791-1100        www.coastalcourt.com**

RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT                           103

DEPOSITION ERRATA

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____


SIGNATURE:_____DATE:_____
    JOHNNIE R. LAMBERT, RN, CCHP-A, LHRM


 **COASTAL COURT REPORTING & VIDEO SERVICES**
          **800-791-1100        www.coastalcourt.com**

### Exhibits

**DX-1**  4:3 9:7,8,9

**DX-2**  4:6 27:8,9,11,12

**PX-1**  4:13 76:20,21,22 93:14

---

### -

**--during**  45:3

---

### 1

**1**  9:7,9 20:18 45:21 46:3,13 54:6 76:20,22 77:2 78:10,20 82:9,14 86:2 93:14,17

**10**  93:25

**10:20**  83:7

**10:30**  44:24

**10:52**  45:17

**10:59**  45:18

**10th**  61:10,13,20

**11:56**  95:23

**12**  64:14 82:15

**12-10**  62:10

**12-19**  62:13

**12:02**  95:24

**12:04**  98:21

**12:59**  47:14

**15**  7:22 16:8 30:2 51:3, 4,11 96:11

**15-minute**  41:5,9,12 77:15 78:24 86:13

**15-minutes**  49:14 77:19 94:19

**19**  9:18

**1974**  22:17

**1975**  24:8

**1977**  8:22

**1997**  23:8

**1998**  12:3

**19th**  61:14

**1st**  73:3

---

### 2

**2**  25:13 27:9,12 82:6

**20**  72:24

**2003**  13:14,17 14:4

**2015**  14:9

**2018**  29:24

**2019**  9:18 10:11 14:9 81:18 82:7 86:8

**2024**  18:12

**250**  72:21

---

### 3

**3**  51:15 52:3 77:2,11,22 78:2 79:12 86:12

**3:50**  52:4

**3:54**  52:7,11 55:2

**3:58**  52:6 55:4

**3:59**  51:15 54:23

---

### 4

**4**  51:14

**4:28**  54:16,20,25 55:4

**4:30**  21:2 53:19,24

---

### 5

**50**  6:13

---

### 6

**6**  93:18

---

### 7

**7**  78:5 86:19 93:21

**7B**  94:25

---

### 8

**8**  80:4,13 91:6 92:25

**8th**  63:21 81:17 82:7

---

### 9

**9**  93:25

---

### A

**A.M.**  45:17,18 82:6 83:7 95:23

**ability**  66:21 97:15

**absent**  85:14

**absolutely**  38:17 76:16

**ACA**  24:1 30:4

**accept**  69:13

**acceptable**  64:11

**accommodation**  88:7, 22,23

**accommodations**  87:23

**accredit**  30:10,11,12

**accreditation**  17:11

**accredited**  30:17

**accredits**  17:3

**accurate**  81:25

**ACOG**  31:25

**Act**  5:5

**active**  23:24,25

**address**  24:25

**addressed**  60:1,3,4

**addresses**  55:22

**adhering**  30:14 39:5,11

**administered**  90:24

**administration**  30:5 48:17

**administrative**  11:4 87:17

**administrator**  13:25 64:10 80:8 89:8,10,21 91:11 92:10 95:1

**admission**  82:24

**admitted**  61:9

**adult**  30:1,2

**advance**  34:10

**advanced-level**  34:23

**advise**  87:23

**advising**  89:1

**advocate**  36:2 58:8 97:13

**advocated**  91:2

**advocating**  56:6

**agitated**  23:18

**agitation**  28:8

**agree**  32:6 33:7 36:19 37:3,5 38:5,15,18 40:19 41:16 43:5,25 44:21,25 45:20 46:4,11 47:15,17 48:3 52:8 57:16 63:19 64:16,20 66:16 67:8,18, 22 68:5,9 69:23 71:15 76:12 79:15 83:22 86:23 90:1,3 97:4

**Agreeable**  5:9,11

**agreed**  42:11 57:6 89:7

**agreement**  5:3

**ahead**  19:18 58:12 68:14 70:2 74:16 80:15 82:3 87:5 97:8

**Alabama**  24:19

**alert**  57:5

**Allendale**  23:10

**allowed**  59:13 79:25



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT   105Index: ambiguity–checking

**ambiguity** 93:16

**American** 20:9 29:25 32:3

**Americans** 23:21 66:7

**amount** 49:22 75:24

**ankles** 42:4

**answering** 68:16

**anymore** 23:19

**apparently** 19:22 54:23

**appears** 56:19

**application** 14:24 80:5 91:8

**applies** 78:2,13 79:12 86:24 87:1 93:18,22

**appropriately** 86:1 88:9

**approximately** 6:11, 18 20:18 46:13 71:24 72:22 83:7 98:21

**Armor** 12:15,17

**arms** 56:9

**arrested** 63:20 82:21

**asks** 56:3 91:3

**aspirin** 53:10

**assess** 22:4 25:21 54:19,21

**assessed** 20:23 48:9, 12 53:3 54:23 55:4 82:8

**assesses** 55:21

**assessment** 35:21,23 44:22 45:10 55:7 70:24 83:23

**assessments** 45:4

**assisted** 10:3 13:8

**Association** 20:9 29:25

**assume** 41:11 44:6,7 46:16 67:22 68:7,25 69:2 70:7,9,10,11,15 83:11

**assumption** 81:23

**attempts** 28:4

**attend** 24:1

**attorney** 5:20 18:19

**auditing** 10:5

**authority** 36:7,10,15 38:6 66:18,20

**aware** 41:3 59:9 67:13 70:20 80:10

---

**B**

**baccalaureate** 22:20

**bachelor's** 23:6

**Bachelors** 22:19

**back** 14:3 23:6 25:3 27:17 42:23 63:11 79:10 93:14

**backed** 81:15

**backup** 22:9

**based** 11:8 21:6 30:12 31:13 43:3 57:9 58:6 71:3,4 80:16,17

**basis** 29:3 48:9 89:7

**Bates** 77:1

**bathroom** 59:13 84:19

**bed** 49:5

**began** 65:13

**behalf** 7:18

**behavior** 33:15 43:14 64:14

**behavioral** 21:12

**believed** 43:21

**belong** 23:25

**big** 42:7 59:20

**bill** 73:3

**billed** 72:25 73:2

**billing** 72:16

**bit** 22:10 42:24 93:16

**blood** 21:4 42:4 52:15 53:8,13 57:22 59:17,20 60:1,2,3,10,21 61:3 70:25 71:17 92:2

**board** 10:10,11

**books** 30:2

**break** 6:21,22 45:16 95:18,22

**breathing** 23:20 42:2

**briefly** 9:17

**brought** 15:9,10 19:22 82:23

---

**C**

**call** 6:2 11:25 14:15 23:17,18 24:21 63:7

**called** 15:16 20:23 46:21 78:20

**calm** 19:25 29:4,6,12 37:23 49:16 75:11 79:22

**camera** 96:16

**canceled** 62:12

**cardiac** 23:1,3

**cardinal** 20:7

**care** 13:25 21:7,9 23:1, 3 29:19,20 30:2,19,23 31:1,2,14,18,22 32:7, 11,19 33:1 36:23 38:16, 19 39:1,6,11,15,17 40:2,3,14 55:25 57:2 58:5 64:1,4 67:24 68:6, 10,11,12,17 69:9,14,25 70:17 76:13 85:8 91:18, 19 96:25

**cared** 13:11 14:5

**caring** 41:1

**Carolina** 23:9 24:15,19 25:1 65:15

**case** 6:20 7:14,15 8:2,4 16:18 18:11 19:11,19 25:23 41:3 43:25 49:18, 19 51:6 57:17 71:22 75:4 84:17,20 88:2

**cases** 16:6,7,13,22 30:19,20 44:9

**caught** 61:15

**causation** 58:14

**caused** 58:15 60:10

**CCHP-A** 5:14 98:19

**CDC** 32:2

**centers** 17:3

**Centurion** 12:14,21,25 14:9 15:18

**certificate** 10:11

**certifications** 22:24

**certified** 22:25 23:1,17, 19

**chain** 38:13

**chair** 17:22 20:3,6,12, 14,19 21:10,17,23 22:3 26:3,9,11 29:7,12 35:4 42:6 43:2,7,12 45:21 46:12,20,22 47:2,14,21 49:7 50:10 53:21,25 54:2,7,11,17 57:5 58:21 59:12 60:7,10 75:7,24 76:1,3,19 79:3,4,10 81:20 82:6,14,18,22 83:2,10,13,24 84:3,8 93:1 94:17

**chairs** 17:22

**Champion** 46:7,17

**chance** 5:24 71:13

**change** 93:24

**charge** 19:23

**chart** 26:23 62:9

**check** 22:6 50:10 51:13,17,24 69:24 97:14

**checked** 51:14 56:23 78:16 96:25

**checking** 26:5 49:23 50:19 85:4

90:18 91:16 96:23 97:22



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT          106Index: checks–custody

**checks** 41:6,9,12 67:16,19,23 68:5,8 69:5,7 77:14,19 78:25 94:18

**Chelsea** 5:19 72:5 73:17

**chest** 20:22 21:4 57:21 59:21

**chronic** 60:16

**circulation** 22:5

**circumstances** 30:22 32:8 33:4 37:19 38:21 39:2,4,19 69:22

**city** 18:2

**Civil** 5:5

**claims** 65:3

**Clayton** 18:21 26:12 80:11 81:16 86:3 94:9, 15

**clean** 7:3,11

**clear** 27:25 29:4 32:22 49:24 95:5

**cleared** 82:24

**clicking** 71:6

**client** 10:13

**clients** 75:21

**clinical** 11:3,21,24 12:7,12 13:5,7,8 15:11 21:11 27:22 31:10,12 33:17 34:2 37:20 49:4,7 68:11,12 84:16,21 87:10 95:9

**clinical-ordered** 79:14

**clinically** 11:16,17 12:2

**clinically-order** 78:10

**clinically-ordered** 34:9 78:3,21 86:14 93:19 94:1

**Clopton** 51:16,20 53:2, 5 55:10 67:14,23 69:24 70:20 71:1,15 80:21 90:19 91:17,25

**Clopton's** 17:24

**colleague** 18:16

**college** 22:23 32:3

**combination** 11:7

**comfortable** 91:4

**comment** 32:18

**commission** 10:6,9 17:1 20:10 23:14,25 29:21

**committee** 69:17

**communicate** 80:6 91:9 93:3

**communicated** 91:24 92:6

**communicating** 80:12

**communication** 14:15 80:12

**community** 31:19,21

**compact** 24:22

**company** 11:23 12:12, 18

**complaining** 20:22 42:16 55:17

**complaints** 19:4 21:4 41:14 71:2,17 92:3

**complete** 19:11

**completed** 25:15 44:10 45:4,7 52:4

**compromise** 71:2

**concern** 48:8 54:10 66:21 67:6

**concerned** 25:18

**concerns** 25:14 80:7 91:10,14,24 93:3

**concluded** 98:20

**conclusion** 21:1

**condition** 55:14,16

**conditions** 90:7

**conducted** 67:16

**conferences** 24:1 66:7

**conflict** 11:13

**confusing** 26:20 53:23 81:6 87:7

**constant** 24:10

**constantly** 49:13 96:14

**consultant** 16:17

**consulting** 74:8

**contained** 81:2

**context** 41:4 77:24

**continued** 9:25 22:23 23:7

**continuous** 10:1

**contract** 12:25 13:1 15:7 49:9

**contracted** 49:10

**contraindications** 21:16 25:21 44:18 45:11,12 82:19 87:22 88:4

**control** 14:17 33:15 50:16 82:21

**controllable** 64:15

**conventions** 23:15

**cooperative** 20:1 29:13

**coordinate** 11:11

**copy** 9:12 27:4 50:22, 23,25 77:8,9

**Corporation** 12:14,15

**correct** 32:24 33:5 34:17 35:6,8,13 36:11, 12,17 38:9 43:8 52:23 58:24 59:1 75:7 76:3 78:22 80:24 84:2 86:4 88:5 89:13 92:12

**Correcthealth** 5:21 18:5 74:5,10 77:19 78:25 80:10 82:8 86:24

**Correcthealth's** 76:18

**correction** 27:23 65:19

**correctional** 7:15,24 9:24 10:6 11:23 13:21 16:19 17:1,8 20:9 23:10,14 27:19 29:22, 25 43:15 65:15 75:22, 23

**Corrections** 23:8,20 65:13 79:11

**correctly** 86:12

**counsel** 5:3

**country** 10:8

**County** 13:19 18:21 26:12 80:11 81:16 86:3 94:10

**couple** 59:19 71:9 76:9 81:22 95:16

**courses** 23:16

**court** 6:24 7:10 98:7

**cover** 71:7

**covers** 24:16

**CQI** 15:9

**create** 31:8

**creating** 10:3

**credentialed** 22:10

**credit** 30:12

**criticism** 43:1 48:7

**criticisms** 28:24 29:16

**CROSS-EXAMINATION** 74:23 76:10

**current** 11:9

**custodial** 14:5 33:12 35:7,19 37:24 48:4,20 64:2 66:11,18 89:24 95:9 96:4 97:3

**custodial-ordered** 33:8 34:3,25 35:2 43:9

**custodial-restraint** 84:9

**custody** 33:13 48:15 57:25 79:13 84:16



87:10 90:15 94:11

**custody-ordered**
78:4,16 79:13 86:20,25
87:8,12 93:22 94:2

**cuts** 59:15

**CV** 9:6,14

---

**D**

**danger** 28:2 33:19,22
50:6

**dangerous** 59:18

**date** 18:13 61:20 73:1

**day-to-day** 12:22

**deadly** 38:4

**death** 8:4,25

**deaths** 23:23

**December** 9:18 61:10,
13,14 81:17 82:7

**decide** 95:2

**decision** 37:15,16 76:1
89:23 97:20

**decisions** 21:21

**deem** 36:13

**deescalate** 28:5

**deescalation** 28:7

**defeats** 29:7

**defendant** 5:12 7:18,
23

**defendant's** 9:7,8
16:21 27:11

**defendants** 75:3

**define** 29:18 48:19

**defined** 30:20 48:16

**degree** 23:7

**degrees** 22:14,20

**Dekalb** 13:19

**delineate** 87:10

**delirium** 23:18

**depending** 49:9

**deposed** 7:14

**deposition** 5:2 6:9
17:25 58:7 98:17

**deposition's** 5:8

**depositions** 6:12

**deputies** 41:5,14,25
42:9,18

**deputy** 41:22 42:8

**designee** 80:8 91:11

**detailed** 95:7

**detention** 17:3 30:3

**determine** 21:18 64:11
89:23

**diaphoretic** 42:5

**difference** 33:8,12,24
41:22

**difficult** 54:13

**diploma** 22:17,22

**DIRECT** 5:17

**director** 48:16 89:9,22
95:2

**Directors** 10:10

**disagree** 76:12

**disciplinary** 87:17

**discomfort** 55:17,22

**discovered** 61:21

**discuss** 27:2

**discussing** 30:25 32:9

**disposition** 43:3

**distress** 36:18,22 57:5,
13 71:16

**doc** 39:7

**doctor** 20:22,23 31:24
32:23 57:17 92:10

**doctors** 30:21 31:3
32:7,19 33:1 35:12
36:15 38:20 39:1,18
43:15

**document** 39:3,16,22
40:14,17 44:10 49:14
54:25 68:9,23 78:1

**documentation** 20:18,
21 26:17,20 38:16,18
39:14 40:11 45:25 47:4
53:22 54:12 68:11,18

**documented** 39:9
40:12,21 46:11 47:1,18
54:22 61:9,18 68:4,20
69:8 70:5,22,24 77:12
89:12

**documenting** 39:6,7,
12 40:6 63:4

**documents** 55:10
56:18 62:9

**download** 73:9

**drive** 73:9

**due** 21:3 34:12

**duly** 5:15

**duties** 12:1

**duty** 9:4 25:20 43:22
64:25

---

**E**

**E-TRAN** 98:11,14

**earlier** 5:20 35:19
43:19,22 64:17 81:4
83:5 84:5 85:25 89:5
96:3 97:18

**early** 81:17

**easier** 7:10

**easy** 24:22

**edition** 29:24

**education** 15:4

**educational** 16:1,2

**effect** 37:16,17

**effective** 23:21 56:24
66:7

**electronic** 10:4 63:4

**elevated** 21:5 42:4
52:15 57:22

**elevation** 59:21

**emergency** 23:4 36:22
37:7

**emergent** 58:3

**employee** 35:7

**employer** 13:20

**encompass** 30:5

**enforcement** 23:22
65:8,23 66:8 75:20

**entire** 11:8

**entitled** 31:21

**entries** 81:24

**equipment** 59:3

**ery** 94:20

**essentially** 48:7

**estimate** 15:16

**ethics** 14:16

**Eunice** 46:7

**evaluate** 21:14 64:2

**evaluated** 67:15 70:21
90:19 96:21

**evaluation** 43:23 44:1,
3,8 77:16 82:17,25
90:22

**evaluations** 67:10

**everybody's** 98:5

**evidence** 77:18

**exact** 18:13

**EXAMINATION** 5:17
83:20 95:25

**excuse** 47:8

**exercises** 16:3

**exhibit** 9:7,8 27:8,11
76:21 83:5 86:2 93:14

**exhibits** 98:11

**expedited** 98:11

**expert** 8:13,20 16:10

**explanation** 7:8



**extent** 79:12 81:9

---

**F**

**facilitate** 79:15 89:8

**facilities** 30:3 96:9,12, 15

**facility** 12:23,24 15:13 19:23 23:10 28:11 30:9, 12,15 48:13 61:24 69:16 82:24 89:21 95:1

**fact** 25:8 62:25 83:9 88:10

**facts** 83:11

**fair** 32:13 48:20 81:6 95:6

**fall** 27:17

**falls** 87:11

**familiar** 46:8

**find** 61:17 72:15 73:11 85:24

**fine** 94:10 95:20

**Finish** 67:21

**finished** 67:21

**floor** 12:2,3 23:11

**Florida** 24:19

**flow** 77:13

**focus** 30:8

**focused** 17:16 19:15

**focuses** 30:7

**folks** 5:24 75:22,23

**follow** 30:16 31:24 32:4 76:14

**force** 27:15

**form** 5:7 32:10 40:8 58:11 68:1,14 70:2 77:20 78:18 79:5,17 80:14 82:2 86:17 97:7

**found** 18:14 67:2 71:16

**foundation** 17:8

**four-point** 49:6

**frame** 15:5

**Franklin** 52:22 53:20

**frankly** 29:8

**frequency** 48:14

**frequent** 66:3

**fro** 29:20

**front** 58:7

**full** 6:4

**function** 37:14 38:8

---

**G**

**gap** 61:8,13

**gave** 6:16 55:10 77:8

**general** 94:25

**generally** 8:23 31:23

**gentleman** 83:25 84:23

**Georgia** 5:5 8:7 24:18 32:23

**give** 5:23 9:19 15:15 17:12 71:20 73:7 93:2 95:17

**glove** 37:13

**graduated** 22:16

**grateful** 6:25

**great** 14:8 37:11 85:23

**GREENAMYRE** 5:9 40:8 58:11 67:25 68:13 70:1 72:3,11 73:15 74:17 76:8,11,24 77:10 78:6,19 79:6 80:3,19 81:11,12 82:4 83:17 86:16 92:17,21,24 95:13,20 97:7 98:4,12, 14

**grievances** 19:3,8

**ground** 6:19

**guess** 12:7 15:4 75:22

**guidance** 95:7

**guide** 94:21

**guidelines** 11:24 13:7, 9 31:11,12 32:2,3,5,9

**guy** 59:20 66:24

**guy's** 63:14

**guys** 71:6 92:16

---

**H**

**Hakeem's** 17:16

**hand** 9:12 37:13

**handcuffed** 79:3,9

**handcuffs** 26:3,8,13 28:18 58:20,23,25 59:2, 6

**hands** 56:11 88:8,9,11, 23 91:3

**hands-on** 13:25

**happened** 9:3

**happening** 49:17

**harming** 34:11 83:3

**hate** 44:5

**head** 7:9 97:18

**heads** 71:12

**health** 10:4 13:24 21:12 29:22 33:18 48:25 49:2 63:5 77:12,14 80:7 87:22 89:5,9,10,22 90:15 91:10 92:10

**healthcare** 10:6,18,20, 21 11:9,11,23 12:12,15 17:2,8 19:16 23:14 27:19 29:22 30:7,11 77:14 87:15 96:23

**heard** 35:19 39:8 75:10

**heart** 52:14 56:15 70:25 71:18 93:15

**held** 26:18,19 75:25

**helped** 12:24,25

**helping** 11:6 16:6

**high** 60:11

**Hill** 41:4 51:23 53:21 57:19 67:9 75:4 81:14

**Hill's** 5:12 17:17

**history** 45:5 60:16,21

**Hoffer** 5:11 71:9,12 74:19,21,24 75:2 76:6 92:20

**hope** 42:19

**hospital** 8:5 9:1

**hospitals** 23:3

**hour** 40:15 51:18 94:18 96:10

**hourly** 71:22,23 72:20

**hours** 20:21 22:4 26:9 40:16 51:12 58:21 64:5, 6,7,10,14 67:1 72:24 77:16 79:4 81:17 82:14, 15 83:10 88:15 94:18 96:18,20

**huh-uh** 7:9 65:1

**hurting** 28:2

**hypertension** 60:18 90:4,5

**hypertensive** 63:21

---

**I**

**ICE** 17:5 30:15

**idea** 19:9 60:8 63:18 73:6

**identification** 9:10 27:13 76:23

**identify** 45:11

**illness** 34:13

**im** 91:7

**immediately** 80:7 90:14 91:10

**impact** 57:12

**impaired** 23:20

**implementing** 13:8



**improper** 80:5,22 91:8 93:4

**improperly** 66:22

**improvement** 10:1,2

**In-custody** 23:23

**in-depth** 77:15

**incarcerated** 31:16,20 41:23,24

**include** 77:13

**included** 29:2

**includes** 35:20,23 68:17

**incumbent** 79:24 84:12 85:12

**indication** 26:22 71:1 84:21

**individual** 31:21

**infection** 14:17

**infirm** 94:20

**infirmary** 26:19

**information** 17:20,22 58:6 87:25

**informed** 86:12

**initial** 81:3

**initially** 25:10 63:20

**injuries** 58:16,19 59:9, 10

**inmate** 13:11 14:5 15:22 34:11 36:14 47:5 48:22,23,25 54:21 57:4, 19 64:2 75:11 84:7 85:9,13,15 89:16 90:16 97:1

**inmate's** 55:14

**inmates** 36:3 51:25 67:11 87:16 89:6 97:14

**inside** 33:22

**Institute** 23:22

**intake** 19:24,25 26:18 44:4,7 45:2,3 53:20 54:2 62:16 83:1,6,11

**intend** 58:14

**intensive** 23:1,3

**interacts** 41:22,24

**Internal** 32:3

**interval** 86:13 96:4

**intervals** 77:15 79:16 85:13 89:7,11 95:8 96:8 97:1

**invoice** 72:4 73:19

**invoices** 73:1

**involve** 15:21

**involved** 37:20 91:18

**IPICD** 23:22

**issue** 25:8 26:2 34:14 42:25 59:17

**issues** 15:8,9,10 22:6 25:6 41:15 42:6 59:23

---

**J**

**J.R.** 5:2

**jail** 7:16 10:4 11:10,12, 16,17,24 12:1,8 18:8,21 20:11 31:18,22 33:23 34:4 36:20 37:5 38:6,8, 14 48:17 63:20 65:8,23, 24,25 66:4,8 75:20 80:11 81:17 86:3 94:10 97:19

**jails** 9:22,24 10:8,14 12:9 17:3 29:23 65:22

**January** 86:8

**Jennifer** 52:22 53:20 54:1 55:6

**job** 12:3 21:18,21 35:18 84:9

**Johnnie** 5:14 6:6 98:18

**July** 73:3,5

**jump** 86:19

---

**K**

**key** 35:4,10,13

**keys** 59:5 97:10

**kind** 7:14 8:2 17:7 26:19 28:24 29:7 50:1 54:4 71:6 75:9 96:13

**kinds** 21:20

**kiosk** 19:4

**knew** 93:7,11

**knowledge** 51:1

---

**L**

**labeled** 77:1

**ladder** 85:11

**Lambert** 5:2,14,19 6:2, 7 74:25 98:18

**law** 23:21 32:23 65:8,22 66:7 75:19

**lawsuit** 8:19,25

**lead** 10:7

**leading** 81:9

**learn** 62:4

**legal** 16:7,16 30:19 66:18 74:9

**legally** 74:9

**letting** 44:11

**level** 31:17

**LHRM** 5:14 98:19

**license** 24:16,23 25:1

**licensed** 24:4,6,12,14, 18

**licensure** 24:9

**licensures** 22:14

**lines** 92:21

**local** 30:3

**long** 16:5 24:24 63:2 83:14

**longer** 64:9,13

**looked** 12:22

**lot** 40:20

**loud** 7:7

---

**M**

**MADAM** 98:7

**made** 24:22 37:15,16

**majority** 24:16 44:9

**make** 7:3 13:6 21:16, 20,22 22:5,6,7 29:8 56:24 71:7 76:1 78:25 79:8 82:9 83:1,4 88:20 89:23 94:13 96:16

**maker** 97:20

**making** 72:12 80:12

**malpractice** 16:13,15, 18

**manage** 10:12

**mandate** 36:15

**manner** 25:15

**manual** 94:5

**manuals** 11:8

**manufacturer** 26:11

**marathon** 6:22

**mark** 9:6,7 27:8 76:20

**marked** 9:9 27:12 76:22

**Marney** 47:7,10,13

**match** 11:12

**matrix** 31:8

**matter** 48:24 70:14 81:4

**means** 61:19

**measure** 28:1 34:5

**medical** 13:22 16:6,13, 14,17 17:18 19:15 20:15 21:13,21 25:20 26:23 29:9 30:5,19



31:15,18,25 33:10 37:7, 12,16,17,24 40:3 41:14 42:6,17 43:6 44:14,17, 19 45:12 48:9,16 49:10, 22 50:10,13 51:6,12,24 52:4 57:18 58:8 59:3 60:24 61:13 62:5,13 63:16 64:24 66:17 67:9 76:14 79:15 80:16 81:3, 5,24 82:17,25 84:20 85:10 89:8,22,25 90:7 93:1 95:1,7 96:14,17

**Medical's** 50:8

**medical-ordered** 34:15

**medically** 22:8 42:10 59:2

**medically-ordered** 34:8 35:3

**medication** 21:3 53:6, 8,25 56:23 60:5 61:17, 23,24

**medications** 53:13 55:11 56:20 60:22 61:1 90:22,24

**medicine** 7:24 8:1 31:4 32:4,21 43:15 61:4 62:20 63:3

**medicines** 63:9

**meet** 69:9 96:25

**meets** 55:25 68:9

**member** 10:10 66:1

**mental** 21:12 33:18 34:12 48:25 49:2 89:9, 22

**met** 5:20 18:23 67:24 68:6 69:14,25 70:17

**Metoprolol** 53:14

**Michael** 75:2

**middle** 6:6

**midnight** 82:6

**Miller** 47:7,10,13

**mine** 18:16

**minimum** 64:5 96:18

**minute** 73:8

**minutes** 51:3,4,11 95:19 96:11

**missing** 72:12 82:17

**misstating** 77:21,23

**moment** 40:15 75:11

**monitor** 41:20 89:5

**monitored** 89:25 90:5, 6 94:20

**monitoring** 14:25 38:2 41:21 42:7 48:14 77:12

**morning** 81:17 82:14

**move** 88:8

**moved** 23:9

**moving** 88:23 91:6

**multi-state** 24:15

**Murphy** 5:1,13,18,19 9:11 40:18 45:19 58:13 68:2,21 70:6 71:11,14 72:6,14,18 73:21,23 74:13 77:8,20,23 78:1, 18 79:5,17 80:14 81:8 82:2 83:19,21 86:18 92:14 95:15 96:1 97:9 98:3,10

---

**N**

**national** 10:5 17:1,2 20:9 23:14 29:21 31:14

**navigate** 79:23

**NCCHC** 10:10 16:22,25 30:7,16 94:5

**necess** 48:23

**night** 23:11,12 83:11

**non-clinical** 80:6

**non-expedited** 98:12, 15

**nonclinical** 80:23 89:6 91:9

**noncompliant** 61:1,7

**nonexistent** 22:21

**nonmedical** 28:13 75:20

**Norvasc** 53:15,16

**note** 21:1 54:1,5 57:10

**notes** 20:24 57:4

**notified** 37:25 44:15 50:8,14 51:6 52:20 55:13 83:25 97:3

**notify** 52:18 90:15

**notifying** 55:22

**number** 9:9 25:13 27:12 58:20 61:22 76:22 77:22 78:2,5 86:12,19 88:14 91:6 92:25

**nurse** 11:16 12:2,3 15:13 16:16 22:10,25 23:1,11,12 24:4,7 25:19 36:9 40:13,19 41:23 42:20 46:4 47:12 55:19, 20 61:16 62:9 65:17 66:24 69:15 84:13,15, 21 85:3,4,5,7,12 88:6, 22 91:2,17,24 92:5

**nurse's** 35:18

**nurses** 9:3,24 11:24 13:2 14:10 15:14 25:18 26:5 30:20,21 31:6 32:7 35:9 36:6,14 38:20 39:1,18 41:13,19 42:3, 15 43:5,14,22 44:17 51:17,24 57:11,17 58:22,25 61:9 63:15 64:2 66:23 67:15 68:7 69:21 83:22 94:21 97:13,15

**nursing** 11:25 13:9 14:14,16 20:16 21:1,7 22:4,16,19,22,24 24:22 25:14 26:15 31:7 45:25 70:24 83:22 94:17,20

---

**O**

**object** 77:20 78:18 79:5,17 80:14 81:9 82:2

**Objection** 40:8 58:11 67:25 68:13 70:1 86:16 97:7

**objections** 5:6

**obligation** 37:25 41:19 80:23 93:3

**observation** 20:17 42:9

**observations** 96:16

**observe** 21:22 93:2

**observed** 71:3 93:11 96:14

**observing** 79:9

**obtained** 21:3 45:1

**officer** 35:5,16 44:15 55:14 56:3 65:15,19 84:16,18,22,25 85:3,6, 8,13 92:11

**officer's** 84:9

**officers** 34:4,17,20,22 36:13 50:18 55:23 57:19 64:21 92:6 97:10

**Ohio** 8:8

**onset** 15:6

**operating** 12:6

**operation** 12:13 15:11

**operations** 11:22 12:7 65:9

**opine** 32:25 58:14 65:2, 5

**opinion** 20:5 21:6 25:17 28:10 29:10 75:11 93:25

**opinions** 19:11,19 25:6,25 27:2

**order** 20:4 21:3 34:23 61:16 74:19 94:13

**ordered** 33:13,17 34:4, 9 53:5,8,10,12 90:22

**orders** 33:25 53:21 55:11 98:8

**organization** 17:2



**orientations** 65:24

**outcome** 97:6

**outline** 19:18 71:7

**override** 66:18

**overview** 9:19 17:13 71:21

**P**

**p.m.** 20:18 82:9,14 95:24 98:21

**paid** 71:21,22

**pain** 20:22 21:4,24 42:16 57:21 59:14,21

**paragraph** 80:13

**parse** 93:15

**part** 8:19 14:19 29:2 36:21 39:14,23,24 53:23 89:14

**participate** 87:15

**patient** 20:21 21:10,17, 22 22:5,7 28:16 29:4,6, 11,12 33:18,21 34:1 36:17 38:2,15 40:3,14, 17,20 41:1 44:16 49:11, 13,15,24 50:9,11,14,15, 19 54:1 56:6 61:17 64:8 79:20 83:23 84:7,18 90:3,7,9 91:3 94:18

**patient's** 21:4,15 22:3 63:5 79:21

**patients** 14:16,25 28:2 30:15 36:18 41:20 50:5 64:12 88:23 97:14

**people** 31:16 33:22 37:21 82:20 96:16

**perceived** 80:22

**perceives** 80:5 91:7

**perfect** 6:8 7:13 77:11

**perform** 67:19,23

**performed** 67:10 68:5

**period** 62:2

**periodic** 35:23

**periodically** 50:11 85:1 96:17

**permitted** 5:4

**person** 5:23 27:21 29:10 33:16 35:4,16 37:22 41:23,24 49:5 75:25 79:25 85:2 92:11

**person's** 38:1 79:22

**personally** 13:12 67:14

**personnel** 76:14 77:14 80:11

**perspective** 5:10,12 37:1 79:1

**pertain** 94:1

**pertains** 86:13

**pertinent** 87:24

**Peterkin** 18:24 19:5,22 25:9 42:15 43:1 44:22 45:20 46:11 48:8 51:13 52:5 53:1,3 55:21 58:9, 17 64:17 67:15 70:21 71:17 79:2 80:13 81:15, 16 82:5 83:9 97:5,23

**Peterkin's** 41:15 58:16 65:3 91:19 92:2,7

**pharmacy** 61:16 63:12

**phone** 74:1

**phrased** 93:10

**physical** 21:24 36:22 45:5

**physically** 83:3

**physician** 20:24 32:16 34:10,23 41:13 52:18, 20 64:10

**physician's** 20:25

**physicians** 13:6 31:13

**picked** 26:6

**piece** 19:16 26:15 82:16

**place** 13:7 42:20 43:3,6

58:23

**places** 49:3

**placing** 20:12 44:22 45:8,11,12

**plaintiff** 7:16 16:22

**plaintiff's** 5:10 18:17 76:20,21 86:2 93:14

**plaintiffs** 18:14

**plan** 65:2

**point** 10:12 52:25 59:25 89:4

**pointed** 86:1

**points** 20:7

**policies** 9:21 10:13,16, 18,21,25 11:3,4,5,11, 12,13 13:4,5,9 14:16 18:2,7 20:8 28:11 31:9 50:1 65:24 76:15 78:15

**policy** 11:8 18:5 26:12, 13,25 28:15 48:19 49:19,21,24,25 50:1,3, 5,13,17 76:18 77:1 85:24 86:2,3,23 87:6 89:14,18,20 93:15 94:4, 8,11,14,24 95:6 96:4

**port** 82:22

**position** 91:4

**positions** 13:2

**post** 67:10

**post-assessment** 97:2

**potentially** 14:3 55:1

**practice** 5:5 31:4,6 32:20 34:10 43:16

**practices** 29:2

**practitioner** 34:24

**pre** 67:10

**pre-assessment** 97:2

**pre-restraint** 43:23 44:1,2,8

**pre-restraints** 35:20

**preparation** 17:13

**present** 9:19

**president** 11:22 12:13

**pressure** 21:5 42:4 52:15 53:8 57:22 59:17, 20 60:1,2,3,11,21 61:4 70:25 71:18 92:2

**pressures** 53:13

**prevent** 34:11

**Prevention** 23:23

**primarily** 16:9,12

**primary** 24:24 30:8

**principal** 27:19

**prior** 44:22 45:7 83:24

**priority** 36:20 37:6

**prison** 11:10 66:2,3,8

**prisons** 9:22,24 10:8, 14 17:3

**private** 12:12 31:24

**privately** 49:10

**probably's** 6:20

**problem** 20:13 36:4 42:17

**problems** 85:9,10

**procedure** 76:18 86:3

**procedures** 9:22 10:13,16,19,22,25 11:3, 5,6,14 13:4,5 14:17 15:5 18:2 28:12 31:10 65:23 76:15

**process** 15:20 35:20, 24 84:10

**produced** 5:15

**program** 15:21

**proper** 74:19

**protocols** 13:9 14:15

**provide** 95:7

**provider** 34:10

**providers** 66:17 67:10



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT      112Index: providing–retrain

**providing** 14:23 15:4

**psychiatric** 22:25

**PTSD** 65:3

**pule** 17:20

**pull** 73:6,8

**pulse** 59:21 60:4

**punish** 20:10

**punishment** 20:6 43:12 75:7 93:1

**punitive** 25:10

**purpose** 22:2

**purposes** 5:4 25:11 33:10 96:2

**pursuant** 5:3

**put** 28:16 29:6 36:24 37:1 44:12 48:19 50:6,9 54:7 75:16,23 79:4 81:19 82:5,13 83:9,13 96:13 98:8

**puts** 21:19

**putting** 28:6 37:22 83:2 94:9

**Q**

**quality** 10:1,2

**question** 33:11 38:22 68:16 88:21 91:21

**questioning** 92:22

**questions** 5:22,25 7:7 71:10 73:17 74:14,20 75:5 76:7,9 81:22 83:18 95:16 98:3

**quickly** 81:20

**R**

**rapid** 59:21

**rate** 52:14 56:15 70:25 71:18 72:20

**re-took** 56:12

**reaching** 14:3

**read** 67:12 98:13

**reading** 62:5 86:22

**readmitted** 63:1

**rearrested** 62:8

**reason** 27:14 28:16 29:13 33:14 47:23 57:10,18 58:8 84:21

**reasonable** 41:12 42:15 95:6

**reasons** 21:11,13 33:18 87:17

**recall** 51:23

**received** 53:20,25 54:2 61:16 65:14,22

**receiving** 61:24 63:3 83:12

**recent** 9:14

**record** 6:5 7:4 10:4 43:19 44:18,20 55:20 60:25 61:13 62:14 63:5 81:5 87:22 98:9

**records** 17:18 20:15,16 21:15 60:24 62:5 80:17 81:3,25

**RECROSS-EXAMINATION** 92:23

**REDIRECT** 83:20 95:25

**reevaluated** 64:7

**reevaluating** 76:2

**reference** 96:2

**referred** 18:17

**referring** 86:1

**regained** 50:16

**regional** 11:21 66:1

**regular** 7:25 25:15 48:9 89:7

**regularly** 26:6

**related** 81:23

**relay** 41:14

**release** 36:14 76:2 97:16

**released** 61:10,12,18 62:8,10,25 63:5,17 75:12 97:3

**relief** 56:19

**rely** 39:13 41:13 42:17

**remain** 23:24,25 64:9

**remained** 24:9

**remains** 57:4

**remember** 18:11,12 46:5 47:11 50:20 51:16

**remind** 7:1 85:12

**reminders** 66:4

**reminds** 7:1

**removal** 36:16

**remove** 36:7,10 58:25

**removed** 26:14,23 28:18 29:5 34:19,22 57:24

**rephrase** 36:9 37:2 38:24

**report** 15:10 27:3,5 28:21 42:8

**reported** 79:10

**reporter** 7:10 98:7

**reporter's** 6:24

**reports** 81:15

**reposition** 56:4,8

**repositioned** 66:25

**repositions** 92:11

**represent** 75:3 81:13

**request** 48:1 57:23 79:25

**requesting** 11:10

**requests** 63:8

**require** 21:7 64:1 76:13 96:12

**required** 17:10 30:16 85:7 87:23

**requirement** 17:9

**requires** 21:9

**requiring** 88:7

**reserve** 5:6

**RESERVED** 98:16

**resort** 28:1,5

**response** 52:17 90:21

**restrained** 13:11 15:22 26:3 27:21 51:25 75:12,17 90:6,16 97:23

**restraining** 15:22 87:16

**restraint** 15:5,20 17:21,22 20:3,5,8,12,14 21:10,17 26:3,9,10,13,24 29:5,7,11 35:4,20,24 36:14 37:20,24 43:2,7,9,11 45:21 46:12 47:20,23 49:6,7 50:9 53:21,25 54:2 75:6,24,25 76:19,25 77:1,13 78:11,21 79:10 81:20 82:13,18 83:10,23,24 84:3,8 86:4 87:8 92:7 93:1 96:13

**restraints** 14:6,11,24 15:1,9 17:21 21:19 25:9,19 27:15 28:6,17 33:9,13,17,21,25 34:3,8,9,16,25 35:3,10 36:7,10 37:22 38:1,3 41:20 44:12,16,23 45:8,13 48:4,15,21 49:2,3,4,8,12,14 50:6,15 51:7 54:5 57:20,24,25 58:9 64:3,9,13 66:12,19 75:13,16 78:3,4,16 79:13,14 80:6,23 82:6 86:14,20,25 87:12 88:14 89:6,24 91:9 93:4,19,22 94:1,2,11 95:9,10 96:5 97:16

**restroom** 64:22 80:1,2 84:7,8,13,23 85:1,5,14

**retained** 18:11

**retrain** 15:14



**returned** 22:23

**review** 18:1,4,7 19:3 21:15 25:21 27:6 60:24 87:21

**reviewed** 17:13,15,18, 19,24 19:12,14 20:15 44:17

**reviewing** 16:6

**rise** 93:2

**risk** 90:16

**RN** 5:14 98:18

**Roberta** 6:7

**rolled** 94:19

**room** 23:4

**rounds** 20:16 25:14 96:17

**routinely** 67:15

**rude** 7:2

**rules** 6:19

**running** 13:1

---

**S**

**safe** 21:23

**safety** 34:5,14 36:20 37:5 67:16,19,23 68:5,8 89:5

**sake** 6:24

**sally** 82:22

**sat** 26:8

**scarring** 58:19 59:15

**schooling** 22:14

**scope** 28:14 43:15

**screen** 83:12

**screening** 44:4,8 62:16 83:1,6

**seclusion** 44:12 76:25 77:1 78:21 86:4 87:16 89:7

**section** 86:13 87:1,9

**security** 21:13,19,20 27:24 30:5 35:16 36:20, 25 37:5,12,15,17,20 49:12 79:20 87:24 89:1

**seek** 88:7,22

**self-admits** 61:2

**send** 44:13 72:5,7 73:18

**sense** 29:8

**sentence** 87:15

**separate** 44:10

**service** 80:7

**services** 13:22,24 29:23 89:9,10 91:11 92:10

**set** 31:1,2 33:20 38:19 52:11

**sets** 30:9

**shaking** 7:9

**share** 10:12

**She'll** 6:25

**sheet** 77:13

**sheriff** 20:4 38:6 47:25 50:9,25 51:1 53:21 75:3,21 97:20,25

**sheriff's** 47:24 50:1,3, 5,13,17

**sheriffs** 50:18

**show** 83:4

**showing** 43:13

**shown** 76:18

**sick** 11:25 14:15 63:7

**side** 13:5 16:21 28:13

**sign** 98:13

**SIGNATURE** 98:16

**signs** 22:7 43:13 45:1 52:3,4,12 55:1 56:12 71:16

**similar** 30:22 32:8 33:4 38:21 39:2,3,19 69:21

**similarity** 33:20

**sit** 49:11

**site** 10:12 94:8,14

**site's** 94:10

**sits** 49:13

**situation** 21:14 58:3 82:9

**skin** 71:2

**sleeping** 49:16

**Smith** 52:22

**societies** 32:1

**somebody's** 75:16

**someone's** 33:14 44:11 94:17

**sort** 16:12 19:18 32:10 35:16 36:3 38:2 43:22 45:4 87:6

**sound** 46:7 52:9

**South** 23:9 24:15,19 25:1 65:14

**speak** 6:23

**speaks** 55:21

**specialist** 12:7

**specific** 14:10 48:22,24 89:11,15,17,18 90:9 94:14 96:4 97:1

**specifically** 14:23 17:23 65:8 67:9,14

**specificity** 94:8

**spelled** 44:19 90:2

**spells** 40:10

**spending** 49:23

**spent** 71:25 72:23 73:5

**spinning** 91:22

**spoke** 55:19

**spoken** 19:1

**stable** 22:8 56:19

**staff** 21:8,13 25:20 29:9 43:6 44:15 49:11,12

63:16 66:1 77:15 78:25 79:15,20 80:4,22 86:24 87:15,21,24 89:1 90:14, 15 91:7,13 93:1 95:8 96:23 97:3

**standard** 21:7,9 22:2 29:18,20 30:18,23 31:1, 2,22 32:6,11,19,20 33:1 38:19,25 39:5,11,15,17, 23,24 40:2,10 49:18 55:25 57:2 64:1,4 67:24 68:6,10,17 69:9,14,25 70:17 76:13 85:8 96:25

**standards** 11:9 27:16, 17,20,25 29:3,22 30:1, 2,4,9,10,13,16,25 31:14,15,23,24 32:9 69:17 83:15 94:5

**started** 12:18 23:13,15

**starts** 78:4

**stat** 55:10

**state** 24:23,24,25 27:20

**stated** 20:25

**statement** 94:25

**states** 10:14 24:12,17

**status** 77:12

**stay** 64:12

**strike** 34:2 35:1 43:20 91:20

**submitted** 19:4

**Subsection** 86:11

**suddenly** 20:3 62:16

**sued** 8:17

**suffering** 21:24,25 57:11

**suggest** 60:25 89:15

**sum** 36:2 81:4

**summarizing** 75:9

**supervise** 11:22

**support** 49:25

**supposed** 20:2 21:14, 15 41:5 48:11,16,18



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT       114Index: surveyor–wrong

72:17 94:22 96:24

**surveyor**  10:7 16:21 69:13

**surveys**  10:7

**swelling**  42:5

**sworn**  5:15

**symptoms**  57:5

**system**  10:4 19:5 61:19

---

**T**

**takes**  36:20

**taking**  23:16 37:22 40:13 60:21 84:6

**talk**  29:20 30:18,23 38:25 81:1

**talked**  25:5

**talking**  69:17,20

**team**  14:19 48:9 52:5

**telling**  36:1 39:25

**tells**  56:22

**ten**  12:14,18

**tend**  49:6

**testified**  5:16 7:17 41:4 43:18,21 51:20,24 59:11 64:17 67:9,14,24 69:24 70:21 71:16,19 75:6 88:3 90:20 96:3 97:18

**testify**  72:8

**testifying**  8:11 51:17 74:9

**testimony**  17:16,17 58:7,18 71:3,4 75:10 80:18 81:14

**thing**  7:6 44:5,6

**things**  6:21 14:12 29:1 40:20 85:11

**thought**  62:24

**time**  6:16 7:20 9:1 11:15 12:17 13:10,21 14:4,7 15:5,18 16:23

21:8 24:18 26:23 29:24 46:16 49:22 51:15 52:14,25 53:5 54:6,22 56:12 57:6 60:7 61:8 62:1 63:1,2 71:24 72:2, 22 73:4 75:24 80:11 81:24 82:23 92:15 98:5

**timeframe**  14:25 50:12 90:12

**timely**  25:15

**times**  15:17 34:11 59:20

**timing**  81:2,5 83:6

**today**  5:20,22 17:14 73:20 75:10 98:6

**toileting**  79:16,23

**told**  8:21 84:5

**top**  38:6,9,11

**track**  11:6

**trained**  14:14 15:6 42:9 65:7 77:14 94:22

**trainer**  23:19

**training**  9:23 11:24 13:2 14:10,13,24 15:4, 19,21 16:17 22:17 23:7 24:2 65:12,15,20,22,23 66:4,10

**transcript**  7:11 17:15

**trauma**  71:16

**traveled**  12:23 66:2

**treated**  63:3 90:4

**treatment**  91:18,19

**trial**  17:15

**trouble**  68:15

**true**  39:4 41:11 43:3 46:16 47:18 52:12 53:22 54:17 55:7 56:4, 16 67:3 84:14 86:14 87:1,19,25 88:4,9,16 89:1,12 90:10,19 91:14, 18 97:16

**two-hour**  79:16

**type**  11:3,5 16:7,13 22:14 31:17 34:12 37:6 47:20 84:9

**types**  10:25

**typically**  30:20 35:12 96:3,7

---

**U**

**uh-huh**  7:8 47:6 62:11, 15,18 63:6,10,13 65:16 86:5 94:16

**ultimate**  97:19

**ultimately**  37:16,17

**uncomfortable**  66:25 97:4

**uncommon**  82:20

**underlying**  27:18

**understand**  10:24 12:21 38:22 39:16 40:1 42:11,22 54:8,14 69:11 88:18

**understanding**  62:3 78:13 93:17

**understood**  9:5 25:2 36:19 46:25 72:11 81:11 84:6

**unit**  96:14

**units**  30:11

**unsafe**  36:13

**updated**  73:19

**urinated**  59:11 64:18

**urinating**  85:10

**utilized**  44:7

---

**V**

**varies**  48:13

**vice**  11:22 12:13

**Victor**  17:16 51:23 57:19 67:8 75:4

**violent**  43:13 47:5,18

**visible**  77:19

**visual**  77:13

**vital**  22:7 44:25 52:3,4, 12 55:1 56:12

**voice**  66:21

**voiced**  29:10 67:5

**voices**  55:21

**voicing**  41:15

**voluntary**  17:10

---

**W**

**wee**  82:14 83:10

**weeks**  61:4,7 62:22 65:14

**wheels**  91:22

**when's**  7:20 13:10 14:4

**witnesses**  19:1

**word**  44:6

**word-for-word**  94:4

**wording**  54:14

**words**  75:15 89:20

**work**  8:20 23:10 24:23 37:13,18 65:13 74:8

**worked**  12:14,17 13:6 14:22 16:18 23:2 74:5

**working**  9:1 10:1 11:16 12:1,11,20 23:13 48:17 69:16

**workshops**  24:2

**worse**  79:1,8 82:10,11

**wrists**  51:18 58:19 59:14,15

**write**  10:13,15 11:7

**writing**  9:21 10:18 11:1,2,3,4 13:8

**written**  26:21 31:9,10, 11,13 49:20 76:14 78:14 87:6 89:21

**wrong**  61:22



RAHEEM PETERKIN vs VCTOR HILL and CORRECTHEALTH
1:24-CV-01945-ELR - JOHNNIE LAMBERT          115Index: wrongful–zoom

**wrongful**  8:4,25

**wrote**  13:4 25:8 54:1

---

### Y

**ya**  8:16 74:2

**years**  6:13,18 7:22
11:18,20 12:6,13,14
16:8 23:2

---

### Z

**Zack**  6:20 7:1

**zip**  73:9

**zoom**  77:5