*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15ᵗʰ St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*



DEFENDANT'S EXHIBIT

## CORRECTIONAL HEALTHCARE CONSULTANT

50 years of experience as a Registered Nurse with extensive management background, as well as clinical expertise in the areas of mental health, acute care, and correctional healthcare. Conducted reviews and formulation of action plans required by consent decrees and/or settlement agreements, and monitoring of adherence and corrective action. Experienced policy writer, contract monitor, and nursing care evaluator.

### J.R. Lambert Correctional Health Consulting, LLC
### December 2019 – Present

- Legal Nurse Consultant: Review, summarization, analysis of medical records. Assist with discovery, analysis of medical staffing, medical records, standards of care, research and analysis of information, written summary reports. Consulting expert for correctional healthcare litigation and jail/prison legal actions.
- Support implementation of electronic health records and modification to meet jail/prison standards.
- Interpretation of contracts and proposal writing
- Train medical staff in legal and clinical aspects of correctional health care.
- Health Care Risk Management: perform risk assessment and mitigation plans for facility programs.
- Multi-State RN Licensed.
- Consult with Correctional Healthcare providers in areas such as staff development and training; policy and procedure development and implementation; medical auditing; risk management; proposal writing; research and review of standards, regulations, and laws pertaining to correctional healthcare; clinical reviews, and other tasks as requested.
- Currently working with National Commission on Correctional Health Care (NCCHC Resources, Inc.) on program development. As Advanced CCHP, screen applicants applying for this certification.

### Centurion, LLC
### Vienna, Va. 22182
### Policy and Accreditation Coordinator
### Clinical Operations Specialist
### May 2015 – December 2019

- Wrote and revised policies, procedures, nursing treatment manuals, and created training programs for Correctional Nursing Management
- Developed training modules for nursing staff upon request of Training Director; worked closely with Chief Nursing Officer, Director of Training, Director Infection Control, Director of Operations, and Sr. V.P of Operations in development and training of staff
- Researched and reviewed standards of correctional healthcare, local regulations, and state laws for contract compliance and new business
- Monitored contract compliance for Centurion/MHM Contracts; supported and trained site managers in CQI, policies, nursing supervision, correctional healthcare procedures, and systems

### Armor Correctional Health Services, Inc.
### Miami, Florida 33155
### August 2005 - May 2015
### Vice-President, Policy & Accreditation

- Wrote and revised policies, procedures, nursing treatment manuals, training programs for Directors of Nursing,

*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15th St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*

and other nursing personnel.

- Evaluated and monitored  Armor systems compliance with appropriate accreditation and evaluation bodies such as ACA, NCCHC, State Reviews, Department of Justice Reviews;
- Conducted training and provided support for Armor healthcare site personnel in policies, procedures, standards
- Assisted in the development and implementation of ongoing Continuous Quality Improvement Programs;
- Assisted in preparation of bids, contract reviews, and responses to RFP's
- Communicated with Armor clients concerning healthcare systems and compliance with standards;

**Correctional Medical Management, LLC**
**Nashville, Tennessee, 37212**
**March 2004-July 2005**
**Director of Clinical Operations**

- Evaluated and monitored all prisons in State of Alabama for compliance to consent decrees and settlement agreements in place. Reviewed medical records, interviewed staff and patients to ensure compliance with NCCHC, ACA standards, and requirements of DOJ settlement agreement (*Leatherwood v. Campbell etal.::2004*)
- Worked with Southern Poverty Law Center on monitoring of settlement agreement (*Gaddis v. Campbell, USDC Middle District Alabama :: 2004);* reviewed records, toured sites, and documented compliance with agreement.
- Monitoring of contractual health care services for correctional facilities
- Preparation of reports
- Review and Analysis of medical records for legal proceedings concerning adherence to settlement agreements and national standards of care
- Provided management training and support for correctional medical staff in contracted facilities.
- Evaluated and directed implementation methods for improving operational efficiency, effectiveness, cost-effectiveness in facilities

**Correctional Medical Services**
**February 1997-March 2004**
**St. Louis, Missouri**

- **DeKalb County Jail, Decatur Ga.**
  **Health Service Administrator, Feb. 2003-March 2004**
  Overall administration of healthcare unit in large county jail with over 3000 inmate population
  - Managed medical staff of over 117 FTE
  - Management of $11 mil/annum budget for healthcare
  - Monitored of provision of care within the requirements of settlement agreement; assisted Sheriff's department in ending the settlement agreement period and worked with an appointed court monitor. (*Dorsey v. Adams:: 2001*)

- **Duval Pre-Trial Detention Facility, Jacksonville, Fl.**
  **Health Services Administrator; May 2001-Feb. 2003**

  - Managed 3000 bed county jail medical unit with approximately 103 employees.
  - Maintained and audited  medical records
  - Provided education and training for nursing and other professional staff
  - Interpreted and monitored adherence to Standards of Care
  - Compiled and reported medical statistics

**Johnnie R. Lambert RN, CCHP-A, LHRM**
**1214 15th St.**
**Port Royal, S.C. 29935**
**Phone: 843-321-2003**
**jrlambertconsulting@gmail.com**

- Acted as liaison between correctional staff and medical staff
- Supervised and implemented adherence to OSHA, National Committee for Correctional Health Care, American Correctional Association, and American Nursing Association standards.
- Assisted in preparation of annual budget for healthcare

✴ **South Area Regional Administrator; February 2000-May 2001**
**Correctional Medical Services**

- Supervised medical services in prison facilities in South Carolina, Florida, and Virginia
- Assisted in budget preparation and management of financial performance of contract sites.
- Monitored for contract compliance and continual evaluation of applicable penalty issues
- Trained and mentored site managers

✴ **Site Administrator: Lee Correctional Institution; Mar. 1999-Feb. 2000**
**Bishopville, S.C.**

✴ **Director of Nursing: Lee Correctional Institution; Dec. 1998-Mar. 1999**
**Bishopville, S.C.**

✴ **Nursing Supervisor: Allendale Correctional Institution; March 1998-Dec.1999**
**Allendale, S.C.**

✴ **Psychiatric Nurse Manager: Allendale Correctional Institution; Aug. 1997-Mar. 1998**
**Allendale, S.C.**

✴ **Staff Nurse: Allendale Correctional Institution; Feb. 1997-Aug. 1997**
**Allendale, S. C.**

## OTHER ACTIVITIES

- 2015-2021: Lead Surveyor, NCCHC
- 2016-2021: Member of CCHP Board of Trustees (NCCHC-3-year terms)
- Present: Member Board of Directors – Health through Walls (501c3)
- 2019-Present: Consultant to NCCHC Resources, INC. (NRI)
- 2009-2010 Consultant – Contributor to Essential Learning, LLC (now Relias Learning, Inc.) Research and develop online training programs for correctional facility medical and security staff
- Member of Ethics Committee: International Alliance of Forensic Nurses

## PUBLICATIONS:

**Developed for Essential Learning, LLC:**

- Intoxication and Withdrawal for Correctional Officers; June 2009
- Grief and Loss for Correctional Officers, July 2009
- Special Needs of LGTBQI Inmates, September 2009
- Confidentiality of Health Information in Correctional Facilities, December 2009

**Developed for Turn Key Health, LLC (2015-2016)**
- Training- Suicide Prevention in Corrections

Johnnie R. Lambert, RN, CCHP-A, LHRM, LNC

*Johnnie R. Lambert RN, CCHP-A, LHRM*
*1214 15th St.*
*Port Royal, S.C. 29935*
*Phone: 843-321-2003*
*jrlambertconsulting@gmail.com*

- Bloodborne Pathogens Training
- Medical Information for Correctional Officers
- Medical Orientation for Correctional Health Staff
- Compassion in Correctional Nursing

**Presentation: NCCHC**

- Psychogenic Non-epileptic Seizures: What are They and How do We Manage Them.  Presented with Dr. Rebecca Vauter, PsyD. ABPP, CCHP-MH, 5/21

## EDUCATION and TRAINING:

- Institute for Prevention of In-Custody Deaths: Certified as Agitated Delirium /Agitated Chaotic Events Instructor
    - NCCHC Certified Correctional Health Professional - Advanced 18 years; NCCHC Lead Surveyor
    - University of Florida – 2008: Licensed Healthcare Risk Manager
    - College for Professional Studies: Nurse-Paralegal (2002-2003)
    - Medical-Legal Consulting Institute Inc.: Certified Legal Nurse Consultant (2002)
    - Management and Leadership Development Program, Correctional Medical Services; Certified as Correctional Healthcare Manager (1999)
    - Cleveland State University (1975-78)
    - University of South Alabama (1971-1973)
    - Mobile Infirmary School of Nursing: Mobile, Alabama (1971-1974)
    - Licensed in State of South Carolina (Multi-State License)
    - South Carolina Notary Public

**Technical Skills:**

- Microsoft Office 365 (Word, PowerPoint, Excel, Visio, Sharepoint)
- Adobe Acrobat
- SuperUser with Sapphire EMR, CorEMR (Electronic Health Records)

## JR Lambert Correctional Health Consulting, LLC
1214 15th St., Port Royal, SC 29935
Tel: 843-321-2003   Email: jrlambertconsulting@gmail.com



My name is Johnnie R. Lambert. I am a registered nurse with over 50 years experience, and have worked in the correctional health field for 28 years. I served for 5 years on the National Commission on Correctional Health Care (NCCHC) CCHP Board of Trustees. I am an Advanced Certified Correctional Health Professional (CCHP-A) through NCCHC accreditation. I have also served with the NCCHC as a Lead Facility Surveyor, reviewing and documenting care given in correctional facilities by medical staff all over the country. I am a member of the American Correctional Association (ACA) and work extensively with ACA Standards.

I have reviewed the trial transcripts of U.S. vs. Victor Hill and the Clayton County Sheriff's Office policy regarding restraint chair use. Clayton County first acquired restraint chairs in 2018 and issued a policy for them, based on national correctional standards. National correctional standards require medical involvement with the detainee restrained in the chair. Although the medical department is responsible for monitoring the detainee while in the chair, they are not responsible for ordering a detainee into restraints, other than Clinical Restraints used for extreme circumstances when all other measures have failed, such as suicidal or out-of-control behavior due to illness or mental instability.

Restraints are used for two reasons in the correctional setting:

1) Clinically-ordered restraints are applied when a patient is exhibiting uncontrollable behavior and presents a risk to self or others. Examples of this include patients exhibiting psychotic symptoms, seriously mentally ill patients demonstrating aggressive and dangerous behavior, suicidal patients actively attempting self-harm, medical issues causing delirium, and other extreme behavior. These may include 4-point restraints, in which the patient is in a supine position and restrained by the arms and legs, or in some facilities, the restraint chair, in which the patient is seated in an upright position. Clinical restraints must be ordered by the provider (physician, mid-level practitioner, or psychiatrist) for the patient's safety only after all other attempts to calm the patient have failed. Restraints are a last-resort measure, and the time in restraints is limited. The treatment plan must provide for removing the patient from restraints as soon as it is safe and possible, or until the patient is sent to another facility or hospital for evaluation.

2) Custody-ordered restraints: The correctional staff may order restraints to be used, such as the Pro-Straint® or another restraint chair, if an inmate is demonstrating dangerous behavior which will place the safety, security, and order of the facility and himself at risk. Medical staff have no input in the use of custody-ordered restraints, however, correctional standards require that the medical staff be notified of detainees being placed in restraints, or of any force used against a detainee, so that a medical evaluation can be completed and periodic medical evaluations be continued throughout the detainee's time in restraints.

All restraints, whether ordered by the physician or by custody, are applied by security staff. Restraints are not to be a method of punishment but a control method of last resort when no other interventions (such as de-escalation, confinement to a single safe cell, or medication as ordered) are effective.

The American Correctional Association (ACA) Standards regarding restraints, which were in effect in 2019, were the Performance-Based Standards for Adult Local Detention Facilities, 4th Edition. These standards state the following:

4-ALDF-2B-01: (Mandatory)[1]: The use of physical force is restricted to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then only as a last resort and in accordance with appropriate statutory authority. In no event is physical force used as punishment.

4-ALDF-2B-02: Restraint devices are never applied as punishment. There are defined circumstances under which supervisory approval is needed prior to application. (*Comment: Restraint devices should be used only to prevent self-injury, injury to others, or property damage. Restraints are not applied for more time than is necessary.*)

4-ALDF-2B-03 (Mandatory): Four/five-point restraints are used only in extreme instances and only when other types of restraints have proven ineffective. Advance approval is secured from the facility administrator/designee before an inmate is placed in a four/five-point restraint. Subsequently, the health authority or designee must be notified to assess the inmate's medical and mental health condition, and to advise whether, on the basis of serious danger to self or others, the inmate should be in a medical/mental health unit for emergency involuntary treatment with sedation and/or other medical management, as appropriate. If the inmate is not transferred to a medical/mental health unit and is restrained in a four/five-point position, the following minimum procedures are followed:

- Direct visual observation by staff is continuous prior to obtaining approval from the health authority or designee
- Subsequent visual observation is made at least every 15 minutes
- Restraint procedures are in accordance with guidelines approved by the designated health authority
- All decisions and actions are documented

(*Comment: A four/five-point restraint secures an inmate's arms and legs (four points) and head (five points.) Restraint guidelines include consideration of an individual's physical condition, such as body weight.*)

The National Association on Correctional Health Care Standards in effect at the time of the incident were the *Standards for Health Services in Jails, 2018*.

Standard J-G-01 (Essential[2]) states:

With regard to custody-ordered restraints:

- a. When restraints are used by custody staff for security reasons, a qualified healthcare professional is notified immediately in order to:

---

[1] A *mandatory standard* is defined by the ACA as a statement that defines a required or essential condition to be achieved or maintained. In order to be accredited by the ACA, a facility must demonstrate adherence to 100% of all mandatory standards and 90% of all applicable non-mandatory standards.

[2] An *essential standard* is defined by the NCCHC as directly related to the health, safety, and welfare of patients and the critical components of a health care standard. The committee accredits facilities that demonstrate compliance with 100% of applicable essential standards and at least 85% of applicable important standards.

    i.   Review the health record for any contraindications or accommodations required, which, if present, are immediately communicated to appropriate custody staff.

    ii.   Initiate health monitoring, which continues at medically appropriate intervals as long as the inmate is restrained. If the inmate's health is at risk, this is immediately communicated to appropriate custody staff.

    iii.   If health staff are not on duty when custody-ordered restraints are initiated, it is expected that health staff review the health record and initiate monitoring upon arrival.

b.  If the restrained inmate has or develops a medical or mental health condition, the provider is notified immediately so that appropriate orders can be given.

c.  When health staff note use of restraints that may be jeopardizing an inmate's health, this is communicated to custody staff immediately.

*Discussion: Examples of custody-ordered restraints include:*

a.  *Emergency restraint chair: A chair designed to transport a subject while restraining the arms, legs, shoulders, and chest.*

b.  *Electronic control device: A restraint device applied to the wrist or ankle; when activated, it temporarily incapacitates a person by delivering electrical energy to the muscle tissue.*

*When inmates are restrained, whether clinically or custody-ordered, periodically exercising each limb is recommended to prevent blood clots.*

In addition to restraint policies, both accrediting organizations require that facilities and their medical providers create policies and procedures to describe facility operation, administration, medical care, and maintenance. During the accreditation process, these policies are reviewed and compared to actual practice and observation of the facility.

Healthcare providers are required to maintain site-specific policies and procedures in accordance with applicable standards. These policies are to be reviewed annually and signed by the Health Authority. Security policies should not be in conflict with health care policies. According to ACA and NCCHC (Standards J-A-02 and 4-ALDF-4D-02), Medical Autonomy includes the fact that custody staff support the implementation of clinical decisions. This would include allowing a calm patient to use the restroom with security assistance, performing circulation checks, and monitoring a patient who is restrained. If the medical provider feels that the restraint is causing harm to the inmate, that medical staff has a duty to advise his or her supervisor and escalate the process through the Corrections Staff.

In addition to standards governing the use of restraints, accreditation bodies issue standards governing the overall care of inmates, which include recommendations for the interaction between security staff and medical staff, whether contracted or directly employed by the agency.

According to NCCHC J-A-05 (Essential):

The responsible health authority ensures that healthcare policies and procedures are developed, documented, and readily available to the staff. #6 of the compliance indicators (required practices) states the following: *Other policies, such as those for custody, kitchen, industries, and healthcare vendors or other contractors, do not conflict with healthcare policies.*

The conditions that require the use of a restraint chair or how the patient is to be physically restrained are not defined in the standards. The standards require that the facility administration publish a policy on the use of restraints other than when clinically indicated. Both accrediting bodies agree that a restraint chair

should never be used as punishment; for clinical restraints, the same types of restraints that would be appropriate for individuals treated in the community are used in the facility.

According to the Clayton County Sheriff's Office policy S.O.P. 4.15, a restraint chair may be used by security staff to provide safe containment of an inmate exhibiting violent or uncontrollable behavior and to prevent self-injury, injury to others, or property damage when other control techniques are not effective. Under the definitions section of this policy III. A.: " Restraint chair: A gray or black-colored chair with large wheels that has restraint capabilities. This requires that standard handcuffs and leg irons are removed from the inmate while they are restrained in the chair. Use of the restraint chair does not constitute a 4-point restraint.[3] This chair is referred to as the SRC Safety Restraint Chair® by the manufacturer." Section IV, A.4. also states that "The Safety Restraint Chair will never be authorized as a form of punishment. The use of the Safety Restraint Chair will be in accordance with the Use of Force policy."
The policy also states that the inmate in the chair is to be "checked on every 15 minutes", a restraint chair monitoring log be placed outside the cell to log the employee conducting the checks, and that the supervisor review the condition of the inmate and the use of the chair once every hour, notifying medical staff if signs of medical distress are noted.

There are two types of SRC, according to the company SRC, Inc. One chair, the SoftGuard SRC®, is built to be used for psychiatric, behavioral, and medical environments. This chair has an attached "pillow" and no cutout for handcuffs.

---

[3] A four-point restraint is defined as a restraint applied when the patient is in a supine position. As the person is sitting upright in the chair, correctional authorities do not consider the chair a four-point (or 5-point) restraint. Medical authorities consider the chair to be a restraint, regardless of type, and require all preventive medical care to be provided (e.g., checking circulation every hour, clearing the inmate medically, exercising the extremities, and toileting as needed if it is safe to do so).





SRC, Inc.


Pro-Straint Chair®

The SureGuard SRC® has a cutout for handcuffs, and, per the manufacturer, the detainee should not be left in this chair for more than 2 hours.

The third chair shown is called a Pro-Straint Chair® and is used in many correctional facilities. The padding can be removed for inmates who are placed in the chair while handcuffed.

In all cases, application of the chair includes removing the handcuffs once the patient is safely restrained. The medical department must initially check the inmate's medical status and clear the patient for use of the chair or 4-5 point restraints, and then periodically monitor the inmate who is in the chair to ensure that there are no health or safety concerns. If a medical staff member feels that the inmate's health is in jeopardy during confinement in the chair, or if the chair is being used improperly, the staff member must notify the Health Authority and appropriate Security Staff so that alternative measures can be taken.

Best practices ensure that the patient is removed from the chair as soon as it is safe to do so. There is no standard or practice that allows inmates to be arbitrarily strapped into a restraint chair for a "standard" 4-hour time period; correctional standards allow for restraints (if no other means are effective) for up to 12 hours, with medical supervision. Manufacturers of the restraint chairs recommend that a patient be restrained in the chair for no more than two consecutive hours.

Prolonged restraining of an individual in the chair presents several medical risks, including the following:
- Injury (broken bones, neck or back injuries, pressure ulcers)
- Death (can be caused by overdose, blood clots, aspiration of vomit, blunt force trauma, internal bleeding, cardiac arrest, and positional asphyxia)
- Dehydration
- Kidney damage
- Urinary tract infection
- Nerve damage.

There are documented incidents of sudden death of inmates left in restraint chairs for prolonged time periods. Due to the severe risk for medical complications when restraints of any type are in use, accrediting bodies require that corrections notify health staff that an individual is going into restraints so that they can review the inmate's medical record and ensure that there are no contraindications to their placement in restraints. The frequency of medical monitoring is to be spelled out in the Health Care Provider Policy and Procedure Manual. This may vary from facility to facility, but should not be less than at least every hour.

Medical staff are then required to periodically assess the patient's health and level of consciousness by monitoring vital signs, speaking with them, offering them fluids, and providing the opportunity to relieve themselves with assistance from the correctional staff. All of these actions are to be documented in the health record. In the Clayton County Jail, the S.O.P. requires that patients be checked every 15 minutes, but the policy is not clear as to who is doing the 15-minute checks – medical or security. As the inmates placed in the chair in Clayton are housed in the medical area, medical checks would be facilitated.

Medical Standards do not require that the inmate be made comfortable, as this type of confinement is not comfortable in any way. Still, standards do require that the medical staff is notified that the inmate is being placed in restraints, so that they can examine the inmate to ensure that they have been applied appropriately, that no injuries were sustained, and that restraints do not interfere with circulatory and respiratory systems. Medical staff are required to document all findings in the health record, and document findings of all periodic checks. Facilities use varying versions of restraint/seclusion clearance forms in order to screen inmates for placement in restraints or seclusion of any type, and logs to

document the inmate's condition during the 15-minute checks. 15-minute checks may be completed by sworn custody staff or medical staff. Since the Clayton County Jail houses restrained patients in the medical unit, medical staff has an obligation to ensure that the patient is not suffering from issues caused by prolonged use of restraints.

The placement of a calm, cooperative inmate in a restraint chair is contrary to the accreditation standards for jails. Medical staff have a responsibility for notifying the chain-of-command if the patient is de-escalated, calm, or even sleeping, so that they can be assessed for removal of the restraints.

## References

American Correctional Association. (n.d.). Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition. Lanham, MD: American Correctional Association.

Amnesty International. (2002, May). *United States of America: The Restraint Chair. How many more deaths?* Retrieved September 12, 2024, from Amnesty International: https://www.amnesty.org/en/documents/amr51/031/2002/en/

Castillo, E. M., Coyne, C. J., Chan, T. C., Hall, C. A., & Vilke, G. M. (2015). Review of the medical and legal literature on restraint chairs. *Journal of Forensic and Legal Medicine, 33*, 91-97.

Moore, J. (2003). *Management and Administration of Correctional Health Care.* Kingston, New Jersey, USA: Civic Research Institute.

National Commission on Correctional Health Care (NCCHC). (2018). *Standards for Health Services in Jails.* Chicago, IL: National Commission on Correctional Health Care.

Puissis, M. e. (2006). *Clinical Practice in Correctional Medicine* (2nd ed.). Philadelphia, Pennsylvania, USA: Elsevier.

# J.R. Lambert Correctional Health Consulting, LLC
1214 15th St., Port Royal, SC 29935
Tel: 843-321-2003   Email: jrlambertconsulting@gmail.com



Thank you for contacting me about your case. Attached, please find my current resume. The following is my fee for Legal Nurse Consulting Services:

**General Record Review for Merit**: $250.00 per hour, billed in 15-minute increments, with a retainer of $1000.00 to be applied towards hours worked. Invoice will be submitted monthly, payable on receipt.

**Written Reports, telephone consulting, research time, non-testifying**: $250.00 per hour, billed in 15-minute increments

**Travel and legal testimony/depositions**: $400.00 per hour plus expenses; travel billed door-to-door, with a two-hour minimum. If an overnight stay is required, billing will be for 8 hours per day plus any travel time. I request a 48-hour notice of cancellation, otherwise a four-hour charge of $400/hr. will be incurred.

I request travel expenses and lodging to be paid in advance, unless other arrangements are made.

All fees are due upon submission of work or receipt of invoice.

Sincerely,

Johnnie R. Lambert, RN, CCHP-A, LHRM

| CORRECT**HEALTH** | CLAYTON COUNTY JAIL POLICY & PROCEDURE | | |
|---|---|---|---|
| **RESTRAINT AND SECLUSION** | | Number | CLTJ-G-01.0 |
| | | Original | January 2017 |
| | | Previous | November 2017 |
| Section | G – Medical-Legal Issues | Current | January 2019 |
| References | NCCHC JAIL  2018: J-G-01 (E);<br>ACA 2008: 4-ALDF-2B-02; 4-ALDF-2B-03; 4-ALDF-4D-21. | | |

**POLICY:**  Clinically or custody ordered restraints are used when necessary and are monitored by the health staff so the inmate(s) is not harmed. *Clinically-ordered restraints and therapeutic seclusion are only ordered for patients exhibiting behavior dangerous to self or others as a result of medical or mental illness.*

**PROCEDURE:**

1. **Clinically Ordered Restraint and Seclusion:**

   General guidelines for clinically-ordered restraints or seclusion for medical or mental health conditions include the following:

   a. Restraints and therapeutic seclusion will be used only when the safety and welfare of an inmate cannot be protected by less restrictive means.

   b. Restraints and therapeutic seclusion will not to be used for punishment and will begin with the least restrictive procedure possible.  Each lessor restrictive restraint or seclusion will be documented prior to escalating.

   c. Restraints may be ordered by a physician or other qualified healthcare professional, as permitted by law, but shall only be applied and removed by trained correctional personnel.

   d. The type of restraints used in the Facility will be comparable to community restraints, such as fleece-lined leather, rubber or canvas hand and leg restraints; 2-point and 4-point restraints; and restraint chairs and wraps.  Metal and hard plastic devices, such as handcuffs or leg shackles, will not be used for clinically-ordered restraints.

   e. Patients will not be restrained in a manner that would jeopardize their health.

   f. Patients will not be restrained in unnatural positions, such as hog-tied, face-down or spread-eagle.

   g. Every effort will be made to minimize the length of time that an inmate is kept in clinically-ordered restraints or therapeutic seclusion.

2. A provider order must be obtained prior to initiating restraints, except in emergency situations.

   a. The order may be written, verbal or via telephone.

   b. The on-site provider must evaluate the patient to determine the need for restraint.

   c. If a provider is not on-site, staff will contact the on-call provider with information sufficient for the justification of restraints.

   d. If restraints are initiated in an emergency situation, the staff will inform the provider as soon as possible to obtain orders.

   e. The provider order must include:

      1. The type of restraint to be used;

      2. The purpose and clinical justification for the type of restraint used;



PLAINTIFF'S EXHIBIT
1

*Restraint and Seclusion 161201*

Page **1** of **3**

Restraint_and_Seclusion_001

3. The length of time for the use of restraints, not to exceed four (4) hours or in compliance with State requirements; and

4. Justification for continuation of restraints after each 4-hour period based upon observation of the patient's behavior and evaluation of their clinical condition.

3. Health status monitoring will be documented on the Restraint Flow Sheet to include visual checks by health trained personnel or health care staff at 15 minute intervals and a more in-depth evaluation every two hours.

   a. The two hour assessment will include the evaluation of airway and breathing status; the circulation, movement and sensation status of each extremity restrained; and the patient's mental and psychological status. Food, water and toileting will be offered at this time. Each restrained extremity will be released and exercised for at least 10 minutes at the two hour evaluation.

   b. When the patient is asleep, it will not be necessary to wake the patient to complete the two hour evaluation; however, during sleep, the patient's breathing and airway status will be documented every 15 minutes.

4. The use of force to apply clinically-ordered restraints will be authorized by a Provider if necessary. Only the amount of force that is absolutely necessary will be used in the application of restraints.

5. The concomitant use of psychotropic medications and physical restraints necessitates constant observation of the patient by a healthcare staff member. As soon as the medication has achieved a therapeutic effect, the restraints will be removed.

6. Therapeutic seclusion may be ordered by a provider to assist a patient in regaining control of behavior.

   a. Patients requiring therapeutic seclusion will ideally be placed in the Infirmary or in a room designed to safely limit a patient's risk, such as a padded cell or room with limited or absent furniture and fixtures.

   b. The therapeutic seclusion orders will include:

      1. Clinical justification for initial placement in, and continuation of, therapeutic seclusion

      2. The maximum period of time allowed in therapeutic seclusion (not to exceed 24 hours) until a provider must evaluate the patient's condition to determine the need for continued seclusion

7. Custody Ordered Restraints:

   Healthcare staff do not participate in the restraining or seclusion of inmates for disciplinary or administrative reasons; however, staff will:

   a. Review the health record for any contraindications or accommodations required and will advise the appropriate security staff of any pertinent information

   b. Monitor the health and safety of inmates placed in non-clinical restraints or seclusion on a regular basis at intervals agreed upon by the Facility Administrator, the Medical Director or Mental Health Services, and the Health Services Administrator.

   c. Immediately notify appropriate custody staff if the health of the restrained inmate is at risk.

8. If staff perceive improper use or application of non-clinical restraints, they will communicate their concerns immediately to the Health Services Administrator or designee.

      a. The Health Services Administrator will communicate this concern to the Medical Director and Facility Administrator.

      b. If the situation is unresolved, the Health Services Administrator will notify the Executive Medical Director or designee and the CorrectHealth Executive Committee immediately.

9. When a patient is under clinically-ordered restraint or seclusion, the Health Services Administrator or designee will provide a patient status report at least daily to the Facility Administrator and the Medical Director.

10. The Health Services Administrator will ensure that a documented sentinel event case review occurs with the Medical Director, Mental Health Team and other appropriate staff when clinically-ordered restraints or seclusion have been used.

Restraint_and_Seclusion_003