# EXHIBIT

# 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


RAHEEM PETERKIN,            )
                           )
     Plaintiff,            )
                           )   CASE NO. 1:24-cv-01945-ELR
     vs.                   )
                           )
VICTOR HILL,               )        ORIGINAL
individually,              )
CORRECTHEALTH CLAYTON,     )
LLC,                       )
                           )
     Defendants.           )


- - -


Videotaped Deposition of
RAHEEM PETERKIN


Wednesday, April 30, 2025
10:28 a.m.


Mitchell, Shapiro, Greenamyre & Funt
881 Piedmont Avenue
Atlanta, Georgia

(Some attendees appeared remotely via
Videoconferencing and/or teleconferencing.)


MARY K. CALDWELL, CSR, B-1325
--------------------------------------------------------------

PRECISION REPORTING, INC.
Certified Shorthand Reporters
125 Chardonnay Oaks Drive
McDonough, Georgia  30252
770-786-9664
precisionreportinginc@gmail.com
www.precisionreporting.net

2

### INDEX TO EXAMINATIONS

Examination                                          Page

Examination by Mr. Hoffer                              5

Examination by Mr. Brock                             125

Further Examination by Mr. Hoffer                    128

### INDEX TO EXHIBITS

Defendant's
Exhibit No.                                          Page

Exhibit 1   Plaintiff's Omnibus Responses to          7
            Defendant Hill's First Discovery
            Requests

Exhibit 2   Criminal History                         21

Exhibit 3   Warrantless Arrest Probable Cause        31
            Affidavits

Exhibit 4   Photographs of wrist, Government         72
            Exhibits 48 and 49

Exhibit 5   Email                                   128

(Original Exhibits 1 through 5 were attached to original

transcript.)

3

APPEARANCES OF COUNSEL:

ON BEHALF OF THE PLAINTIFF:

ZACK W. GREENAMYRE, ESQ.
MARK H. VERSTRAETE, ESQ.
Mitchell, Shapiro, Greenamyre & Funt, LLP
881 Piedmont Avenue, Northeast
Atlanta, Georgia  30309
(404) 812-4751
zack@mitchellshapiro.com


ON BEHALF OF DEFENDANT VICTOR HILL:

MICHAEL D. HOFFER, ESQ.
Cruser, Mitchell, Novitz, Sanchez, Gaston &
Zimet, LLP
Meridian II, Suite 2000
275 Scientific Drive
Peachtree Corners, Georgia  30092
mhoffer@cmlawfirm.com


ON BEHALF OF DEFENDANT CORRECT HEALTH CLAYTON, LLC:

CHAD MICHAEL BROCK, ESQ. (via Zoom)
Lavender Hoffman Emery, LLC
750 Hammond Drive
Building 2, Suite 200
Atlanta, Georgia  30328
(404) 793-0399
cbrock@lhefirm.com


VIDEOGRAPHER:

Henry Stewart, Atlanta Legal Media

- - -

(Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, the court reporter disclosure statement is tendered at the end of the transcript.)

PRECISION REPORTING, INC.
(770) 786-9664

4

DEPOSITION OF RAHEEM PETERKIN

PROCEEDINGS

(Video on.)

THE VIDEOGRAPHER:  Today's date is April 30th, 2025.  The time is 10:28 a.m. We're on the record.

Will the court reporter please swear in the witness.

COURT REPORTER:  Would you raise your right hand, please.  Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

MR. HOFFER:  This will be --

This is Michael Hoffer.  I'm counsel for Victor Hill.

And do you have any other read-ons that we need to do before?

THE VIDEOGRAPHER:  No.

MR. HOFFER:  No read-on?  All right. And you swore the witness?  Okay.

COURT REPORTER:  Yes, sir.

RAHEEM PETERKIN, having been first duly sworn, was examined and

testified as follows:

EXAMINATION

BY MR. HOFFER:

Q    Mr. Peterkin, my name is Michael Hoffer. I represent Victor Hill in this lawsuit that you have pending in the United States District Court for the Northern District of Georgia.

For your deposition today -- you've probably talked to your lawyer about this -- I don't want to know anything that y'all have talked about.

But just the ground rules. Our court reporter went over some of them before the deposition. Just make sure that we don't talk over each other and you give verbal answers so that our court reporter can give a nice, clean record.

Is that acceptable?

A    Yes, sir.

Q    Okay.

MR. HOFFER:  And then this will be the deposition of Raheem Peterkin, taken pursuant to proper notice and agreement of counsel, taken for all purposes allowable under the Federal Rules of Civil Procedure.

And I'm not sure if there's been other depositions in this case, but can we agree

6

to reserve objections except to form of the question and responsiveness -- responsiveness of the answer until first use?

MR. GREENAMYRE:  Yes, and privilege.

MR. HOFFER:  That --

MR. BROCK:  That's agreeable.

MR. HOFFER:  Okay.

BY MR. HOFFER:

Q    All right.  Mr. Peterkin, have you ever given your deposition before?

A    Not that I recall.

Q    Okay.  And I understand you have given trial testimony before; correct?

A    Yes, I have.

Q    Okay.  So do you understand that you're under oath today and that you have to tell the truth just as if you're in front of a judge and jury?

A    Yes, I do.

Q    Okay.  Are you currently taking any medications or under the influence of any drugs that would compromise your ability to remember or testify truthfully today?

A    No.

Q    Okay.  And, again, I don't want to know

anything that you and your lawyers have talked about, but I do want to know:  What did you do to prepare for this deposition today, and especially did you talk to anyone other than your lawyers?

A    No.  I just talked to my lawyers.

Q    Okay.  Did you review any documents?

A    The documents that my lawyer sent me.

Q    Okay.  And what documents are those?

A    I think it was the medical records, a video that he sent me.

(Thereupon, marked for identification purposes, Defendant's Exhibit 1.)

BY MR. HOFFER:

Q    Okay. And I'm going to hand you what I've marked as Defendant's -- Defendant's Exhibit 1. These are Plaintiff's Responses to Defendant Hill's First Discovery Requests.

Is this one of the documents that you reviewed to prepare for your deposition today?

A    I'm not sure.  It's been a long week.

Q    Okay.  Yeah.  I understand.

A    But I do remember seeing this.

Q    Okay.  And one thing you may have heard me talking to your counsel about before we went on the

8

record.  My -- my question to you is going to be if these are true -- these Responses are true, correct and complete.

Before you answer that, it's my understanding that there's a reference to the incident that we're here about, the -- the restraint-chair incident.  In the Responses it reads December 28th, 2019.  Based on my review of the arrest records and -- and whatnot, I think that it's supposed to be December 8th, 2019.

Is that your recollection and understanding, as well?

A    I was reading that.

Can you repeat that again?

Q    Okay.  So there's references in these Interrogatory Responses, Defendant's Exhibit 1, to this -- the restraint-chair incident occurring on December 28th, 2019, but based on -- I'll represent to you, based on my review of all the arrest records and whatnot, that it looks like this was -- this incident was on December 8th, 2019.

Does that ring a bell?

A    Yes.  It was December 8th.

Q    Okay.  So my question is:  Other than that change to the date of your -- of the incident, do

9

you -- are these Responses true, correct and complete, to the best of your knowledge?

A    Yes.

Q    Okay.  That -- that saved you quite a few questions on this.  And you're currently --

Are you still currently employed at IES Commercial, Inc., in Lithia Springs?

A    Yes.

Q    And it looks like your job is a warehouse supervisor?

A    Yes.

Q    Okay.  And your compensation is $73,000 per year plus an annual bonus?

A    No.

Q    What is your current compensation?

A    It's $25 an hour.

Q    $25 an hour?

A    Yes.

Q    Okay.  Do you also get an annual bonus?

A    Yes.

Q    Okay.  Did your -- did your -- did you --

Did you switch from salaried to hourly?

A    Yes.

Q    Okay.  When did you make that change?

A    They made that change maybe couple months

10

ago.  Yeah.

Q    And what was the reason for that change to put you from salaried to hourly?

A    It was just the company.  They came up with it.  I don't know why.  They just came to everybody with it.

Q    Okay.  So it wasn't particularly directed at you?

A    No.

Q    Okay.  Then it looks like before working at IES, you worked at CJ Logistics in McDonough, also as a warehouse supervisor?

A    Yes.

Q    And why did you leave CJ Logistics?

A    We just parted ways with each other.  It wasn't a good fit for me nor them.

Q    Did you --

Were you terminated from that job?

A    No.  They gave --

No, no.  It was just a -- we just parted ways.  It wasn't a good fit.

Q    Time to move on?

A    Yeah.

Q    Okay.  And then before your job at CJ Logistics, it looks like you worked at A1 Quality

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

11

Solutions from -- in Cincinnati from about 2020 to February 2024.

Is that correct?

A    Yes.

Q    And it looks like you were a manager of 41 warehouses?

A    47.

Q    47 warehouses?

And why did you leave A1 Quality Solutions?

A    They became a 3PL and started a new company.

Q    They became a what?

A    3PL.

Q    What does that mean?

A    Third-party logistics.

Q    Okay.  Does that mean you basically were out of a job?

A    Yeah.

Q    Okay.  So were you living up in Cincinnati when you were working for A1 Quality Solutions?

A    No, sir.

Q    Worked remotely down here?

A    Well, my job was to travel from state to state.  My home office was here, so I had a building

12

in Forest Park.

Q    Okay.  And are you still living at 221 Misty Ridge Trail in Stockbridge?

A    Yes.

Q    And you're from Baltimore originally?

A    Yes.

Q    Okay.  And when did you move up to the Atlanta area?

A    What do you mean?  When I --

Q    Yeah.  When did you move from --

A    Leave Baltimore?

Q    -- Baltimore to Atlanta?

A    I moved down here from -- I think it was 2012.

Q    Why did you make that move?

A    I just didn't want to live in Baltimore no more.

Q    It looks like you have a couple degrees from community colleges up in the Baltimore area?

A    I don't have a degree.  I just went to college.

Q    Okay.

A    And I didn't finish.

Q    Okay.  And it looks like you had an injury -- on-the-job injury in November of 2023?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

13

A    Um-hum.

Q    And you have to say yes or no.

A    Oh.  Yes.

Q    Yeah.  It's just --

A    I'm sorry.

Q    That -- it's -- it's -- it's very easy to do.  We do this all the time, you don't; so don't be offended if I --

A    No.  It's fine.

Q    -- poke you on that.  Okay.

So a workers' compensation claim?

A    Yes, sir.

Q    Injured your leg at work?

A    Yes, sir.

Q    And are you fully recovered from that?

A    As the doctor said.

Q    Has that -- has that --

There was a lawsuit arising out of that workers' compensation injury.

Is that correct?

A    Yes.

Q    Has that resolved?  I --

A    No.

Q    Okay.  It's active?

A    Yes.

14

Q    Okay.  And who's your lawyer on the workers' comp case?

A    I can't remember his name.  I talk to him every now and then.

Q    Is he with a firm?

A    Yes.

Q    Does the name Gerber & Holder ring a bell?  Is that who it is?

A    I don't remember his name.

Q    Okay.  And it looks like you did -- you have not given any testimony in that workers' compensation proceeding?

A    No, sir.

Q    Okay.  All right.  So we are --

One other thing also.  This is an intro -- intro matter.  This is not a marathon.  It's not -- I'm not trying to make you uncomfortable sitting in that chair.  So if -- if you need to take a break, go to the restroom or stretch out or something like that, just let me know.  We'll accommodate that.  The only thing I ask is that if I've got a question pending to you, that you answer that before we go on break.

Okay?

A    Yes, sir.

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

15

Q    Okay.  So primarily we're here for -- this lawsuit, at least, against my client is out of an incident at the Clayton County Jail on December 8th, 2019.

Is that correct?

A    Yes, sir.

Q    Okay.  Now, I'm going to ask you some questions about your health and condition before your arrest.

All right?

A    Um-hum.  Yes, sir.

Q    Okay.  So before December 8th, 2019, did you have any health issues where you had to be in the hospital?

A    No, sir.

Q    Before December 8th, 2019, did you have any health issues that required surgery?

A    No, sir.

Q    And before December 8th, 2019, had you had any sort of issues with your wrists?

A    No, sir.

Q    Did you have any issues before December 8th, 2019, with numbness anywhere in your body?

A    No, sir.

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

16

Q    Before December 8th, 2019, did you have any issues with your shoulders?

A    No, sir.

Q    Before December 8th, 2019, did you have any issues with your heart, like, high blood pressure even, I mean --

A    Yes.  I have high blood pressure.

Q    How long have you had high blood pressure?

A    I had high blood pressure -- I found out when I was, like, 26.

Q    And that's before December 8th, 2019; correct?

A    Yes, it is.

Q    Okay.  You were born in 1980?

A    Yes, I am.

Q    Okay.  Did you have any -- any history of psychological issues before December 8th, 2019?

A    No, sir.

Q    Before December 8th, 2019, were you ever diagnosed with a mental illness, mental disorder or any sort of mental health condition?

A    No, sir.

Q    Before December 8th, 2019, did you ever use illegal drugs?

A    No, sir.

17

Q    How about alcohol consumption before December 8th, 2019?  Did you drink?

A    Maybe on the weekend.

Q    Would you categorize yourself as a light, moderate or heavy drinker?

MR. GREENAMYRE:  Objection.  Just --

Now or before?

BY MR. HOFFER:

Q    At December 8th, 2019, before -- you know, before that -- that time.

A    I wouldn't even call it light.  I might have a drink on the weekend, one weekend.

Q    And as far as after December 8th, 2019, have you used illegal drugs since then?

A    No, sir.

Q    And I'd like to direct you to Interrogatory No. 8.  That's basically asking about your -- your arrest and criminal history record.

Okay?

A    (Witness nods head affirmatively.)

Q    Are you there?

A    Um-hum.

Q    You've got to say yes.

A    Yes, sir.

Q    Okay.  So I'm just going to run through

18

these.  I'm actually going to go back in time.
Let's go to 2000 --

MR. GREENAMYRE:  Huh-uh, starting
here --

THE WITNESS:  Okay.

MR. GREENAMYRE:  -- and then on the
next page.

BY MR. HOFFER:

Q   Yep.  There you go.  There you go.
That -- that's the page I'm really going to be
asking on.

So let's start from the beginning.  Let's
just kind of rip through your arrest record.

So it appears here that your first arrest
was 2001 for possession of a controlled substance in
Baltimore?

A   Yes.

Q   Do you remember the resolution of that
charge?

MR. GREENAMYRE:  It may be on the next
page.

THE WITNESS:  Oh.

A   Yeah.  I pleaded guilty --

BY MR. HOFFER:

Q   Okay.

19

A    -- did three years probation.

Q    Three years probation?

Then the next incident is 2003, looks like a probation violation in Baltimore.

And was the resolution that you had a year in jail or prison?

A    Yes.

Q    And then another three years probation?

A    Yes.

Q    And then jumping forward, 2011, an aggravated assault in Baltimore.

And it looks like that charge was dismissed?

A    Yes.

Q    Okay.  Do you recall any arrests between 2003 and 2011?

A    It say the incident date is 2014.  Yeah.

Q    Okay.  I'm asking if there's -- because there's an eight-year gap between the 2003 probation violation and the 2011 aggravated assault charge that was dismissed.

My question is:  Do you recall any arrests between 2003 and 2011?

A    No.

Q    Okay.  And then we go to 2014.  You had a

20

simple-battery charge in Henry County, Georgia, and you received a one-year probation sentence.

Is that accurate?

A    Yes.

Q    And that -- that's after you moved to Georgia in 2012; correct?

A    Yes.

Q    Okay.  And then we have -- again, it says December 28th, 2019.  I believe that's December 8th, 2019.  And that's the arrest that we're -- that we're kind of here about today that led to your incarceration at Clayton County Jail; correct?

A    Yes.

Q    And you were arrested for aggravated assault, felon in possession of a firearm and terroristic threats?

A    Yes.

Q    And what was the resolution of that -- those arrests?

A    I pleaded guilty to a simple possession of a firearm and probation.

Q    Okay.  It says time served.

A    Yeah.

Q    Did you also get time served?

A    Yes, I did.

21

Q    Do you recall about how -- what length of time you did serve before you had your guilty plea and were not in jail anymore?

A    I did ten months.

Q    And where did you do those ten months at?

A    In Clayton County Jail.

Q    So the entire ten months was at Clayton County Jail?

A    Yes, sir.

MR. HOFFER:  Did we just do one, one exhibit?  I'm going to get this --

COURT REPORTER:  Yes, sir.

MR. HOFFER:  Oh, okay.

(Thereupon, marked for identification purposes, Defendant's Exhibit 2.)

BY MR. HOFFER:

Q    I'm handing you what's been marked Defendant's Exhibit 2.  And I'll represent to you this is what I believe is an arrest record from the documents that the Clayton County -- Clayton County Sheriff's Office had in connection with your arrest, so I think they're -- they're -- and -- and you can take a look at these.  I don't want to belabor it too much, but it appears to me that there may be

22

some -- some other arrests that -- that you may not have remembered.  And so if we could take a few moments to go through some of these.  We have a --

Well, on the first page there's a -- there's an October 2015 battery in Henry County.

Is that the same as that 2014 simple-battery and maybe the dates are wrong?

A    Yes.  The date --

Q    Okay.  And then if you go to -- at the -- on the bottom there's what we call a Bates stamp, and it says Hill_000042.

Do you see the numbers on the bottom of the exhibit there?

A    Yes.

Q    Okay.  Could you turn to Hill_00042, please.

A    What does the Hill_00042 stand for?

Q    Oh.  That's -- that's what we call a Bates stamp, and that's how lawyers organize documents that they produce so that there's a number so we're not just thumbing through pages all the time.  It's -- it's something that we put on these -- it's a stamp we put on these documents so we can all kind of keep track of them.

A    Okay.

23

Q    Yep.  And since it was produced by my client, Victor Hill, we -- we put Hill so we knew who had produced the documents; so there's nothing -- that's just more of a reference for you to -- to look at.

A    Okay.

Q    Okay.  So on this it looks like there was a 1999 robbery charge in Baltimore.

Does that ring a bell?

A    I don't recall that.

Q    Okay.  It also says second-degree assault.

Does that -- does that ring a bell?

A    I don't recall that.  That was twenty -- 26 years ago, but --

Q    Okay.  Do you have any reason to doubt that you maybe were arrested in 1999 for robbery and assault?

A    Like -- again, I don't recall that.

Q    You don't recall one way or the other?

A    No, but --

Q    Okay.  Then if you'd turn to Hill_000045.  That's a couple of pages down the line.  And tell me when you get there.  There you go, yep, there you go, past the blank page.

A    Yep.

24

Q    Okay.  We have an arrest date of July 1st, 2000, up in Baltimore, looks like a marijuana possession charge.

Do you recall that?

A    No.  I don't recall that.

Q    We have a -- on Page 00049, if you'd turn to that page, there's a charge on December 21st, 2001, for second-degree assault and it looks like deadly weapon with an intent to injure.  That's on the next page.

Do you recall those -- that arrest, that charge?

A    No.  Are these just charges or they was dismissed or -- because I don't recall none of these.

Q    Okay.  Well, it does say that this was resolved through a -- we call it nolle-prossed, or nolle prosequi.

But what I'm asking is if you recall being arrested for these things.

A    No.

Q    Okay.  And, again, do you have any reason to doubt that -- that -- that -- that this arrest record is accurate and you just don't recall?

A    I just don't recall it.

25

Q   Okay.  All right.

A   So every one that you just called out, was they non-prossed [sic] or --

Q   Well, some of them are resolved in different ways; but, again, what I'm asking you is if you recall the arrests because I didn't see them on -- when we went through your arrest list on your Interrogatories, some of these ones I didn't see on there.

A   Right.

Q   And so when I compared them to the arrest record, there were some ones I didn't see; and so I wanted to ask you about those.

A   Okay.

Q   Okay?  And then if you'd go to 000051.  April 4th, 2003, it looks like a misdemeanor cocaine distribution arrest.

Do you remember that?

A   No.

Q   No?

A   No.

Q   If you'd go to 000053.  Towards the bottom of the page, there is an arrest on June 22nd, 2004.

Do you see that?

A   Um-hum.

26

Q    Yes?

A    Yes.

Q    For felony home invasion.

Do you recall that arrest?

A    No, sir.

Q    If you'd go to 000058, please.  I see a charge on November 16th, 2005, in Baltimore, possession with intent to manufacture or distribute.

Do you recall that arrest?

A    No.  I -- I don't recall that one.

Q    Then if you'd go to 000060, which I believe is the last page or the second-to-last page.

Tell me when you're there.

A    You said 60?

Q    Yes.

A    That's the last page.

Q    Okay.  This record shows that June 29th, 2015, an arrest in Baltimore for second-degree child abuse.

Do you recall that arrest?

A    No, sir.

Q    Do you recall any circumstances that you might have been involved in something where you'd be accused of child abuse?

A    No, sir, but -- no.  I was just looking at

27

it.  It's -- I'm just looking to see what happened.

So, like, was it dismissed or something like that?

Q    Yeah.  You don't get a lot of detail on these.  It does look like there's a nolle prosequi.

But, again, my question is:  Do you recall being arrested for these things?

A    No, sir.

Q    Okay.  How many times have you been incarcerated at Clayton County Jail?

A    I do believe twice.

Q    Okay.  And one -- obviously, once for the ten months after your December 8th, 2019, arrest; correct?

A    Um-hum.  Yes, sir.

Q    And what was the other time?

A    I got pulled over in Clayton County for -- I think my light was out, and Henry County had a warrant for me.

Q    What was the warrant for?

A    I can't recall.

Q    When was that Clayton County, we'll call it the taillight, when they pulled you over for the taillight?

A    I can't recall the date.  It was -- it was

28

a while ago.

Q    Was it before or after the December 8th, 2019, events?

A    It was before.

Q    Before?  Have you had any arrests since December 8th, 2019?

A    No, sir.

Q    Okay.  So let's -- let's talk about December 8th, 2019 --

A    Yes, sir.

Q    -- and that arrest.  Okay?

A    Yes, sir.

Q    So tell me what you were doing before you were arrested.

A    I was just getting home.

Q    Okay.  And the -- and -- and tell me what happened -- tell me --

Tell me what happened that led to your arrest.  Tell me what -- what was going on.

A    I'd just got home.  It was two guys sitting out front of my house.  I was the only person living in that building at that time because they was renovating, so they moved 85 percent of the people out.

And it was, like, midnight, something like

29

that, after midnight.  And two guys are sitting in front of my house.  They tried to rob me.

Q    How did they do that?

MR. HOFFER:  Bless you.

BY MR. HOFFER:

Q    What did they -- what did they do?  How did you know they were trying to rob you?

A    Because, for one, they cut their lights on and tried to blind me with their high-beams and -- and said you know what time it is.

Q    And what did that mean to you?

A    To give up what I had, because I had bags in my hand.  I'd went shopping.

Q    Did they ever get out of the car and --

A    Yes.

Q    Okay.  And did they threaten you in any way?

A    When they said you know what time it is, and the guy said a few cussing words to me.  And, yeah.

Q    Did they pull a weapon on you or anything like that?

A    I can't recall if they did or didn't pull a weapon.

Q    Okay.  According to the arrest record --

30

well --

And what did -- what did you do in response?

A    I tried to open my door and run in the house.

Q    Did you have any other interactions with these guys?

A    Never seen these people a day in my life.

Q    Okay.  Did you have any other interactions with them after you went into your house?

A    No, sir.

Q    So the -- the arrest record has a reference to you pointing a gun at one of those guys' heads.

Is that something that happened?

A    No, sir.

Q    Did you have a gun on you?

A    No, sir.

Q    Okay.  Because you did get arrested for felon in possession; correct?

A    Yes, I did.

Q    Okay.  So your testimony is you did not have a gun on your person?

A    No, sir.

(Thereupon, marked for

31

identification purposes,

Defendant's Exhibit 3.)

MR. HOFFER:  All right.  I think we're on 3; correct?

MR. GREENAMYRE:  Is this 3?

MR. HOFFER:  Yes.  This is Defendant's Exhibit 3.

THE WITNESS:  Oh.  Thank you.

BY MR. HOFFER:

Q    Mr. Peterkin, I -- I -- there's a reason why I asked you those questions.

I've handed you what's been marked Defendant's Exhibit 3.  It's a couple of probable cause affidavits related to your arrest on December 8th, 2019.  They're Bates stamped Hill_000013, and then the second page is Hill_00015.

Do you have those documents in front of you?

A    Yes.

Q    Okay.  And the narrative reads that on December 8th, 2019, the offender -- and that would be -- that would be you -- threatens to cause bodily harm to the victim.  The offender did so by stating "today gonna be the day you die," while pointing an Ozzie -- which I think might be Uzi -- type firearm

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

32

with an extended magazine.

Are you --

Is it your testimony that that never happened?

A    No, that did not happen.

Q    And then the next sentence says:  The victim advised that the offender held the firearm to the head of the victim -- or the offender held the firearm to the head of the victim while making threats of causing bodily harm.

Did that happen?

A    No, sir.

Q    And then the next sentence refers to you holding somebody at gunpoint.

Do you see that, that next sentence, you had Bell and another victim at gunpoint?

A    I see it.

Q    Okay.  Did that happen?

A    No, sir.  Who is the other victim?

Q    They refer to a Bell and a Jackson as the two -- two guys.

Did -- did you ever --

You didn't know these guys?

A    No, I did not.

Q    Never --

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

33

Had you ever seen them before?

A    Never seen them a day in my life.

And Jackson was a fake name because my lawyer did the homework.

Q    Okay.  And so when did the officer show up, I presume, to -- to arrest you?

A    I don't know.  I was in the house.

Q    Okay.  And tell me about your interactions with the arresting officer.  Tell me what happened.

A    I was in the house, and I was scared. They asked me come out.  I told them that I'll come out, and that's what I did.

Q    Do you know --

A    Then once I got in the car, he talked to me, said what he had to say and took me to the jail. We joked a bit, and then I went in the jail.

Q    So how many officers came to your door?

A    I don't recall.

Q    I believe that this -- the officer who wrote this report, about two-thirds of the way down, is Officer Georges, which looks like Georges, G-E-O-R-G-E-S (spelling).

Do you remember -- so you were --

Is that the officer that talked to you?

A    Yes.

34

Q    Okay.  Now, the narrative that the officer has, it reads:  I arrived on the scene and observed the offender -- that's you -- with his hands together in a cupping position at the driver's side window of this -- these guys' vehicle.

So are you saying that the officer incorrectly relayed that?

A    Yes, I do.

Q    The next sentence says:  When the officer [sic] saw me, he placed his hands -- or the offender -- I apologize -- the offender saw me -- that's you -- he placed his hands towards his left side.  The offender turned to his left, at which time I observed a magazine of a firearm protruding from his left pocket.

Is it your testimony that that did not happen?

A    Can you read the first part again?

Q    Sure.  When -- instead of offender, I'll say you.

A    You can say the offender.

Q    Okay.

A    It don't matter to me.

Q    Just whatever is -- I -- it's con -- it's a little confusing to read it, so that's all.

35

A     Okay.

Q     I'm trying to make it easy.

"When the offender saw me" -- and me is the officer -- "he placed his hands towards his left side."

A     No, the part before that.  I'm sorry.

Q     "The officer arrived on the scene and observed the offender with his hands together in a cupping position at the driver's side window of Bell's vehicle."

A     Okay.  Can you read the second part?

Q     Yeah.  "When the offend" --

MR. GREENAMYRE:  And it's right here.

THE WITNESS:  No, no, no.  I -- I can understand.

MR. GREENAMYRE:  Okay.

BY MR. HOFFER:

Q     "When the offender saw me, he placed his hands towards his left side."

Did I read that correctly?

A     Yeah.

Q     Okay.  Is it your testimony that -- that that did not happen?

A     No.  That did not happen.

Q     The next sentence reads:  The offender

36

turned to his left, at which time I observed a magazine of a firearm protruding from his left pocket.

Are you saying that the officer was untruthful in making that statement?

A     Yes.

Q     The next sentence says:  I told the offender to stop walking away, that I was the police.

Is it your testimony that that did not happen, as well?

A     No, sir.  I was in my house.

Q     If you'd go to the next page, which is Hill_00015.  It's a continuation of Officer Georges' Probable Cause Affidavit.  He relays:  The offender disobeyed and ran into the residence and locked the door.

Is it your testimony that that also did not happen?

A     I did not run in my house.  I've been in my house, and I locked the door when I walked in.  There was no officer.

Q     And then the last sentence reads:  The offender also did advise that he was a convicted felon.

37

Did you tell the officer that you were a convicted felon?

A   No, sir, I did not.

Q   Did not?  All right.

So -- so the officer knocks on your door.  So basically your -- your --

Well, before we do that, so basically your -- your testimony is that all the information in this Probable Cause Affidavit by Officer Georges, it's your testimony that it's -- it's pretty much all incorrect?

A   Yes.

Q   All right.  So coming back to --

Your -- your testimony is that the officer came to your door and knocked on your door.

Did he announce he was Clayton County Police?

A   Yes.

Q   Okay.  And then your reaction was what?

A   I asked him what he wanted.  And he said something about a robbery, or something like that, and he wanted to talk to me.  And there was a bunch of cars outside.  And then they got on the bullhorn.  And eventually after we talked, I came outside.

Q   When you said a bunch of cars outside, are

38

you talking about, like, law enforcement cars?

A    Yes, police cars.

Q    Okay.  And they had the bullhorn.  And they said, like, what, come out?

A    Yes.

Q    Okay.  And you never had any conversations with them about that you had been a convicted felon?

A    No, sir.

Q    Okay.  So you referred --

You testified a little while ago that you were joking with this officer at some point.

A    Yes.

Q    What -- what were you guys joking about?

A    Me going into the jail and how tough it was and how crazy it was.

Q    Do you remember any specifics about that conversation with the officer --

A    No, sir.

Q    -- beyond what you just testified about?

A    No.  I don't re -- remember the whole conversation.

Q    Were you handcuffed?

A    Yes, I was.

Q    Where did --

Where were the cuffs placed:  In front or

39

behind you?

A    They were behind me.

Q    And were you placed in the squad car?

A    Um-hum.  Yes.

Q    Okay.  How tight were the handcuffs?

A    They wasn't that tight because I had --

They actually doubled them; so I had a cuff here.  I had --

He had two sets of cuffs on me, so my hands were spread apart.

Q    But they were cuffed behind you?

A    Yeah.

Q    Okay.  Did you talk to anyone else at the arrest scene other than this arresting officer?

A    No, not that I recall.

Q    Did any -- anyone come up and introduce themselves to you?

A    Not that I recall, no.

Q    Now, do you remember going to the Clayton County Jail on December 8th, 2019?

A    Yes.

Q    Were there any stops that the officer made in between arresting you and taking you to the jail?

A    Yes.

Q    Where did he stop?

40

A    I believe a precinct.

Q    Like, the police precinct?

A    Yes.  I don't know what it was, but I think that's what it was, because we just stopped.

Q    Did he take you inside the precinct?

A    No.

Q    He left you out in the car?

A    Yes.

Q    Did he say anything about why he was going to the precinct?

A    No, not that I recall.

Q    So you get to the Clayton County Jail on December 8th, 2019.

And -- and you recall that incident? Going to the Clayton County Jail --

A    Yes.

Q    -- you recall?  Okay.

And walk me through what happened when you got into the Clayton County Jail.

First of all, I mean, let's start -- I'm -- I'm -- I want -- I want a pretty detailed explanation from you, and so start from when you -- assume --

I assume you got out of the police car; right?

41

A    Yes.

Q    Okay.  And then from that point, walk me through what happened.

A    Oh.  Once I got out of the police car, me and officer -- the officer, I guess George [sic] -- I think that's what his name is.

Q    I think that's his name.

A    Okay.  So George [sic], we was talking, joking about going in the jail and how tough and crazy it was.  And then he actually walked me in there.  He took his gun off.  I had to go through a metal detector.

I was in there for about a good five minutes -- not even five minutes.  Victor Hill walked in, and it was everybody -- sergeant on deck, so everybody had to turn around.  And he told everybody else to clear out.

Hold.  You've got to give me a second.

Q    Yeah.  Take your time.

A    So --

Q    And if you need -- if you need to take a break, you know, you're in charge of that.

A    So he -- he actually told everybody to clear out and --

MR. HOFFER:  Would you like to take a

42

minute?  Okay.

THE VIDEOGRAPHER:  We're off the record.

(Video off.)

(Whereupon, there was a recess in the deposition from 11:10 a.m. to 11:15 a.m.)

(Video on.)

THE VIDEOGRAPHER:  11:15 a.m.  We're back on the record.

MR. GREENAMYRE:  What time did we go off the record?

THE VIDEOGRAPHER:  I'm not sure.  It's been about seven minutes ago, so eight after.

BY MR. HOFFER:

Q   Okay.  All right.  Mr. Peterkin, you're okay to keep testifying?

A   Yes.

Q   Okay.  So I'll break down some of your testimony that you -- you gave right before we went off the record.

So you testified that pretty much right away when you went into the jail, you went through the metal detector; right?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

43

A     Yes.

Q     Okay.  And then you were --

Where were you for about that next five minutes?  You testified you were there for about five minutes before.

A     They put us in a -- in a cell.  The door was open because it was crowded.

Q     How many folks were in that cell?

A     I can't recall the numb -- actual number.

Q     And was it -- was it just you and a bunch of sheriff's deputies or were those -- were there a mix of arrested people and deputies in that room?

A     No.  It was -- it was just the inmates that came in.

Q     Okay.  So it's all just arrestees in that room?

A     Yes.

Q     Okay.  And you were in there for about five minutes before, I believe you testified, Sheriff Hill came in vicinity?

A     Yeah, about three to five minutes.

Q     Okay.  And then you testified something like officer on deck or sheriff on deck or something like that that --

A     They said sheriff on deck.

44

Q    And who --

Do you remember who said that?

A    I don't recall.

Q    Okay.  And then when that -- when you heard that, the other folks in the -- I'm -- I'll just call it a holding cell, okay, that -- that first holding cell, they all got up and faced the wall?

A    Yes.

Q    And what did you do?

A    I got up and looked at somebody.  And they said face the wall, so I faced the wall.

Q    Who did you look at?

A    Anoth --

Q    An arrestee or a deputy?

A    Another inmate.

Q    And that inmate said face the wall?

A    Yeah.

Q    Okay.  And so then what did you do after he told you that?

A    I faced the wall.

Q    Okay.  And then tell me what happened next.

A    I was facing the wall.  They told everybody else to get out of the room.

45

Q    Okay.  And before -- let's -- this is one thing I forgot to ask.  Was there any sort of --

When you walked through the metal detector, was there any sort of intake before Sheriff Hill walked in?

A    What do you mean intake?

Q    Like, intake, like, processing --

A    No.

Q    -- filling out paperwork?  Anything like that?

A    No, sir.

Q    Okay.  All right.  So let's go back, then.  So did you --

How did you know it was Sheriff Hill that had walked in the room?

A    Because they say sheriff on deck.

Q    Okay.  Had you ever seen Sheriff Hill before?

A    Never.

Q    Okay.  And so it's my understanding at this point you -- you are facing the wall?

A    Yes.

Q    Okay.  And then what happened next?

A    One of the -- what do you call them -- COs or -- I don't -- I don't know what you want to refer

46

them to as.

Q    Jailer?

A    The jailer --

Q    Okay.

A    -- CO, they -- they told me to come out of the room; so I came out of the room.  And I was looking across the -- across the room at the intake counter, and it was -- there was a white lady standing right there.  And I looked at her and said is -- I looked at her, and I seen a chair.  And then Victor Hill walked up to me with him -- what is that guy's name, the big-muscle guy.  And there was about ten of them.

Q    Okay.  And then you said there was a chair next to the white woman?

A    No.  It was a chair right there in the middle of the hallway.

Q    What kind of chair was it?

A    It looked like a --

Now I know the name of it.  It's a restraint chair.

Q    Okay.  I just wanted to make sure it wasn't just -- she was standing next to just a random chair.

A    No.

47

Q    Okay.  So she's --

So there's a restraint chair in this area?

A    Yes.

Q    Okay.  And then what happens next?
There's the -- the really muscular officer.  He --

What does he do?

A    He put his gloves on.  And then Victor
Hill said, you like pointing guns at -- you like
pointing guns at motherfuckers?  I wish I was there,
I'd riddle you with bullets.

Q    And then what happened after that?

A    He told one of the sergeants to put me in
the chair, and they put me in the chair.

Q    Now, that statement that Victor Hill --
that you claim Victor Hill made -- I'm probably not
going to get it right -- that you like pointing guns
at people, and, like, that statement, you -- you
don't know one way or the other where he got that
information from, do you?

A    No.

Q    Okay.  Okay.  And so then he makes that
statement, and then did he -- did he --

Is it your testimony that he gave some
instruction about the chair or --

A    Yeah.

48

Q    -- or how did you come to be in the chair?

A    He told them to put me in the chair.  He was like (indicating) --

Q    And did they put you in the chair then?

A    Absolutely.

Q    Okay.  How --

A    They put the handcuffs on my back, and they put -- they told me to sit down.  I sat down.

Q    Was there any sort of verbal altercation between you and any of the -- the COs before you were placed in the chair?

A    No, sir.

Q    Okay.  So you then sat in the chair --

A    Yeah.

Q    -- sat down in the chair?

A    Um-hum.

Q    Correct?  Yes?

A    Yes.

Q    And then what happened next?

A    He told them to tighten -- tighten my straps up.  So I was sitting like this, my hands behind my back.  He put the cuffs on.

Q    Who put the cuffs on?

A    One of the officers put the cuffs on, and he tightened them real tight.  And I kept pleading

49

with him because they was tight.  And then he told another officer to check my straps.  And he looked, and he told him to take his foot and put it in my chest and pull the ones that's right here tight.

Q    And you're motioning.  Just -- it's on the video --

A    Yeah.

Q    -- but just so our court reporter can get it --

A    I'm sorry.  He --

Q    No, no, no.  You're -- it was --

You said there was a strap around your chest?

A    So the straps came across your chest, across your midsection and around your legs, and I think across your chest.

And he -- and he told him to put his foot in my chest and make sure that they was tight.

Q    If you need another moment, that's fine.

A    No.  I'm good.

Q    And what did the officer do then?

A    He did it.

Q    Were all --

Were these other officers still in the vicinity at this point?

50

A     Yes.

Q     And I believe you testified there -- you thought there was about ten officers?

A     Yes.

Q     Were there --

Were they all male or were there some females?

A     No.  It was -- I think it was two females and the rest males.

Q     Now, the woman -- the white woman that you saw earlier, was she to your knowledge also a corrections officer or was she someone else?

A     No.  She was a correctional officer.

Q     Okay.  Did you see any medical folks in the vicinity at this point?

A     Not right then and there, no.

Q     Okay.  All right.  So it's your testimony that the officer then tightened the -- tightened the straps.

And, again, you -- you testified -- did they -- well, let me ask it this way, apologies for that.  That's a bad question.

What parts of your body did they tighten the straps across?

A     My chest, my midsection and my shoulders.

51

Q    Okay.  Where was Victor Hill at this point?

A    Standing in front of me.

Q    What do you recall him doing?

A    He was just standing there looking at me.

Q    Did you have any other conversations or -- or -- or -- or any sort of speaking engagements with Sheriff Hill at that point?

A    No.

Q    Did you ever have any conversation with Sheriff Hill after?

A    I can't recall that part.  I -- I do -- I don't --

Oh.  I did.  I asked why am I being put in this chair.  And one of the officers said shut the fuck up before we fuck you up.

Q    Do you remember which officer said that?

A    I think it was Wynn.  Wynn did all the talking.

Q    And how do you spell Wynn's last name?  Do you know?

A    No.

Q    Okay.  And when you asked why -- why am I in the chair, who did you direct that question to?

A    I was talking to Victor Hill, but you

52

can't talk to him.

Q    What do you mean you can't talk to him?

A    Can't nobody talk to him.

Q    Are you referring to some -- like, a rule or something or -- or just that you just can't -- you -- you physically cannot talk to the man?

A    No.  It's a rule.  You can't talk to him because they told me to shut the fuck up, don't talk to the sergeant -- I mean, the --

Q    Sheriff?

A    -- Sheriff.

Q    Did -- did Victor Hill re -- respond to your question about why you were in the chair?

A    I think he said something about he's -- something about he's God, or something like that.  I don't remember.  I just was out of it after that.

Q    Okay.  And, again, I'm just asking these to the best of your recollection.  And you're doing a -- you're doing a good job remembering.

And, again, if you need -- you need to step away for a few minutes, we'll -- we'll do that.

Okay?

A    Um-hum.

Q    Are you okay to go on for a little bit?

A    Yes.

53

Q    Okay.  So when you tried to ask why you were in the chair, about how long had you been in the chair at that point?

A    I think I'd been in the chair for about maybe another five, six minutes, something like that.  I can't recall, but we didn't have no clocks or no watches or nothing.

Q    So then what happened next after you --

You asked that question.  You were told to shut the F up.

What happened after that?

A    They took a picture of me sitting in the chair and put me in the holding cell.

Q    And was the holding cell in close proximity to where they initially put you in the chair?

A    Yes.

Q    And how did they get you in there?  They wheeled it?

A    Yeah.  They leaned me back -- they leaned the chair back and drug me in the room.

Q    And was there anyone else in that holding cell?

A    Yes.  There was another inmate in there.

Q    Okay.  Did you have any conversations with

54

that inmate?

A    No.  No, sir.  I was screaming.

Q    You were screaming?

A    Yes.

Q    When did you start screaming:  Before or after you went into the holding cell?

A    I think after.

Q    Do you recall what the other inmate was doing?

A    No.  He kept -- he kept moving his chair.

Q    Like, rocking it around or what?

A    Yeah.  He was moving it around.

Q    Did -- was he --

I mean, was he able to put his feet on the floor and scoot the chair around?

A    I don't know how that man did that, but he was moving it around.  And --

Q    Okay.

A    -- he just kept moving it around.  His feet wasn't on the floor because you can't put your feet on the floor.

Q    So you testified you were -- you were screaming when you were in the holding cell.

Were you -- were you screaming anything specific or -- or just generally screaming?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

55

A     I was just saying --

Actually, I wasn't screaming.  I was saying Allahu Akbar, Allahu Akbar, Allahu Akbar -- and that just means God -- because I was just trying to take my mind off the pain.

Q     Do you identify religiously as Muslim?

A     I do.

Q     Do you still identify as Muslim?

A     I was born Muslim.  So, yes.

Q     Okay.  Apology.  I probably didn't phrase that in a -- hopefully that was not insensitive how I phrased that.  I apologize for that.

A     It's fine.

Q     Okay.  So you were -- you were screaming Al -- Allahu Akbar.

And about how long did that episode take?

MR. GREENAMYRE:  Objection, form, but go ahead.

A     I don't even recall -- I can't recall a time because it wasn't no -- it's no clocks or no watches in there, so you don't really know.

BY MR. HOFFER:

Q     And I guess what I'm --

Yeah.  And that's fair.

I guess what I'm trying to get at:  Like,

56

did -- were you screaming that for maybe a few minutes or more like an hour or so, really, like, a short time or a long time?

A    I just -- it wasn't at -- I --

It was hurting, so I said it for about maybe 20 minutes.  But then my voice got low, and I just start saying it to myself, so -- well, not saying it to myself, just speaking it out, not very loudly no more because I was trying to take my mind off the pain; so I can't really give you a time frame.

Q    Did anyone come into the cell while you were screaming?

A    No.

Q    Other than the guy that was already in there?

A    No.

Q    Okay.  And then what -- what happened next?

Well, actually, before I -- before you answer that, you -- you -- I believe you mentioned something about pain.  Did --

A    Yeah.

Q    What -- what -- what are you talking about with that?  What do you mean by pain?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

57

A    My shoulder was hurting.  My wrists was hurting.

Q    Which wrist?

A    Both of them.

Q    And which shoulder was hurting?

A    Both of my shoulders.

Q    Okay.  So walk me through what happened next.

A    We sat there.  The other guy, he was sitting.  He kept moving his chair around.  And I went to the bathroom on myself, and then they -- they came in a while later.  Well, yeah.  They came in, the sheriff and the -- the doctor.  I guess that was a doctor, but he came in with him.

Q    With Sheriff Hill or with a deputy?

A    No.  It was a deputy.

Q    Okay.  And when you -- when you went to the bathroom on yourself, before that happened did you -- did you call out to any -- anyone that --

A    Yes.

Q    -- and let them know, hey, I've got to use the restroom?

A    There's no one around.  It's a locked -- it was a locked area.  And I kept trying to get somebody and just couldn't.

58

Q    Do you recall about how long you had been in the cell just generally before you went to the bathroom on yourself?

A    It had to have been -- so they came in --

When they came in, it was two and a half hours later; so probably about a hour and a half, between a hour, hour and a half.

Q    And who came in two and a half hours later?

A    It was the doctor and Sergeant Johnson, the big Sergeant Johnson because there's two of them.

Q    Is this the guy -- well, no.

You were talking about you thought a guy named Wynn was the real muscular one; right?

A    Yeah.

Q    Okay.  And how do you -- how do you know that it was about two and a half hours that you were in the restraint chair before the doctor came in?

A    Because the doctor and the sergeant was talking and asked how long he was in here.

Q    And one of them said two and a half hours?

A    He was like maybe two, two and a half hours.

Q    Okay.

59

A    And then --

Q    Tell me about your interaction with the doctor and what the doctor did.

A    He used his little tool.  He checked my heart, checked my vitals.  And I was talking to him about my blood pressure.  I was like, my blood pressure high.  And I said, can I get my blood-pressure medicine?  And he said -- I said, I just need my blood pressure -- my blood-pressure medicine [sic] is high, man, can I get my -- some -- any kind of blood-pressure medicine?  And he said -- well, I was like, because I don't want to die in here.  And he was like, man, it's fucking Sunday, ain't nobody trying to hear that shit, you ain't going to die in here and I just came from church.

Q    You did or the doctor did?

A    That's what he said.  He said -- he said, I just came from church, don't even try this shit.

Q    About what -- what -- what time of day was this?

A    I got locked up in -- three --

This had to have been, like, early in the morning.  Like, I don't -- I don't know what time of day it was because there's no clocks, but -- and you can't see outside.  But the man just said he just

60

came from church, so I wouldn't know.  You can't see outside in a jail.

Q    So -- and I guess I'm kind of get -- trying to get a little bit of a time line.  When --

When those two guys were in front of your house, you said that was around midnight; correct?

A    It could have been midnight, could have been --

I don't know the actual time.

Q    It was late?

A    It was late.

Q    Okay.  And then about how long between that incident did the officer come to your door?

A    I don't know.  I can't recall that, though.  Like, I --

Q    I mean, like, bang-bang, right afterwards or was it more like you're already in your house and -- and the officer came by a while later?

A    Yeah.  No.  I was in my house, and he just came and knocked on the door.  He -- so he came -- the guys --

The guys was still sitting outside; so it could have been, like, 10, 15 minutes later.  I ain't sure.

Q    And I may have asked you this, and I

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

61

apologize.

MR. HOFFER:  So you can go ahead and say asked and answered or whatever.

BY MR. HOFFER:

Q    But did -- did the officer -- did the officer relay to you what those other guys had apparently told him?

A    No.  He didn't say anything to me.

Q    He didn't say anything about you pointing a gun at someone's head or --

A    No.  He didn't say that.

Q    Okay.  All right.  So let's go back to when the doctor saw you in the restraint chair.  Okay?  So --

And you had a conversation with him, and you said he said you -- you testified that he told you that you're -- you're not going to die in here, it's a Sunday, you know, I just got out of church, or whatnot.

What happened after that?

A    After he did that, he took his -- took my vitals and everything.  Well, he didn't take my vitals.  He took the -- I think the test -- whatever you call that.

Q    Stethoscope?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

62

A    Stethoscope. And he checked my heartbeat, checked that. And then he -- I kept asking about my medicine. And he said, what kind of medicine do you take? I told him.

And then probably a little while longer, another lady came in with the same officer. And she gave me -- she checked me. She actually took my vitals and gave me some blood-pressure medicine. And they checked me again, and she told them to take my hands from behind my back and put them on the chair.

Q    And did they do that?

A    They left. And then after while they came back and did it.

Q    And was this person a healthcare provider, this woman? Like, did she -- was she wearing, like, healthcare provider clothes?

A    Yes, yes.

Q    Okay. And did the doctor give you any sort of medication?

A    No.

Q    It came from the nurse?

A    Yes.

Q    Okay. And did she give you the blood-pressure meds that -- that you had asked for?

63

A     I'm not sure.  I don't --

Q     What -- go ahead.

A     She just said it was blood-pressure medicine.

Q     What blood-pressure medicine were you on at that time?

A     I was on metoprolol.

Q     Can you spell that?

A     No.

Q     Okay.  I'm trying to ask for the court reporter.

MR. HOFFER:  Do you know how to spell it?  Okay.  Are you --

THE WITNESS:  I'm sorry.

MR. HOFFER:  That -- that's okay.

BY MR. HOFFER:

Q     Are you still on that medication?

A     No.

Q     Are you on a different blood-pressure medication now?

A     I -- I have it.  But since I've been taking -- you know, fasting and meditating, my blood pressure actually went down; so I don't have to take it no more.

Q     How is your blood pressure now as we're

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

64

sitting here, maybe not this moment but generally?

A    Right now it's a little elevated, but generally it's -- it's getting better.

Q    And you're largely controlling it with meditation and --

A    Fasting and --

Q    -- fasting?

A    -- juicing and working with my doctors and my healthcare providers.

Q    But before I forget to ask, do you have a primary care doctor?

A    I do.

Q    Who's the primary care doctor?

A    I go to Kaiser, so you don't have a actual doctor.

Q    It's just whoever is at the facility?

A    Yeah.

Q    Okay.  Which Kaiser clinic do you generally go to?

A    I know that you have all my information and stuff.  Because you work for Victor Hill, I'm actually scared to give you all my stuff because of the retaliation.  And I'm actually afraid of that man.  So if we can refrain from asking where my -- all my whereabouts be, I will feel a lot better.

65

Q    Okay.

A    And I know that's your client and you work for him.  I don't know the relationship you have with that man.  So you have my whole life in this book, and I'm actually afraid of that man.  So you're asking me where I go to doctors at, where I'm -- what I do.  I see my address with my kid's name on there.  There is scary to me.

Q    Okay.

A    So you're asking me where I go to doctors at and what's my doctor name.  It's -- it's --

Q    Okay.  How about, why don't we take a -- why don't we take a minute?

A    No.  I'm -- I'm fine.

Q    That's okay.

A    I just want to get through it.

Q    Sure.

A    But you're asking personal questions about where I go to doctors at.

Q    Okay.  And I'll tell you why.  I mean, some lawyers might say, I'm -- well, it's because I'm asking the question and you have to answer it.  I don't like doing that.

A    That's fine.

Q    Yeah.  Why I'm asking you is because, you

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

66

know, you've -- you've made medical -- you know, injury claims also and -- and about how your life is affected, and so it's generally kind of --

I -- I -- I hear where you're coming from, but it's a -- it's a -- I will tell you it's a fairly standard question.  And so maybe if you're uncomfortable putting it on the record, we -- we could do this one of two ways.

Number one, we could go off the record and I could ask you -- you know, just like a lot of times we ask for a Social Security number, and we go off the record so it's not -- it's not public.

The other way we could do it is I could -- because I haven't received these -- the medical records yet -- that I could -- I -- we could -- I could go through your lawyer for that.

A     If you can, please go through my lawyers.

Q     Okay.

MR. GREENAMYRE:  Yeah.  And I'll work -- I'll get you what you need.

MR. HOFFER:  All right.  Perfect.

MR. GREENAMYRE:  Yeah.

BY MR. HOFFER:

Q     So do you feel a little -- a little more secure?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

67

A    Yes.

Q    Okay.  All right.  I appreciate that.

Okay.  So let's go back.  And I'm jumping around a little bit, but I'm trying to actually move things along.  There's -- there's a method to this.

So you did receive some blood-pressure medication while you were in the restraint chair; correct?

A    Yes.

Q    Okay.  And did you feel -- did you feel better after you got those meds, as far as for your blood pressure?

A    No, I did not.

Q    Okay.  So what happened after the nurse came in, checked you out, they loosened the -- the straps, and you got the medication?

What happened next?

A    They did not loosen the straps.  They took my hands for hind -- from behind my back.

Q    Ah.  Okay.

A    And they put them on the chair, and he just tightened them back down.  But he stuck his finger in there and he said that's too loose; so he tightened it up a little bit whereas, though, I was just like this on the chair.

68

Q    Okay.  He tightened it up a little bit?  Like, was it -- was it --

A    Yeah, because he had --

Q    Was it really tight, I mean, like, con -- contacting all the skin or was there a little bit of room?

A    No.  It was contacting my skin because when he first took them off, he put his finger in there and was like there's -- and then he pulled it tight some more.

Q    And which officer do you believe this was?  Do you know?

A    I think at that point it was --

I know the sergeant was in there, but I don't remember who else was.  It could have been -- I don't know.  Hum-um.

Q    Okay.  Again, I'm not -- I'm not trying to get you to speculate.  If you know, you know.  If you don't know, you don't know.

A    Right.  I understand.

Q    Okay.  So what -- what happened after that interaction with the nurse and the -- and the officer?

A    I sat there for a long time, a little while longer.  And they came and got the -- the guy

69

out of there.  Then I sat there by myself for a while, and then they came and got me.

Q    And when they came and got you, what -- what happened with that process?

A    That's when I went to do all the intake stuff.

Q    Did they release you from the chair at that point?

A    Yeah.  They let me go from the chair, and I went through intake.

Q    Did you have any conversations with any medical person or sheriff's officer as -- after that nurse came in and -- and the -- and the other deputy was in there?

A    No.

Q    And part of the -- who --

Did you hear anyone issue an order to let you out of the chair?

A    No.

Q    Just one of the officers came over and released you?

A    Yeah.

Q    And then you went over to basically the booking desk, and they booked you in?

A    Yes.

70

Q    And tell me about the booking process.

A    The -- the white lady that was standing there -- and, I'm sorry, I don't know her name --

Q    It's okay.

A    -- she let me use the phone.  She let me use the phone a lot.  And she let me get my cell phone to get some numbers out because I didn't know no numbers.

And I sat down.  I think they -- they brought -- she had some food or bagged -- I think it was a brown paper bag full of food, or something like that, they was giving out.  She gave me one, and they let me sit out the little waiting -- the little holding cell.  They didn't lock me in.  They sat -- they let me actually sit out.  And after that she booked me and put me --

Q    The -- the white woman booked you?

A    Yeah.

Q    Okay.

A    Took my fingerprints and all that type of stuff.

Q    And she gave you some food?

A    Yes.

Q    Did you have any conversations with her?

A    No.

71

Q    Did you have any conversations with any other deputies at this time?

A    No, not that I recall.

Q    All right.  So then you get some food, and you're put into another -- well -- and you're getting booked.

Are you then put into another cell?

A    Yeah.

Q    And were you ever placed in the restraint chair again?

A    No.

Q    And you were in the -- in Clayton County Jail, I believe you testified, about ten months?

A    Yes.

Q    Okay.  And I know some of the injuries you're alleging, the physical injuries, in this -- that you're alleging in this lawsuit are your wrists and your shoulders; correct?

A    Yes.

Q    Did you observe any sort of visible injuries to your body when you were released from the restraint chair?

A    Yes.

Q    What did you observe?

A    My wrists was bleeding, both -- well, this

wrist was bleeding more.

Q    And you're referring to your left wrist?

A    My left wrist was bleeding more.  This had -- this -- my right wrist had bruises on it, but this -- my left wrist had a cut and it was bleeding.

Q    I'm going to hand you --

MR. HOFFER:  Are we on 4?

Did I give you this already?

MR. GREENAMYRE:  Yeah.  And this is --

MR. HOFFER:  The -- it's a two --

MR. GREENAMYRE:  -- 48 and 49.

MR. HOFFER:  48 and 49.  Yeah.

MR. GREENAMYRE:  Yep.

(Thereupon, marked for identification purposes, Defendant's Exhibit 4.)

BY MR. HOFFER:

Q    I've handed you what's been marked Defendant's Exhibit 4.  It's two photographs that are actually labeled Government Exhibit 48 and 49, I believe, from the criminal trial.

Do you see those?

A    Yes.

Q    Are --

Is that your body that's depicted in those

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

73

photographs?

A    Yes.

Q    And on the picture that's labeled Government Exhibit 48, it looks like that's your hand.

Is that correct?

A    That's my wrist.  Yes.

Q    Okay.  And which hand is that:  Right or left?

A    Left.

Q    That's your left wrist?

A    (Witness nods head affirmatively.)

Q    And there's a -- well, why don't you just mark on that --

Well, first of all, when were these photographs taken?

A    When I came home.

Q    And who took those photographs?

A    Me.

Q    So is this about ten months after the restraint-chair incident?

A    Yes.

Q    Okay.  And can you mark with this pen on the first page, Government Exhibit 48, where you claim that this injury to your wrist was?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

74

A    (Witness complies.)

Q    All right.  It looks like you've circled basically around your -- your whole wrist?

A    Yes.

Q    Okay.  On the next page, Government Exhibit 49, what part of your body is that depicting, that picture?

A    That's -- that's my wrist.

Q    That's your wrist?

A    My right wrist.

Q    Your right wrist?  Okay.  Oh.  Okay.

Is that kind of taken where your -- your hand is -- is palm-up?

A    Yeah.

Q    Okay.  I was having a hard time figuring out what that was.  All right.

So same question:  In Government Exhibit 49, would you please circle what part of your wrist you contend was -- was injured by the handcuffs and the restraint chair.

A    (Witness complies.)

Q    You've circled the -- the entire wrist area again?

A    (Witness nods head affirmatively.)

Q    Yes?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

75

A     Yes.

Q     Okay.  Did you receive any treatment for your wrists while you were in Clayton County Jail?

A     No.

Q     Keep that with you.  We've got to -- we've got to keep all the exhibits together.

Did you make a complaint and ask for medical treatment about your wrists?

A     I did.

Q     Who did you ask?

A     I put it in the kiosk.

Q     When did you put it in the kiosk?

A     The same day I got to my floor.

Q     Was that the same day of the arrest -- well, the -- the same day of your intake into the jail?

A     No.

Q     How long -- how long did it take you to actually get placed into kind of the unit that you were in more long term?

A     Probably seven days.

Q     Seven days?

A     Yeah.

Q     And what -- what would you call -- what was -- what was the initial period --

76

The first seven days, what part of the jail was that called that you were housed in?

A    I don't know what they call it.  It's called pre-intake or -- I don't -- I don't know --

Q    Okay.

A    The classification.  I don't -- I don't know what they call it.

Q    Okay.  And did you receive kind of some orientation about the rules of the jail at that point?

A    Yes.

Q    Is that how you came to know that if you had a complaint or something like that, that you'd go to the kiosk and make it?

A    No.

Q    How did you come to that knowledge?

A    Once I got to the -- once I got to that housing unit, when I walked up to the nurse, they said, you can't talk to us, you've got to put it in the kiosk, we can't do nothing for you.

Q    Okay.  So then you put it in the kiosk, and what happened?

A    Nothing.

Q    What did --

Do you recall what you put into the kiosk,

77

what did you input?

A    I put in I need to see medical, because they had medical, and then they tell you a reason, why do you need medical.  So I told them about my wrists.  I told them about my blood pressure.  And then nothing.

Q    And I'm going to represent to you -- I -- I don't have these documents here, but they have been produced in the lawsuit -- that it looks like you made a complaint about almost like an abscess or some issue with your tooth.

A    Yes.

Q    Do you recall that?

A    Yes.

Q    And I -- again, correct me if I'm wrong. I -- I -- I want to say that that was within about ten days of your arrest.

Does that sound about right?

A    I can't recall if it was --

No.  I don't think so, but I don't know.

Q    Okay.

A    If it was 10 days or 20 days, I don't remember.

Q    Okay.  And did you get treatment for your tooth?

78

A    I did.

Q    How did they treat your tooth?

A    They pulled it.

Q    Okay.  Now, your wrists, what condition were they in after you got out of the restraint chair, as far as were -- was there bleeding?  Was there bruising?

A    Yes.

Q    Tell me about that.

A    It was bleeding on my left wrist.  It was bruising on my right.  Yeah.

Q    And was it -- was it an active bleed or more of a sore?

A    It was bleeding.  It wasn't pouring, but it was bleeding.  You could see where it cut down into my skin.

Q    How long did it bleed?

A    What do you mean?

Q    Like, how long was it actively bleeding?  Was it an hour?  Two hours?  Thirty minutes?

A    I can't say.  I actually took a piece of sheet, tore it and wrapped it up.

Q    To kind of stop the bleeding?

A    Yeah.

Q    Okay.  How about your --

79

You testified about your shoulders.

Did you have any sort of bruising or visible injuries to your shoulders?

A    No.  It wasn't visible, but it was hurting a lot, but it wasn't visible.

Q    And you testified it's both shoulders that you had pain in?

A    Yes.

Q    And after that initial interaction with Sheriff Hill when you were put into the restraint chair, I believe your testimony is that you never had any interactions with him in the jail for the next ten months?

A    I didn't have no physical interaction with it -- with Hill.

Q    What interactions did you have with him?

A    He came on a -- he came on our tier.  And somebody in my section was doing something wrong.  I guess they got into a fight.  I believe they got into a fight or something.  I don't recall.  But what actually happened, he came up there.  They shook the whole thing down.  He threw everybody's stuff out, and they -- they was doing shakedown.

Q    You said that Hill was -- had ordered that shakedown?

80

A    Yeah.  He was there.

Q    Okay.  But it sounds like he wasn't personally interacting with you, was he?

A    No.

Q    Okay.  It was more applicable to everyone that was in your unit?

A    Yeah.

Q    Okay.  Other than that, did you have any interactions with Sheriff Hill during your incarceration there?

A    Personally, no.

Q    Did you see him sometimes?

A    Yeah.

Q    Okay.  Did you see any other folks get put into the restraint chair?

A    No.  I didn't see nobody get put in the restraint chair, but I heard about it.

Q    Okay.  Well, what did you hear?

A    A new guy came up.  He said he just got out of the chair.

Q    Do you remember what that guy's name was?

A    No, sir.  We didn't -- no.

Q    Did he tell you why he was put in the chair?

A    Yeah.

81

Q    What did he tell you?

A    Said Victor Hill is a asshole, he'll just put anybody in the chair.

Q    And did you tell him about your experience being put in the chair?

A    Yeah.

Q    And what did you tell him?

A    I said I got put in the chair.  And he was like, what did you get put in the chair for?  I said, I don't know, Bro, I don't know -- I don't even know why I'm in this jail, but, you know -- he was like, don't worry about it, everybody gets put in the chair.

Q    And you don't know this guy's name?

A    No.

Q    Did you ever later come to an understanding of what his name was?

A    No.  They called -- they called everybody by either you -- your neighborhood or wherever you're from.

Q    What did they call you?

A    They called me Ak.

Q    Is that in relation to --

A    Brother.

Q    Ah.

82

A    It's Muslim.

Q    Okay.

A    So Akhi is actually what they said.

Q    Okay.  Did anyone put ointment on your wrists?

A    I did get some ointment, but it wasn't mine; but I put it on my wrist.

Q    Who did you get the ointment from?

A    Another inmate.

Q    When did you first request medical help after you were released from the chair?

Was it when you reported into the kiosk about --

A    Yes.

Q    -- a week or so later?  Yes?

A    Yeah.

Q    Okay.  Were you placed on what's called special management meals?

Is that familiar to you?

A    Yeah.

Q    When was --

When did that happen?

A    It happened because of my -- I don't know.  The doc --

After I seen the -- the nurse and stuff,

83

she said you've got to be on a low-sodium diet.

Q    Was that for your blood pressure?

A    Yeah.

Q    Okay.  And do --

Were you put on a low-sodium diet, then?

A    Yeah.

Q    Did it taste pretty crappy?

A    Yeah.

Q    Well, you couldn't have salt.  Yeah.
Okay.

A    Yeah.

Q    And how long were you put on that
low-sodium diet?

A    The extent of my jail stay.

Q    I'm sorry?

A    The whole time I was in there.

Q    Okay.  Did you ever have any other
blood-pressure episodes while you were at Clayton
County Jail?

A    No, because they started giving me
blood-pressure medicine every day.  I took it twice
a day.

Q    Were you ever placed in the -- the jail
medical infirmary?

A    No.

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

84

Q   About how many times did you get medical treatment while you were in Clayton County Jail?

A   I got my blood-pressure medicine every day, twice a day.

Q   Okay.  Were there any other visits -- specific visits?  I mean, there was your tooth.

A   Oh, yeah.  I got my tooth, though.

Q   Okay.  What -- what other medical treatment did you receive while you were in the jail?

A   That was it.

Q   And when you were released from Clayton County Jail after, whatever, ten, ten and a half months, were you then free to go?  You were on probation at that point?

A   No.

Q   Where did you go?

A   I posted bond.

Q   Okay.  And what happened with that?

Was that when you were going to go enter your plea?

A   No.  I posted bond.  I went to work.

Q   Okay.  You went back to work?

A   Yeah.

Q   And where were you working at that point?

85

A    I got fired, but I went to A1.  I got a job at A1.

Q    So A1, that's the A1 we talked about before?

A    Yeah.

Q    So probably -- doing the math, probably the fall of 2020?

A    Yeah.

Q    Okay.

A    Yeah.

Q    And where were you working at the time of your arrest?

A    I was working at a warehouse on Fulton Industrial.  It was a piping warehouse.

Q    A what ware -- warehouse?

A    It was a -- it was pipes, pipe warehouse.

Q    Oh.  Okay.

A    Yeah.

Q    And what was your job at the pipe warehouse?

A    Assistant warehouse manager.

Q    And what was the name of the company?

A    K&H.  Yeah.  They call it K&H.

Q    Like, K as in kilo?

A    Yeah, H.

86

Q    H as in hotel?

A    Yes.

Q    Okay.  And do you remember who your supervisor was at K&H?

A    His name was Mr. Wilson.

Q    And did you ever have any interactions with K&H after you were released from Clayton County Jail?

A    No.

Q    You just knew that you had been let go?

A    Yeah.

Q    Did they ever communicate that with you or did you just kind of figure it out?

A    No.  They called my girlfriend to figure out where I was at.  She told them that, you know.  And they was like, we have to release him.

Q    Do you recall what you were making salary-wise at K&H?

A    I was making sixty-seven five.

Q    Sixty-seven five a year?

A    Yes.

Q    Any bonuses, anything like that?

A    Yes.

Q    Were you also on health insurance with that employer?

87

A     Yes.

Q     And I -- I'll try to cut through some things.  Are you -- are --

      Have you been on health insurance with all your employers that we've talked about?

A     Yes, sir.

Q     Okay.  So that's one of the benefits of the job?

A     Yeah.

Q     Okay.  Were you ever placed on suicide watch?

A     Never.

Q     Did you ever file a complaint with the jail about being placed in the restraint chair?

A     Yes.

Q     How did you do that?

A     My girlfriend did it.

Q     Who did she file the complaint with?

A     I have no clue.

Q     Did she tell you that she'd filed a complaint?

A     She said she was going to talk to someone and --

Q     Do you know if she did?

A     I'm sure she did.  The federal government

88

came and found me.

Q    I mean, do you -- do you know for certainty if she had -- if she made a -- you know, talked to anyone at Clayton County Jail making a complaint on your behalf?

A    Yes.  I don't know who she talked to, but I know she made attempts to call and talk to them.

Q    Talk to who?

A    She talked to my lawyer first.

Q    Your criminal lawyer?

A    Yes.

Q    And who was that?

A    Mr. Mondelli.

Q    Thomas Mondelli?

A    Yeah, yeah.

Q    Okay.

MR. GREENAMYRE:  When we get to a natural stopping point, if I could take a quick five-minute break.

MR. HOFFER:  Yep.  Why don't we -- why don't we do that now.

MR. GREENAMYRE:  Okay.

MR. HOFFER:  Yeah.

THE VIDEOGRAPHER:  12:02 p.m.  We're off the record.

89

(Video off.)

(Whereupon, there was a recess

in the deposition from

12:02 p.m. to 12:12 p.m.)

(Video on.)

THE VIDEOGRAPHER:  12:12 p.m.  We're back on the record.

BY MR. HOFFER:

Q    All right.  Mr. Peterkin, after that -- that brief break, are you ready to keep going?

A    Yes.

Q    Okay.  So what we were talking about were whether you had filed a complaint about being placed in the restraint chair back on December 8th, 2019.

I believe your testimony was that you believe your girlfriend had filed a complaint, had tried to talk to somebody at the jail.

Is that fair?

A    Yes.

Q    And do you --

But you don't know who she talked to?

A    No.  We had very limited access because it was during COVID, so --

Q    Do you know if she sent something in writing?

90

A    I don't know.  I don't know what she did.

Q    And what -- what's your girlfriend's name?

A    Lavelle Austin.

Q    How do you spell her last name?

A    A-U-S-T-I-N (spelling).

Q    Okay.  Lavelle, L-A-V-E-L-E (spelling)?

A    Um-hum.

Q    V-E-L-L-E (spelling)?

A    L-A-V-E-L-L-E (spelling).

Q    Okay.  I should have had you spell it rather than me try it, but I got it right.  Okay.

And are you still involved with Ms. Austin?

A    Yes.

Q    Have y'all gotten married or are you still boyfriend-girlfriend?

A    No.  We're married Islamicly.

Q    Ah.  Okay.  All right.  Does that mean --

I mean, have you done the marriage certificate and stuff like that or more of a religious thing?

A    We -- we don't do marriage certificates.

Q    Okay.

A    That's for Christians.

Q    Okay.

91

A    And the -- we don't do that.

Q    Okay.  All right.  And do you recall ever getting a re -- that your girlfriend ever got a response to whatever complaint she attempted to make?

A    No.  Last time we talked about --

When she talked about it, my lawyer just started taking over.

Q    Okay.  And -- and, again, I'm not trying to ask about anything that you have talked to your criminal counsel about, either.

A    Right.

Q    But do you know if there was any outcome about this complaint, any -- any -- anything that happened as a result of it?

A    Yeah.  I got contacted by the federal state's attorneys and --

Q    Okay.  And when -- when did --

And you say federal state's attorney.

Do you mean the FBI or a U.S. Attorney?

A    It was first the U.S. attorneys that contacted me, and then the FBI called me.

Q    Do you remember which U.S. Attorney contacted you?

A    I can't remember his name.

92

Q    And when -- when were you contacted by somebody from the U.S. Attorney's office?

A    I mean, I was home for about maybe a year or -- or so.  I -- I can't remember the actual date when they called me.

Q    All right.  Let's ballpark it.

So if you got out probably around October of 2020 --

Is that about right?  You were in there for about ten months?

A    Yeah.

Q    Okay.  And then about a year later, are we talking fall of 2021 when you believe the AUSA first contacted you?

A    Yeah, something like that.

Q    And what did you talk about with the AUSA?

A    First they asked me was I ever in Clayton County, and I said yes.  And he said -- asked me when was I arrested, asked me what happened.  And he said, I might want to interview you -- well, he said, the FBI might want to interview you, so, he said, we're going to keep in contact.

Q    What did you tell the AUSA, to the best of your recollection, about what happened?

A    He ex -- the same thing I explained to

93

you.  I went to the jail, got put in the chair, and explained to him what happened.

Q    About how long after that interview did the FBI contact you?

A    I can't recall the time.  Maybe six months later, seven months later.  I can't recall.

Q    So that would put us into 2022?

A    Yeah, something -- I can't recall when it actually was.  But, yeah.

Q    Do you recall which agents contacted you?

A    No.  I don't know who -- what his name was.

Q    Did --

So it sounds like you didn't file a -- or -- or send a complaint about the restraint chair through the kiosk system, did you?

A    No, I did not --

Q    Okay.

A    -- because --

Q    And -- go ahead.

A    No.  I just -- I didn't put it in --

I told my girlfriend about it.  She said she was going to get with my lawyer and see what happens.

Q    Did you ever see anything in writing that

94

your girlfriend or your lawyer sent to the Clayton County Sheriff's Office complaining about the restraint chair?

A    Yeah.  I saw the email.

Q    You did?  And do you recall when -- when that email was sent?

A    No.

MR. HOFFER:  Okay.  Let's go off for just a second.

THE VIDEOGRAPHER:  We're off the record.

(Video off.)

(Thereupon, a discussion was held off the record.)

MR. HOFFER:  Okay.  All right.  Can we go back on?

(Video on.)

THE VIDEOGRAPHER:  We're back on the record.

MR. HOFFER:  Yeah.  I just don't want to ask him --

MR. GREENAMYRE:  Sure.

MR. HOFFER:  -- a bunch of questions if --

MR. GREENAMYRE:  No, no, of course.

95

MR. HOFFER:  -- we haven't seen it, so --

BY MR. HOFFER:

Q    Okay.  All right.  So other than --

Well, let's go head to toe.  Okay?

From, you know, the head down to your toes, what injuries are you claiming you received as a result of being in the restraint chair at the Clayton County Jail?

A    As you can see in the picture, my wrist is messed up, my shoulders a little bit, and my mental health.

Q    And I'm going back to Defendant's Exhibit 1.  This is your -- your Interrogatory Responses.  You may want to get that back in front of you so we're working off the same --

MR. GREENAMYRE:  What page -- or paragraph?

MR. HOFFER:  That's Interrogatory No. 9, so it's about --

BY MR. HOFFER:

Q    Well, it's probably about a third of the way through your Responses.

If you can just go to Interrogatory response No. 9.  Let me know when you're there.

96

MR. GREENAMYRE:  So that's on -- on that page and the next page.

THE WITNESS:  Okay.

BY MR. HOFFER:

Q    Are you there?

A    Yeah.  I'm on No. 9.

Q    Okay.  You -- you testified a moment ago about mental health.

Is that the PTSD that you mention in Interrogatory 9?

A    Yes.

Q    Okay.  And then wrist injuries.

We've talked about your wrists; correct?

A    Yes.

Q    And then shoulder injury.

And we've talked about your shoulders; correct?

A    Yeah, yes.

Q    And then acute cardiac episode.

Is that what you already testified about, the blood-pressure issue?

A    Yes.

Q    Okay.  Any other injuries, physical or mental, that you're claiming as a result of being placed in the restraint chair in Clayton County

97

Jail?

A      No.

Q      Okay.

A      Huh-uh.

Q      And it might sound like a silly question, but I assume -- and correct me if I'm wrong -- that you're all -- you've been truthful with your medical providers in telling them what's going on with you; correct?

A      Yeah.

Q      And you've been complete with your medical providers about whatever was going on with you whenever you saw the medical providers?

A      Yeah.

Q      And that's because, the doctors, they need that information to be able to treat you the best they can; right?

A      Yes.

Q      Okay.  So I'm going to focus on your physical injuries with a few follow-ups, and then we'll talk about the PTSD.

So in your Interrogatory, you indicate that you are still having problems with your wrists.

Is that your testimony?

A      Yeah.  My wrists --

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

98

I ride dirt -- I used to ride dirt bikes a lot-lot.  Like, that was my thing.  So I can't ride it as much, but --

Q    You can't put -- pull the throttle?

A    I can, but not for long periods at a time.

Q    Is --

When you say dirt bike, I take it that's a motorized dirt bike, not a --

A    Yeah.

Q    -- old-school BMX bike?

A    No.  It's a -- it's a motorized dirt bike.

Q    Do you own a dirt bike?

A    I do.

Q    What kind of dirt bike?

A    I've got a YZ450F.

Q    Is it --

That's a 450 cc?

A    Um-hum.

Q    That's a big dirt bike.

A    Yeah.

Q    When's the last time you rode it?

A    About -- about two years ago.

Q    Have you ridden any other dirt bikes in the interim?

A    I try to ride my bike.  I might get about

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

99

20 minutes in.  Then I will set it still.  But, no.

Q    Do you go off-roading or just kind of tool around the neighborhood?

A    I was going off-roading.

Q    Okay.  And is -- is one wrist --

Does one wrist cause you more problems than the other one?

A    Yeah.

Q    Which wrist?

A    My left.

Q    Your left causes you more problems than the right?

A    (Witness nods head affirmatively.)

Q    How is the pain in your right wrist as we sit here today?

A    It's okay.

Q    And how is the pain in your left wrist as we sit here today?

A    Today today?

Q    Yeah.

A    It's all right.

Q    And generally?

A    Oh.  I mean, if I do too much, it hurts.

Q    Is it kind of one of these things where if you're -- if you're not doing something with it,

100

it's not really hurting that much?

A    Right.

Q    Okay.  And as far as medical treatment that you've gotten for your wrists, we've already talked about, you know, whatever treatment you got in the jail.  It sounds like you got some ointment.

Was there any other treatment in the jail that you got?

A    For my wrist?

Q    Yes.

A    Oh.  No.

Q    Okay.  Have you gotten any treatment for your wrist since you got out of Clayton County Jail?

A    No.

Q    All right.  Let's talk about your -- your shoulders.  Your Interrogatory response says that the duration of your shoulder pain was from December of 2019 up to about January of 2021.

Is that correct?

A    Yeah.  Something like that, yeah.

Q    And what sorts of pain did you have in your shoulders?

A    It was, like -- more like a throbbing pain.

Q    And was it in --

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

101

          MR. HOFFER:  Bless you.

BY MR. HOFFER:

     Q     Was that in both shoulders?

     A     Yeah.

     Q     Was one shoulder worse than the other one?

     A     No.

     Q     And how did you -- how did you control that throbbing in your shoulders?

     A     I used to take aspirin, Tylenol.

     Q     Did that help?

     A     Yeah.

     Q     Did you ever get medical treatment for your shoulders?

     A     No.  Well, I went and got a -- when I went for my yearly checkup, I told them about it.  They just told me, you know, to take Tylenol and they checked me out.  That's about it.

     Q     And when you had your annual physical, it sounds like, what year was that where you told them about your shoulders?

     A     Oh.  I came home in 20 -- 2020.  I went straight to Kaiser when I got my job.  It had to have been after 90 days because you've got to wait 90 days to get your clearance; so 2020 -- 2020, 2021, something like that.

102

Q    So basically probably about ten months in jail, and then about the 90-day probationary period, and then you were able to go -- go to primary care?

A    Yeah.

Q    Okay.  And that's when you told them about your shoulders?

A    They ask you everything about what's going on with you, where you was at, what happened; so you have to tell them that stuff.

Q    Okay.  All right.  And the only treatment they prescribed was basically what you were already doing, which is --

A    Yeah.

Q    -- take some aspirin, take some Tylenol?

A    Yeah.

Q    Okay.  They didn't prescribe physical therapy, anything like that?

A    (Witness shakes head negatively.)  No.

Q    No?

A    I'm sorry.

Q    That's fine.  That's fine.

And you responded in the Interrogatory this injury caused significant physical pain.

Is that the throbbing you're talking about?

103

A    Yes.

Q    And was that throbbing kind of on and off again?  Is it aggravated by the weather?

You know, tell me -- tell me about that.

A    If I'm too physical, then, yes, it will start up.

Q    What sorts --

Was there certain activities that would aggravate it?

A    If I went to the gym or if I ride my dirt bike.  I used to own a hookah lounge, so if I'm working too hard.

Q    When did you own the hookah lounge?

A    I got my lounge maybe three -- three years ago.

Q    And is that still in operation?

A    No.

Q    What was the name of the hookah lounge?

A    Big Kloud Hookah Muslim Joint.

Q    Big Kloud Hookah Muslim Joint?

A    The Big Kloud Hookah The Muslim Joint.

Q    And where was that located?

A    It was a mobile hookah company; so I did different -- I did different venues, like, TGI Friday's.

104

Q   Kind of like that you'd be in, like, the parking lot, something like that --

A   In a --

Q   -- in a partnership or --

A   Yeah.  It's a partnership, but I wasn't in the parking lot.  I was actually in the building.

Q   Okay.  Okay.  And I may have missed this.  It's still in operation?

A   No.

Q   And when did you stop it?  Did you say 2023?

A   No.  I stopped it last year.

Q   Okay.  2024?  All right.  Do you have any other kind of side businesses like that right now?

A   No, sir.

Q   Just the -- your --  Your sole source of income is your job at the warehouse?

A   Yes.

Q   Okay.  All right.  And according to your discovery response, that shoulder pain pretty much resolved by January 2021?

A   I -- yeah, I guess.  I mean, it don't hurt as much.  It don't hurt.  So, yeah.

105

Q    Okay.  So is --

Now, generally, your shoulders are -- are fine?

A    Yeah.

Q    Okay.  And then the last physical injury that you -- you list in this Interrogatory is the acute cardiac episode.  And you -- the duration was from the December -- we'll say December 8th, 2019, not December 28th, 'til January 10th, 2020.

What happened on January 10th, 2020?

A    What do you mean what happened?

Q    Why -- why did you pick that specific date for saying that the cardiac episode ended?

A    What do you mean cardiac episode?  I'm confused.

Q    So --

MR. GREENAMYRE:  Just --

THE WITNESS:  Oh.

BY MR. HOFFER:

Q    Oh.  There you go.  That will help you a little bit more.

MR. GREENAMYRE:  Yeah.  It's this part right here.

MR. HOFFER:  Yeah.

106

BY MR. HOFFER:

Q    So the acute cardiac episode, which I believe you testified that's the high -- the blood-pressure issue; correct?

A    Oh.  Okay.

Q    Okay.

A    So my blood pressure --

They started giving me a medicine.  They contacted my girlfriend and gave me -- and got the name of my medicine; but they couldn't give it to me, so they gave me the next thing, was a generic.  And my blood pressure started going down.  I started getting my medicine every day.

Q    So is January 10th -- and I'm not trying to put words in your mouth, but is that when your blood pressure kind of got back -- had -- had then gotten back to normal after taking the meds?

A    Yeah, because they wasn't giving me the meds on a -- on a constant basis.  I would put it in.  It took them a while, though.

Q    Okay, because I'm a little confused because you testified a little while ago that you were getting your blood pressure meds every day.

Right?

A    Right, after that.

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

107

Q    Okay.

A    So they was trying to figure out -- and -- what my medication was because I haven't seen the -- what you call it -- the nurse.

Q    Okay.

A    So I kept asking.  I'd put them in. They'll give it to me.  And then after that date, I got them every day.

Q    Okay.  So it's kind of -- they were trying to kind of figure out what you needed to stabilize your blood pressure?

Is that fair?

A    Yeah, I guess, yeah, because I had to get blood work done, too.

Q    Okay.  And your blood pressure --

So you had high blood pressure.  But according to the Interrogatory response, you had a severe drop in your blood pressure?

A    I don't think I said that.  I don't know.

Q    That's what it says in the response.

A    It's not -- it wasn't as high as it was.

So my blood pressure was always high when I was in there.  So when she redid it, it came to almost normal, if that makes sense to you.

Q    It does, yeah.  I -- I was trying to

108

figure out what -- you know, you said it was high blood pressure, but then there was a blood-pressure drop in this Interrogatory response.

A     Right.

Q     I was trying to figure out what --

A     Oh, okay.

Q     -- what that is.

A     So what happened was, my blood pressure was high.  They put me on that diet.  And for a while it stayed high, so they was kind of concerned; so she gave me -- she upped the dosage from 25 to 50 milligrams, and then it came down.

Q     Okay.  And as we sit here today, I believe you testified that you -- you have pretty good control over your blood pressure?

A     Yeah.

Q     Okay.  Are you currently under doctors' care for your blood pressure or are you more handling it on your own?

A     The last time I went, they wanted me to take it.  And this was what?  About seven months ago, eight months ago, I got some blood work.  They said it was coming down, it was stabilizing.  So I started doing and losing weight, and it's getting back right.  So, yeah.  I'm good right now.

109

Q    Well, congratulations.

A    Yeah.

Q    All right.  And then you also talk about having PTSD.  Are there any -- and we'll talk about that in a little more detail.

Are there any other mental health issues that you're claiming from the incident at the Clayton County Jail other than PTSD?

A    No.  I don't -- no, not that I -- no.

Q    Okay.  And according to the --

Well, how are you doing with that today, not necessarily today because I know this has probably been stressful for you, but generally in this time period, how -- how is your PTSD?

A    I go home and go to --

I go to work and go home.  I make it my business to stay away from Clayton County because that's a trigger for me.  I don't do nothing in Clayton County.  I don't like seeing Clayton County cars, so -- and my therapist just told me it's best for me to just remove myself from the area, and that helps out and --

Q    And you live in Henry, correct, Henry County?

A    Yeah.  That's what it says.

110

Q    So it sounds like you're -- you're --

Are -- are you under current mental health treatment right now?

A    Not this second.  I was.  I -- I'm switching actual providers.

Q    Okay.  And are you -- are you with another provider now or are you in process?

A    I'm in process because the last one didn't take my insurance; so I got some new insurance, so I had to switch.

Q    Okay.  And who was the prior mental health provider?

A    Man.  I can't recall the name of the company.  My lawyer probably have it, but I can't recall the name of it.

Q    Would you -- would it help you --

I think a few pages down the line, Interrogatory No. 13, you indicated LifeStance Health.

A    Yeah.

Q    And was there a particular provider at LifeStance who you were working with?

A    Yeah.

Q    And what was that therapist's name?

A    I think her name was Jones, or something

111

like that.  I can't remember.

Q    And do you know what sort of therapist he was?  Like, was he a psychologist --

A    It was a female.

Q    Oh.

A    She was a psychologist --

Q    Psychologist?

A    -- and mental health therap -- therapist.

Q    Okay.  And it looks like you started treating with LifeStance, with Dr. Jones, June 5th of 2024.  And I guess present was -- you know, I know it's not present.  But when these were responded to, it was -- you were currently under treatment.

So you started treating with -- getting mental health treatment June 5th, 2024?

A    Yeah, something like that.

Q    Okay.  And so it does -- it looks like you did not get any mental health treatment prior to June 5th, 2024.

A    Yeah.  I couldn't afford it.

Q    You were on health insurance during that time; right?

A    Yeah.  They wouldn't cover it.

Q    Okay.

112

A    A1 didn't -- yeah.  They wouldn't cover it.

Q    Who was your --

Do you remember who your health insurance was with A1?

A    I can't remember the name of it.  It was really, really cheap.  I can't remember the name of it.

Q    Okay.  Well, if you can remember who it was, would you let your lawyer know?

A    I sure will.

Q    Okay.  And then currently you're on Kaiser; correct?

A    Yeah.

Q    And then the -- the intermediate job -- I've forgotten the name of the job in between A1 and your current job -- who was your health insurer at that job?

A    You said in between?

Q    This is at CJ Logistics.

A    Oh.  Kaiser.

Q    Yeah.  That was Kaiser also?

A    Um-hum.

Q    Okay.  And IES is still Kaiser?

A    Yeah.

113

Q   Okay.  All right.  And then the Interrogatory 13 -- what I really want to do is, I want to make sure we have a list of your medical providers in case we need to get those records.

So LifeStance Health, that's one of them. We just talked about them.

A   Yes.

Q   And that's from June 5th, 2024, up until whenever.

When you get your new provider, will you please tell your counsel?

A   Yes.

Q   Okay.  And then we have Clayton County Jail medical facility, that they offered treatment there; correct?

A   Yeah.

Q   And then I don't see any other medical providers listed for anyone who's provided treatment for you for the injuries you're claiming in this lawsuit.

Is that correct?

A   Yes.

Q   Okay.  But you -- you are under regular medical --

Like, you go see whoever it is at Kaiser

114

that will see you; correct?

A    Yeah.

Q    And how often do you go to the doctor? Just for your annual?

A    Yeah --

Q    Okay.

A    -- unless something's wrong.

Q    Have you had anything go wrong in the last couple of years where you needed to get extra treatment from the doctor?

A    No.

Q    How about for your workers' compensation injury?  Did -- what sort of treatment did you get for that?

A    I got physical therapy.

Q    And is that done?

A    Yeah.

Q    Okay.  And that was after you were released from Clayton County Jail; correct?

A    Yeah.

Q    Okay.  When's the last time that you have received medical treatment?

A    What do you --

     For what?

Q    For -- for anything really.  Let's break

115

it down this way.

When's the last time you had your physical?

A    Wasn't it --

Not too long ago, couple months ago, something like that.

Q    Okay.  Did you have any other --

What other nonphysical-related medical treatment have you gotten, as in -- as -- non-physical-exam medical treatment?

A    Umm --

Q    Don't recall?

A    Are you talking about for my workers' comp?

Q    No, because we've talked about workers' comp.  I'm talking about just through your -- through your doctor.

A    I went and got some glasses that I need. But other than that, no.

Q    Okay.  Okay.  And we'll probably get more information when we get your medical records.

Have you visited a hospital since you were released from Clayton County Jail?

A    I'm sure I have.  I don't recall.  I had a abscess at one time, but I don't recall, but --

116

Q    Was that the abscess in the jail?

A    No.

Q    You had another abscess?

A    Yeah.

Q    Okay.  So that's what I'm getting at.  I mean, when we're talking about medical treatment, a lot of folks think that dental is not medical.

But I'm -- I'm trying to get a snapshot of everything that has -- other injuries you've had or medical treatment you've had since you were released from Clayton County Jail.

A    Okay.  Yeah.  I had a abscess.

Q    Okay.  When did you get the abscess handled?

A    It was last year sometimes.

Q    2024?

A    Yeah.

Q    Okay.  Any other treatment other than the abscess since you were out of Clayton County Jail?

A    No.

Q    Okay.  And other than getting your annual physicals and getting mental health treatment?

A    No.

Q    Okay.  You don't have any doctors' appointments currently scheduled?

117

A    No.

Q    Have you had any injuries to your wrists after being put in the restraint chair?

A    No.

Q    Have you had any injuries to your shoulders after your release from the restraint chair?

A    No.

Q    And you had to go back to Clayton County Jail one time.  I -- I believe it was --

You were pulled over for a taillight, but you had a bench warrant --

A    Well, that was --

Q    -- or was that before?

A    That was way before I --

Q    Okay.  That's right.  I apologize.  I got confused.  Okay.

You have not had any jail visits after being released from Clayton County Jail in 2020?

A    I have not been contacted by the police at all since I got released.

Q    Okay.  Have you incurred any medical expenses in connection with the treatment that you're claiming from this lawsuit?

A    Not that I know of.

118

Q    Are there any permanent injuries that you're claiming that you've suffered as a result of your incarceration at the Clay -- Clayton County Jail?

A    Yes.

Q    Which -- what injuries?

A    My wrists, my --

Q    And your left wrist really?

A    Yeah, and then my left wrist, and my right wrist is hurt, but -- and my mental health.

Q    And other than the medication for blood pressure that you're not taking because you're controlling it through other means, do you have any other prescription medications that you're on?

A    No.

Q    You talked about not being able to ride your dirt bike as much as you'd like.  And you also talked about -- I think you talked about working out, that that may have been affected.

Are there any other physical activities that we have not discussed that you -- you can't do now as a result of the incident at the Clayton County Jail?

A    No.

Q    Are there any other symptoms for any --

119

any injuries related to the incarceration at Clayton County Jail that you -- you know, symptoms of anything that you haven't already told me about?

A    Yes.

Q    Okay.  What?

A    I distanced myself from my family.  I started drinking a lot.  I don't like to go outside. And I just go to work and go in the house.

Q    And you said drinks a lot.

Are you saying currently?  Is that an issue right now or is that something you --

A    It's not because I've been working -- well, when I was working with my therapist, I was getting through it; but it was real bad at one time.

Q    Like, bad, as in, were you diagnosed with alcoholism?

A    No.  I wouldn't -- my family told me that I need to stop because I would drink every day.  I'd go to work and do my job, come home.  I wouldn't go outside.  I wouldn't take family vacations or nothing.

Q    And so that -- when you got -- started getting the mental health treatment in June of 2024, was that one of the things you worked on?

A    Yes.  She worked on it.  She just said,

120

you know, to go to Walmart, go -- instead of ordering online, go outside and get it to get yourself comfortable with just being outside because she said I was on a downward spiral.

And she wanted to get back in contact with me, but -- she was going to try to prescribe some medicine, and I told her let me work -- work on it myself.

Q    And you feel like you've made good headway on that?

A    I think I've been doing pretty good.

Q    Good, good.

Are there any other physical activities that you haven't already told me about that you -- you -- I -- you can't do or that you can't do as well as a result of your injuries at the Clayton County Jail?

A    I think I told you all of them, but I don't know.

Q    Okay.  And are there any specific exercises that you -- you can't do or can't do as well when you're working out?

A    I'm not doing pushups.  And I -- I don't do bench press or pushups or pullups or nothing like that.

121

Q    And so anything that's chest-related?

A    Chest and wrist.

Q    Okay.  Can you do --

If you wanted to, not that you do, but could you do squats or something like that?

A    I'm sure I could do squats.

Q    Okay.  Do you --

Are you a member of a gym?

A    No.

Q    When's the last time you worked out?

A    I maybe try to do last week or something like that.  I don't know.

Q    Just at home?

A    Just the gym at my house, yeah -- well, the apartment complex, yeah.

Q    And you talked about your -- your family, that, like, you go home to your family after your -- your job.

Who -- who is in that family unit?

A    Me, Lavelle and her son.

Q    What's her son's name?

A    Niquel.

Q    And how old is he?

A    He's 19.

Q    Okay.  And you're not aware of any future

122

medical procedures related to your injuries at the Clayton County Jail, are you?

A     No.

Q     What -- what are you seeking to accomplish with this lawsuit?

A     That this don't happen to no -- nobody else and just shine light on the situation.

Q     And are you seeking money in this case?

A     I talked to my lawyer, and I told him what I wanted.  He just said I want to shine light on the situation.  I don't want this to ever happen to no one else.  It was the most horrible day of my life.

Q     Okay.

A     And I lost my -- I lost myself.  I can't even talk about it without shaking and crying, so there's no money in this world can ever fix what I've been through.  It's -- it's -- I feel less of a man sometimes.  Like, that man just took my manhood away from me by putting me in the chair.  So there's no money in this world can ever, ever fix what I went through in that jail, and I didn't do absolutely nothing.  And for somebody to treat me like that?

Q     Okay.  We're almost done, believe it or not.  I'd like to ask you a little bit about -- and

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

123

if you're able.  If you need to take a break, that's fine.

A    No.  I just want to get through it and go home.

Q    I hear ya.  All right.  So a little bit about the -- Victor Hill's criminal trial.

It's my understanding you provided testimony at that trial.

A    Yes.

Q    Did you ever review a transcript of your trial testimony?

A    I can't recall.

Q    Is there anything as we sit here today that you would want to change about the testimony you gave at that criminal trial?

A    Not one bit.

Q    And we testified -- or you testified about this before, but you -- you did work with the FBI in connection with Sheriff Hill's prosecution; correct?

A    Yes.

Q    Do you have any relationship with a guy named Robert Hawes?

A    I don't even know who that is.

Q    Or Jonathan Newton?

A    I don't know who that is.

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

124

Q    Okay.

A    Who is that?

Q    Well, that's just -- I'm just asking the question.  I'm trying to figure out if you knew any of these guys.

MR. GREENAMYRE:  It's all right.

THE WITNESS:  Okay.

MR. HOFFER:  Yeah.  All right.  That is -- that's all the questions I've got for now.  I'm sure my colleague on -- representing Correct Health may have some questions now, as well, and your counsel may have some questions.

THE WITNESS:  Okay.

MR. HOFFER:  Thank you.  I appreciate it.

THE WITNESS:  Um-hum.

MR. GREENAMYRE:  Chad, how -- how long do you -- not, like, holding you to anything, but just for ballpark planning purposes?

MR. BROCK:  How about two minutes --

MR. GREENAMYRE:  Fair.

MR. BROCK:  -- or less.

MR. GREENAMYRE:  All right.  Proceed.

125

MR. BROCK:  Good afternoon, Mr. Peterkin.  My name is Chad Brock, and I represent Correct Health.  I just have a couple of questions for you.  Okay?

THE WITNESS:  Yes, sir.

EXAMINATION

BY MR. BROCK:

Q    So I'm --

You had earlier testified that approximately two, two and a half hours after you were placed in the restraint chair, that a C -- a CO, big Sergeant Johnson, came in with a doctor.

Is that correct?

A    Yeah.

Q    Do you recall the doctor's name?

A    No.

Q    Is that the only time that you saw that doctor while you were at -- incarcerated at Clayton County Jail?

A    I didn't see him to -- to work with me, but I did see him moving about through the jail.

Q    Got it.

Can you just describe physically what he looked like, height, weight, race?

A    He was a light-skinned black male, had to

126

have been, like, maybe six -- five -- five-eleven or six feet.

Q    Okay.  And, you know, he -- he said something along the lines that he had just gotten back from church and that, you know, no one is going to die here on a Sunday.

Is that correct?

A    Actually, what he said to me is -- I don't -- what he said was -- this is crazy.  I asked him for my medication, and I told him I don't want to die in here.  And he said, don't nobody want to hear that shit, you ain't fuck -- you ain't going to die in this jail, or some sorts -- or something like that.  But, yes.  He said he just got back from church and he don't want to hear it.

Q    Did you interpret that to mean he wasn't going to let anyone die on his watch in a way that he was going to make sure that you were cared for or how did you interpret it?

A    I interpreted it that he didn't hear -- he didn't want to hear what I had to say and this was normal in this jail and basically shut up.

Q    Okay.  And --

But then a nurse did subsequently come in and provide you with blood-pressure medication.

127

Is that correct?

A     Yeah, about two and a half hours later, yes.

Q     So that was two to two and a half hours later after the doctor had come in?

A     Yes, sir.

MR. BROCK:  Okay.  I think that that's all I have.

MR. GREENAMYRE:  All right.  Maybe if we can take a five-minute break?

MR. HOFFER:  And if -- if you want to do -- I forgot an exhibit to ask just a couple of questions about.  I apologize.

So do you want me to go through that or you want to take your five minutes?

MR. GREENAMYRE:  Let's just take a quick five minutes and --

MR. HOFFER:  Okay.

MR. GREENAMYRE:   -- and then come back.

MR. HOFFER:  All right.  Yeah.  It'll be quick, but I -- I forgot about it.

MR. GREENAMYRE:  That's fine.

THE VIDEOGRAPHER:  12:49 p.m.  We're off the record.

(Video off.)

128

(Whereupon, there was a recess

in the deposition from

12:49 p.m. to 12:53 p.m.)

(Video on.)

THE VIDEOGRAPHER:  12:53 p.m.  We're back on the record.

(Thereupon, marked for

identification purposes,

Defendant's Exhibit 5.)

FURTHER EXAMINATION

BY MR. HOFFER:

Q    Mr. Peterkin, I have handed you what's been marked Defendant's Exhibit 5.  This is a document that was produced, that we produced to -- to your lawyer in this case.  It's stamped Hill_000273.

Do you see that?

A    Um-hum.

Q    It's also --

A    Yes, sir.

Q    Yeah.  It's also CCSO_00001250.  It's got a double Bates stamp on there.

A    Okay.

Q    So we're on the same page with that; right?

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

129

A     Yeah.

Q     Okay.  And this is kind of an incident-report type of thing.  And if you go down to the bottom where it says Comments --

Well, first of all, Inmate's Name, that's you?

A     Yes.

Q     And then arrest date 12/8/19?

A     Yes.

Q     And then they --

There's the Officer Georges.

See his name?

A     Yes.

Q     Okay.  And then it says what your charges were:  Aggravated assault, two charges of that, two charges of terroristic threats, obstruction, and possession of a firearm by a felon.

Is that correct?

A     Yes.

Q     All right.  And then there's a court date on there.

And then really what I want to ask about is the Comments section.

Do you see that?

A     Yes.

130

Q    Okay.  It says:  On 12/8/19 -- 2019 Sheriff V. Hill entered intake to speak with Inmate Peterkin.  Afterwards he advised to place Inmate Peterkin in the Safety Restraint chair for his actions and prevent him from harming himself or someone else.

What actions were you doing that indicated that you were maybe going to harm yourself?

A    I wasn't doing anything.

Q    And then it says:  Inmate Peterkin sat in the -- Inmate Peterkin sat in the chair willingly and without any force being used.

Did I read that correctly?

A    Yes.

Q    And then Officer K. Isaac and SRT Operator Clayborn placed him in the Restraint Chair.

Did I read that correctly?

A    Yes.

Q    And that's what happened; correct?

A    Yes.

Q    And then the last sentence says:  Inmate Peterkin was checked by Nurse M. Miller.  He will receive three days of Special Management meals.

See that?

A    Yes.

VIDEOTAPED DEPOSITION OF RAHEEM PETERKIN - April 30, 2025

131

Q     And was that the start of that low-sodium diet?

A     No.  The special management meals is when you do something wrong, but I never received that.

Q     Okay.  So you were never -- that's why I had asked --

Do you remember before --

A     Yeah.

Q     -- I asked you about the special meals?

A     Oh.  No.

Q     Okay.  Yeah.  So that's what I was actually asking about, but --

A     So basically they give you a ball of bread and water, or something like that.

Q     Is that the nutraloaf?

A     Yeah.

Q     Okay.

A     I never received that.

Q     Okay.  All right.  Okay.

So it sounds like you -- you take issue with that sentence that --

That second sentence, "Afterwards he, Victor Hill, advised to place Inmate Peterkin in the Safety Restraint chair for his actions and prevent him from harming himself or someone else," you

132

disagree with that sentence?

A    Yes.  I wasn't doing nothing.  When I came in, I wasn't in that jail more than three to five minutes, and I was laughing and joking with Mr. George [sic].

Q    Okay.

A    And he testified to that.

MR. HOFFER:  All right.  No other questions.

THE WITNESS:  Thank you.

MR. GREENAMYRE:  All right.  Anything more, Chad?

MR. BROCK:  No questions.

MR. GREENAMYRE:  All right.

MR. BROCK:  Thank you for your time today, Mr. Peterkin.

THE WITNESS:  Thank you.

MR. GREENAMYRE:  All right.  No -- no questions here.  We can go off the record.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  12:56 p.m.  We're off the record.

(Video off.)

COURT REPORTER:  Copies of the transcript?

133

MR. HOFFER: Yes, please.

MR. GREENAMYRE: Electronic only, no index, please.

COURT REPORTER: Mr. Brock?

MR. BROCK: E-tran, please.

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(3), signature of the witness, RAHEEM PETERKIN, has been waived.)

(Deposition concluded at 12:56 p.m.)

- - -

134

C E R T I F I C A T E

STATE OF GEORGIA:

HENRY COUNTY:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to printing under my direction; that the foregoing pages 1 through 133 represent a true and correct transcript, to the best of my ability, of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia and O.C.G.A. 15-14-37 (a) and (b), written disclosure is attached herein.

This, the 16th day of May, 2025.



_____
MARY K. CALDWELL, CSR, B-1325
Certified Shorthand Reporter
Certification expires 3/31/26

135

DISCLOSURE

STATE OF GEORGIA:
COUNTY OF HENRY:


DEPONENT:  RAHEEM PETERKIN

Date of Deposition:  April 30, 2025


        Pursuant to Article 10.B. of the Rules and
Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosure:

        I am a Georgia Certified Court Reporter.   I
am not disqualified for a relationship of interest under
the provisions of O.C.G.A. 9-11-28(c).

        I am here as a representative of Precision
Reporting, Inc.

        Precision Reporting, Inc., was contacted by
Attorney Michael Hoffer to provide court reporting
services for this deposition.

        Precision Reporting, Inc., will not be taking
this deposition under any contract that is prohibited by
Georgia law.

_____
Mary K. Caldwell, CSR B-1325
Certified Shorthand Reporter
Certification expires 3/31/26


PRECISION REPORTING, INC.
(770) 786-9664

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RAHEEM PETERKIN,

Plaintiff,

v.

VICTOR HILL, individually,
CORRECTHEALTH CLAYTON, LLC,

Defendants.

Civil Action No.:

1:24-cv-01945-ELR

## PLAINTIFF'S OMNIBUS RESPONSES TO DEFENDANT HILL'S FIRST DISCOVERY REQUESTS

Plaintiff Raheem Peterkin responds to Victor Hill's first Request for Production of Documents and Interrogatories as follows:

## PRELIMINARY STATEMENT

These responses to Victor Hill's Requests to Plaintiff were prepared with the assistance of counsel.  Subject to inadvertent or undiscovered errors the responses are based on and necessarily limited by the records and information in existence, presently recollected, and/or thus far discovered in the course of the preparation of these answers.  Consequently, Plaintiff reserves the right to revise or supplement her responses if it appears at any time that omissions or errors have been made therein or that more complete or accurate information is available.  The word usage and sentence structure may be that of the person assisting in the preparation of the answers and does not necessarily purport to



DEFENDANT'S EXHIBIT

PENGAD 800-631-6989

1

4/3/25 MKC

be the precise language of Plaintiff. Subject to the limitations set forth herein these responses are true and correct to the best of Plaintiff's knowledge, information, and belief.

## INTERROGATORIES

1.

Please state your full name; all other names by which you have been known, including, but not limited to, alias(es), and nickname(s); date and place of birth; Health Insurance Claim Number/Medicare Number; and Social Security Number (if you have used more than one, include each number and the dates on which you used it. Concurrently with your responses to these interrogatories, you may provide your Social Security Number and date of birth in a separate document that will not become a part of any public record.

**RESPONSE:**
**Raheem Peterkin,**
**221 Misty Ridge Trail, Stockbridge, GA 30281,**
**d/o/b/ 12/26//80**
**Place of Birth: Baltimore, MD**

2.

State each address at which you have resided for the past five years by listing the street number and name, city or town, state, and zip code; the dates you resided at each address; the current or last known address of all

persons who lived with you at each address; and your relationship with each such person.

**RESPONSE:**

**Address: 221 Misty Ridge Trl, Stockbridge, GA 30281**
**Duration: (2020-Present)**
**Roommates: Jermaine Moses (friend) (2020-Present)**

**Clayton County Jail**
**Duration: December 28, 2019-October 2020**

3.

State specifically the name and address of Your current employer and every other employer for whom you have worked for the past ten years, giving as to each the dates of employment, the position you held, the nature of the work performed, the reason for leaving (if applicable), and the average pay received on a weekly, monthly and yearly basis.

**RESPONSE:**

**Plaintiff objects as overbroad as he is not seeking lost wages. Subject to and without waiving any objections:**

**IES Commercial Inc. Lithia Springs, GA 30122 (January 2025 – Present), Warehouse Supervisor, managed warehouse.**

**Compensation: $73,000 per year plus annual bonus.**

CJ Logistics, 220 Greenwood Ct, McDonough, GA 30253 (February 2024-January 2025) Warehouse Supervisor, manage warehouse team and ensure product delivery; name of supervisor: Ken Hurts; rate of compensation: $81,000 yearly

A1 Quality Solutions, 3055 Blue Rock Rd, Cincinatti OH (2020-Febraury 2024); East Coast Manager, managed 41 warehouses in ten different states; name of supervisor: Al Braff; rate of compensation: $105,000 yearly

4.

Please describe your educational background, beginning with high school, stating the name of each school or training program, the dates attended, your course of study, whether you graduated, and degrees or certificates earned.

RESPONSE: Southwestern High School, Baltimore MD (1994-1998, graduated); Community College Baltimore County (CCBC) (2005-2009) (Bachelors Business Management & Marketing); Baltimore City Community College (BCCC) (2006-2007) (certificate in horticulture).

5.

State whether you have ever served in the military of any country in any capacity. If so, identify the branch of the military, the date of entry, the date of discharge, the type of discharge (i.e., honorable or dishonorable), and your military serial number.

RESPONSE: No.

6.

State whether you have ever been a party to a civil lawsuit (other than the present action), or other legal proceeding, including but not limited to a claim for divorce, personal injury, worker's compensation, Social Security benefits, a bankruptcy proceeding, or any proceeding to determine Plaintiff's competency or

guardianship. If so, state the style or caption of the case; whether you were a plaintiff or defendant; when, where, and in what court the action was filed; the names of all other parties; the names of the attorneys involved; the nature of each claim, counterclaim, and cross claim; and the disposition of the case.

**RESPONSE:**
**Date of Lawsuit Filing: November 2023**
**Type of Claim: Worker's Compensation**
**Description: Injured at work when leg was caught between pallets**
**Site of Injury: PVH McDonough Ga (Warehouse)**
**Defendant: Cannot recall**
**Jurisdiction: Fulton County**
**Status: pending**

7.

State whether you have testified under oath (whether in court, by deposition, by affidavit, or otherwise). If so, identify the state, county, and name of the court in which the action is/was pending; the style or caption of the case; the case number; the date on which the action was filed; the nature

of the case; your capacity in the case (e.g., plaintiff, defendant, or non-party witness); and the outcome of the case (specifying the type of relief and amount of any judgment or settlement, or the nature of the offense and the verdict or plea).

**RESPONSE:**

**Georgia, Fulton, United States District Court (Northern District of Georgia)**

**Victor Hill was indicted on April 19, 2021**

**This matter is a criminal case involving allegations of criminal deprivation of civil rights against then Sheriff Victor Hill. Plaintiff participated in this case as a non-party witness. Victor Hill was ultimately found guilty of several accounts of criminal deprivation of civil rights under 18 U.S.C. § 242**

8.

State whether you have ever been charged, arrested, and/or convicted for any crime or offense. If so, identify each crime or offense; the date of each charge, arrest, and/or conviction; the arresting or charging authority; the court in which any criminal proceeding against you was held; and the disposition of each charge.

**RESPONSE:**

**Plaintiff objects as this is not relevant to any issue in this case. Plaintiff further objects based on this being a matter of public record.**

Date of Incident: December 28, 2019

Charges: Aggravated Assault; Felon in Possession Firearm; Terroristic Threats

Location: Jonesboro GA, Clayton County, GA.

Disposition: Plead Guilty to Simple Possession of Firearm

Sentence: time served + 10 years-probation

Date of Incident: 2014

Charges: Simple Battery

Location: Henry County, GA.

Disposition: Plead Guilty to Reduced Charge

Sentence: 1 year probation

Date of Incident: 2011

Charges: Aggravated Assault

Location: Baltimore MD,

Disposition: Dismissed

Date of Incident: 2003

Charges: Violation of Probation

Location: Baltimore, MD

Sentence: 1 year in custody and 3 years' probation

Date of Incident: 2001

Charges: Possession of Controlled Substance

Location: Baltimore, MD.

Disposition: Pled Guilty

Sentence: 3 years probation

9.

Please itemize all damages, including special damages, claimed as a result of the occurrences giving rise to this lawsuit, including but not limited to medical expenses, hospital expenses, and drug expenses.

**RESPONSE:**

Condition: Post-Traumatic Stress Disorder (PTSD):

Duration: December 28, 2019-Present Day

Description: Plaintiff has difficulty sleeping, anxiety, and anhedonia. Plaintiff's mental illness prevents him from performing some activities. Plaintiff has become more reclusive. This mental condition has also impaired his relationship with his girlfriend and other family members.

Condition: Wrist Injuries

Duration: December 28, 2019-Present Day

Description: Plaintiff has physical pain. This limits his physical activity and enjoyment of activities like riding his dirt bike or performing yard work.

Condition: Shoulder injury

Duration: December 28, 2019—January 2021

Description: Plaintiff suffered shoulder injury from improper restraint in chair and lack of monitoring. This injury caused significant physical pain and limited Plaintiff's physical function.

Condition: Acute Cardiac Episode
Duration: December 28, 2019—January 10, 2020
Description: Plaintiff suffered a cardiac episode including severe drop in blood pressure from his restrain in the chair. Plaintiff thought this episode would kill him. He experienced physical pain for nearly two weeks after the incident.

Plaintiff will produce billing records for treatment of injuries (both physical and mental)

10.

Describe with particularity all photographs, charts, diagrams, videos, audiotapes, social media posts, YouTube links, or other illustrations or transcriptions of any person, place or thing involved in this lawsuit, including but not limited to the incident giving rise to the Complaint in this civil action, giving the date each was made and the name and address of the persons with possession, custody or control of each item.

RESPONSE: None except the materials referenced by Ms. Lambert.

11.

Please identify every individual known to you, your agents, employees, or attorneys who possess or may possess knowledge or information of any fact or record relevant to the claims made by plaintiffs in this action, including

persons who possess or may possess knowledge or information of damages that you contend you are entitled to recover. As to each individual, list the particular knowledge that the individual possesses or may possess, and the individual's last known phone number and address.

RESPONSE:

Defendant Victor Hill (Opposing counsel is aware of known address)

Lavelle Austin, 1908 Custer Ave, Atlanta, GA

CorrectHealth Clayton Nurses employed by Clayton County Jail

Sgt. Jackson (Clayton Sheriff Office Employee)

Karol Clayborn (Clayton Sheriff Office Employee)

Dr. Clopton (Doctor in Clayton County Jail who monitored Plaintiff during restraint)

Other unknown Clayton County Sheriff's Office employees present at the scene

Damages Witnesses:

Jahvona Bagley, Baltimore, MD (410-262-9460)

Sharon Jones, Baltimore, MD (443-447-6436)

Lavelle Austin, 1908 Custer Ave, Atlanta, GA

Jermaine Moses, 221 Misty Ridge Trl., Stockbridge, GA 30281

Tamike Pott-Hopkins, McDonough, GA (404-496-1110)

Joshua Thompson, Columbia, MD (301-356-7242)

12.

State all physical and/or mental injuries or conditions you have incurred since the date of the incident which you claim either (a) aggravated your injuries or (b) were new injuries.

RESPONSE: No new injuries

13.

State the name and address of all doctors, psychiatrists, psychologists, chiropractors, hospitals, therapists, and other physical or mental health care providers who have rendered medical, psychological, and/or other types of care as a result of the incident.

RESPONSE:

Lifestance Health
Date of Treatment: June 5, 2024—Present.
Duration of Treatment: Initially appointments twice per week, later reduced to every other week.
Reason for Treatment: PTSD resulting from restraint chair in Clayton County Jail

Clayton County Jail Medical Facility
Date of Treatment: December 28, 2019
Reason for Treatment: Assessed wrist lacerations caused by handcuffs and restraint chair; treated blood pressure issues resulting from restraint in chair.

14.

Describe in detail all injuries and damages you are claiming you received as a result of the incident, indicating which injuries and damages you are suffering from at present and the manner and extent of your current suffering.

**RESPONSE: Please see answer to request 9**

15.

Please state whether you have been detained or incarcerated in jail, prison, or other facility. If so, please provide the name and location of the facility, the and the location in the facility where you were detained or housed.

**RESPONSE: Plaintiff objects as this is not relevant to any issue in this case. Plaintiff further objects based on this being a matter of public record. Plaintiff further objects based on the request being overbroad. See earlier responses.**

16.

State whether you have received any payment from an insurance company or any other source for the injuries you sustained as a result of the incident which forms the basis of this lawsuit. If so, identify the source of the payment and state the amount paid.

**RESPONSE: None.**

17.

Identify each internet social networking site that you used since the date of the incident (e.g., Facebook, MySpace, X, Instagram, LinkedIn, etc.); and for each, include your user name.

**RESPONSE: Instagram: Famous_Frenchies1058**

18.

Describe with particularity all photographs, charts, diagrams, videos, audiotapes, social media posts, YouTube links, or other illustrations or transcriptions of any person, place or thing involved in this lawsuit, including but not limited to the incident giving rise to the Complaint in this civil action, giving the date each was made and the name and address of the persons with possession, custody or control of each item.

**RESPONSE: Please see answer to response 10.**

19.

Identify all medical providers that you have seen or visited, including primary care physicians, regarding any personal injury, ailment, physical impairment, illness, and/or sickness, or for any reason over the past fifteen years.

**RESPONSE: Plaintiff objects to this request as overbroad. Without waiving the objection, Plaintiff submits the following:**

**Name of Provider: Kaiser Permanente**

Date of Treatment: (November 2023-Present)

Reason for Treatment: Regular physicals and check-ups.

Name of Treatment Setting: Clayton County Jail Medical

Date of Treatment: December 28, 2019—October 2020

Reason for Treatment: Monitored blood pressure levels resulting from restraint chair. Also performed dental surgery (removed three teeth)

20.

If you have ever used or consumed any illegal drugs, identify by type, name or brand, and quantity the amount of each such drug you consumed and the frequency with which you used it.

**RESPONSE: Plaintiff objects to this question as immaterial to any issue.**

22.

Please explain how you were contacted by the Federal Bureau of Investigation ("FBI") regarding the incident giving rise to this lawsuit. Please include in your response: the date you first spoke with the FBI regarding the subject incident, whether you made a complaint regarding the subject incident before the FBI contacted you, and if you were offered anything by the FBI in exchange for your testimony against Defendant Victor Hill.

**RESPONSE: Plaintiff was contacted by the United States Attorney's office. Plaintiff was never in contact with the FBI and was not offered anything in exchange for testimony.**

23.

Please state all facts and circumstances supporting, relating to or contradicting plaintiff's allegations as set forth in Count II of the complaint, wherein it is alleged that Defendant Hill battered Plaintiff. In responding, identify all persons having knowledge of such facts, identify all documents concerning or relating to such facts, and identify all communications concerning or relating to such facts.

**RESPONSE: Defendant Victor Hill ordered Clayton County Sheriff's Officers to place handcuffs on. Defendant Hill ordered Sheriff's office employees to tighten the handcuffs after they had already been placed on in order to increase the physical discomfort. Defendant Hill ordered Sheriff's Office employees to restrain Plaintiff in the chair. After Plaintiff was restrained in the chair, Defendant Hill ordered Sheriff's Office employees to tighten the restraints of the chair in ways that were solely meant to increase physical discomfort, rather than provide restraint. Sheriff's Office employee Johnson was ordered by Defendant Hill to tighten the straps to increase pain, Johnson took pictures of Plaintiff restrained in the chair.**

**Other Sheriff's Office employees with personal knowledge of the events of Defendant Hill's battery of the Plaintiff include Officer Wynn, two brothers who were officers with Clayton County Sheriff's**

Office (Officer Karon Clayborn and Clayborn's brother), Clayton County Sheriff's Office Sergeant Johnson.

24.

State whether you have received any payment from an insurance company or any other source for the injuries you sustained as a result of the incident which forms the basis of this lawsuit. If so, identify the source of the payment and state the amount paid.

**RESPONSE: None.**

25.

Please state the name and address of all expert witnesses or professional consultants retained or consulted by Plaintiff or on Plaintiff's behalf to make an evaluation or investigation of the cause of the incident(s) giving rise to the lawsuit or the damages sustained by Plaintiff. In addition, please identify each such expert witness that is expected to testify at trial and the subject matter about which the expert is expected to testify and the substance of the facts and opinions to which the expert is expected to testify and give us a summary of the grounds for each such opinion.

**RESPONSE: See expert disclosure previously produced.**

## REQUESTS FOR PRODUCTION

1.

All documents identified in your responses to Defendant Hill's first interrogatories.

**RESPONSE: Plaintiff will produce requested materials in his possession.**

2.

All documents that you relied on or referred to in responding to Defendant Hill's first interrogatories.

**RESPONSE: Plaintiff will produce requested materials in his possession.**

3.

For each person whom you expect to call as an expert witness at trial: a current CV; all documents sent to that person; all documents received from that person; all data or other information considered by that person in forming the opinions; all exhibits to be used as a summary of or support for the opinions; a list of all publications authored by that person within the preceding ten years; and a list of all cases in which that person has testified as an expert at trial or by deposition within the preceding four years.

**RESPONSE: Plaintiff has previously produced this information for expert witness Johnnie Lambert as part of her Rule 26 disclosure.**

4.

All documents that reflect statements of any kind (i.e., oral, written, recorded, or videotaped) from each person who has knowledge relating to the incident.

**RESPONSE: Plaintiff will produce these records to the extent that they are in his possession.**

5.

All documents that reflect statements of any kind (i.e., oral, written, recorded, or videotaped) from each person who has knowledge relating to the events immediately before the incident.

**RESPONSE: Plaintiff objects to the overbroad nature of this request. Plaintiff will produce any documents that exist in his possession.**

6.

All documents that reflect statements of any kind (i.e., oral, written, recorded, or videotaped) from each person who has knowledge relating to the events immediately after the incident.

**RESPONSE: Plaintiff objects to the overbroad nature of this request. Plaintiff will produce any documents that exist in his possession.**

7.

All documents that reflect statements of any kind (i.e., oral, written, recorded, or videotaped) from each person who has knowledge relating to your claims in this action.

**RESPONSE: Plaintiff objects to the overly broad nature of this request. Plaintiff objects under work product privilege to the extent that this request seeks confidential attorney work product. Plaintiff will produce non-privileged information in his possession.**

8.

All documents that reflect statements of any kind (i.e., oral, written, recorded, or videotaped) from each person who has knowledge relating to the injuries you claim to have sustained as a result of the incident.

**RESPONSE: Plaintiff will produce responsive records to the extent that they exist and are attainable in his possession.**

9.

All e-mails, text messages, or other correspondence which you or your representatives have sent or received regarding the subject incident and/or the damages and injuries asserted in this lawsuit excluding any documents protected by the attorney client or work product privileges.

**RESPONSE: None in Plaintiff's possession.**

10.

Any and all requests served by you or on your behalf pursuant to the Georgia Open Records Act, pursuant to a subpoena, or pursuant to a non-party request, and any and all documents and correspondence received in response to any such request.

**RESPONSE: Plaintiff will produce Open Records Requests submitted in furtherance of this lawsuit.**

11.

All documents depicting or describing any person, place, or thing involved in this action (i.e., photographs, videotapes, diagrams, maps, drawings, charts, and other illustrations), including but not limited to the location where the incident occurred.

**RESPONSE: Plaintiff objects to the overbroad nature of this request.**

12.

Each insurance policy under which you have or may have coverage for the incident.

**RESPONSE: None.**

13.

All documents that reflect your cellular telephone usage on the date of the incident and/or relating to the subject incident.

**RESPONSE: Plaintiff objects to relevance and overbreadth of this request.**

14.

All documents that reflect any payment from an insurance company or any other source for the injuries which you contend resulted from the incident.

**RESPONSE: None.**

15.

A current photograph of you.

**RESPONSE: Plaintiff objects to the relevance of this request.**
**Plaintiff will produce a current photograph.**

16.

All documents that reflect any investigation relating to the incident.

**RESPONSE: Plaintiff objects to this request to the extent that it**
**captures confidential work product. Plaintiff will produce any non-**
**privileged documents that exist in his possession.**

17.

All documents that reflect any investigation relating to Defendant Hill named in this action, his employees or family members, or his property, including but not limited to photographs and videotapes.

**RESPONSE: Please see response to request 16.**

18.

All documents that reflect communications between you and Defendant Hill, including but not limited to, any of his current or former agents, employees, or representatives.

**RESPONSE: None.**

19.

All photographs, charts, diagrams, videotapes, and other illustrations of any person, place or thing involved in the incident, including any alleged damages sustained by you.

**RESPONSE: Plaintiff objects to the overbreadth of this request. Plaintiff will produce non-privileged documents that exist in his possession.**

20.

All documents that support your contention that Defendant Hill bears fault for the incident.

**RESPONSE: Plaintiff objects to the overbreadth of this request. Plaintiff objects insofar as the request seeks privileged attorney work product. Please see federal conviction. Please see documents in Ms. Lambert's expert disclosure report.**

21.

All documents that support your contention that Defendant Hill breached a duty to you with respect to the incident.

**RESPONSE: See response to Interrogatory 20.**

22.

All documents that support your contention that Defendant Hill named in this action violated a statute, ordinance, rule, constitutional right, regulation, or other law with respect to the incident.

**RESPONSE: See response to Interrogatory 20.**

23.

All documents that support your contention that Defendant Hill was deliberately indifferent to you in any allegedly actionable manner.

**RESPONSE: See response to Interrogatory 20.**

24.

All documents in your possession, custody, or control that are relevant to the allegations in the complaint in this action.

**RESPONSE: Plaintiff objects insofar as this request seeks privileged attorney work product. Plaintiff will produce non-privileged documents.**

25.

A copy of your driver's license or state identification card.

**RESPONSE: Plaintiff will produce.**

26.

All documents relating to any claim that you have made for benefits or payments relating to the injuries you claim to have sustained as a result of the incident.

**RESPONSE: Plaintiff will produce relevant medical records.**

27.

All documents relating to any treatment you sought or received for the injuries you claim to have sustained as a result of the incident, including but not limited to medical bills, prescription or medication charges, claims for payment, correspondence to or from healthcare providers or healthcare facilities, admission and discharge forms, medical reports, correspondence to or from insurance companies, letters, diaries, calendars, and notes.

**RESPONSE: Plaintiff will produce relevant medical records.**

28.

All documents relating to each element of damages you claim in this action.

**RESPONSE: Plaintiff objects to this overbroad request. Plaintiff objects that this request captures privileged attorney work product. Plaintiff will produce non-privileged materials.**

29.

All documents relating to expenses you have incurred as a result of the incident.

**RESPONSE: Plaintiff will produce relevant medical billing records.**

30.

All photographs, videotapes, and other graphic images in whatever form that show your injury, illness, condition, or disability allegedly sustained as a result of the incident, including "day in the life" photographs or videotapes.

**RESPONSE: Plaintiff will produce such images to the extent that they exist.**

31.

All diaries, journals, correspondence, and other personal notes kept by you that relate to the incident or your claims.

**RESPONSE: None.**

32.

For each social network account you have (i.e., Facebook, Twitter, LinkedIn, Instagram etc.), a copy of every page, photograph and post from the date of the incident up to and including the present.

**RESPONSE: Plaintiff objects to this overbroad request.**

33.

A copy of each Facebook page and post, as well as any photograph on Facebook that includes your image or in which you are "tagged," from the date of the incident up to and including the present.

**RESPONSE: Plaintiff objects to this overbroad request.**

34.

All documents and other tangible things that you intend to introduce into evidence or otherwise use at any trial of this action.

**RESPONSE: Plaintiff objects to this request on the basis on attorney work product. Plaintiff will produce non-privileged material to the extent that it exists.**

35.

All documents produced by any non-parties.

**RESPONSE: Plaintiff will produce documents.**

36.

All photographs, videos, and other graphic images in whatever form that show your injury, illness, condition, or disability allegedly sustained by

you as a result of the incident, including "day in the life" photographs or videotapes.

**RESPONSE: This was already asked.**

37.

All diaries, journals, correspondence, and other personal notes kept by you that relate to the incident.

**RESPONSE: This was already asked.**

38.

A signed and notarized copy of the authorization for release of your medical records, which is attached.

**RESPONSE: Plaintiff will sign targeted HIPAA release(s).**

39.

A signed and notarized copy of the authorization for release of your employment records, which is attached.

**RESPONSE: Plaintiff objects to the relevance of this request. No claim is made for lost wages.**

40.

All documents supporting plaintiff's claim for punitive damages.

**RESPONSE: These documents likely overlap with documents produced that relate to liability.**

41.

All documents supporting plaintiff's claim for attorney's fees.

**RESPONSE: Plaintiff objects on the basis of attorney client privilege and work product.**

42.

All documents supporting plaintiff's claims that he has experienced "physical and mental pain and suffering and will continue to suffer into the future," as alleged in the complaint.

**RESPONSE: These documents include medical records that will be produced when Plaintiff obtains them.**

43.

All documents supporting plaintiff's claims that he has "suffered emotional distress including, but not limited to, fear, anger, shame, humiliation, embarrassment, and worry," as alleged in the complaint.

**RESPONSE: These documents include medical records that will be produced when Plaintiff obtains them.**

44.

All documents, including written or electronic communications, concerning the Federal Bureau of Investigation's ("FBI") investigation regarding Victor Hill and the subject incident.

**RESPONSE: None in Plaintiff's possession.**

This 19th day of March 2025.

/s/ Zack Greenamyre
Zack Greenamyre
Georgia Bar No. 293002
Samantha J. Funt

Georgia Bar No. 943783


MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Ave NE
Atlanta, GA 30309
404-812-4751
404-812-4740 (fax)
zack@mitchellshapiro.com
sam@mitchellshapiro.com

DEFENDANT'S
EXHIBIT
2
4/30/25   MKC
PENGAD 800-631-6989



Height          Weight          Date of Birth
5'07" (2019-12-08)    185 (2019-12-08)    1980-Redacted (2019-12-09)

Hair Color          Eye Color
Unknown (2019-12-08)    Brown (2019-12-08)
Brown (2015-10-24)

Place of Birth          Citizenship
MARYLAND (2019-12-08)    US (2015-10-24)
GEORGIA (2015-10-24)

Miscellaneous Information
III Record          MSO

*********************** CRIMINAL HISTORY ***************************

==================== OTN 88401638791 (Cycle 001 of 002) ================
Offender Tracking Number (OTN)          88401638791
Earliest Event Date          2015-10-24
Offense Date          2015-10-17

--------------------------------------------------
Arrest          (Cycle 001)
Arrest Date          2015-10-24
Case Number          1048788
Arresting Agency    GA0750500 HENRY COUNTY POLICE DEPARTMENT
Subject's Name      PETERKIN, RAHEEM
Arrest Type          Adult

Charge          1
Charge Tracking Number 88401638791-001
     Charge Literal  BATTERY
          Statute  16-5-23.1; GA
     NCIC Offense Code  1399
     State Offense Code  1376
          Severity  Misdemeanor

--------------------------------------------------
Prosecutor Disposition  (Cycle 001)
Case Number          15SL3587
Prosecutor Agency    GA075023A HENRY COUNTY SOLICITOR GENERAL
Subject's Name       PETERKIN, RAHEEM

Charge          1
Charge Tracking Number 88401638791-001
     Charge Literal  BATTERY
          Statute  16-5-23.1; GA
     NCIC Offense Code  1399
     State Offense Code  1376
          Severity  Misdemeanor
          Disposition  AMENDED (2016-04-26; Other)

Charge          2
Charge Tracking Number 88401638791-002
     Charge Literal  SIMPLE BATTERY
     Charge Description  AMENDED FROM CTN 1.
          Statute  16-5-23; GA
     NCIC Offense Code  1313
     State Offense Code  1379
          Severity  Misdemeanor
          Disposition  ACCUSATION (2016-04-26; Other)

HILL_000038

```
--------------------------------------
Court Disposition      (Cycle 001)
Case Number ;          16SR1331
Court Agency :         GA075043J HENRY COUNTY STATE COURT
Subject's Name         PETERKIN, RAHEEM

Charge                 2
Charge Tracking Number 88401638791-002
    Charge Literal SIMPLE BATTERY
  Charge Description AMENDED FROM CTN 1.
            Statute 16-5-23; GA
   NCIC Offense Code 1313
  State Offense Code 1379
          Severity Misdemeanor
       Disposition  FIRST OFFENDER ACT (O.C.G.A. 42-8-60)
                  (2016-10-04; Deferred)
                  FIRST OFFENDER ACT SEALED (AS MATTER OF LAW)
                  (2017-10-05; Other)
                  DISMISSED - COMPLETED CONDITIONAL DISCHARGE
                  SENTENCE (RESTRICT NON-CJ PURPOSES)
                  (2017-11-08; Dismissed)

--------------------------------------------------
Sentencing             (Cycle 001)
Sentence Date          2016-10-04
Sentencing Agency      GA075043J HENRY COUNTY STATE COURT

Charge                 2
Charge Tracking Number 88401638791-002
    Charge Literal SIMPLE BATTERY
        Sentence PROBATION 12 MONTHS
                 FINE $750.00
                 COMMUNITY SERVICE 40 HOURS
                 FEES $495.00

==================== OTN 88420106563 (Cycle 002 of 002) ================
Offender Tracking Number (OTN)          88420106563
Earliest Event Date          2019-12-08
Offense Date                 2019-12-08

---------------------------------------------
Arrest                 (Cycle 002)
Arrest Date            2019-12-08
Case Number            000282555
Arresting Agency       GA0310100 CLAYTON COUNTY POLICE DEPARTMENT
Subject's Name         PETERKIN, RAHEEM SALAAM
Arrest Type            Adult

Charge                 1
Charge Tracking Number 88420106563-001
    Charge Literal AGGRAVATED ASSAULT
           Statute 16-5-21; GA
   NCIC Offense Code 1315
  State Offense Code 1318
          Severity Felony

Charge                 2
Charge Tracking Number 88420106563-002
    Charge Literal TERRORISTIC THREATS AND ACTS
           Statute 16-11-37; GA
   NCIC Offense Code 1602
  State Offense Code 1386
```

HILL_000039

Severity Felony

Charge                    3
Charge Tracking Number 88420106563-003
    Charge Literal WILLFUL OBSTRUCTION OF LAW ENFORCEMENT OFFICERS
        Statute 16-10-24(a); GA
    NCIC Offense Code 4899
    State Offense Code 4805
        Severity Misdemeanor

Charge                    4
Charge Tracking Number 88420106563-004
    Charge Literal RECEIPT, POSSESSION OR TRANSPORT OF FIREARM BY CONVICTED
FELON OR FELONY FIRST OFFENDER, ETC
        Statute 16-11-131(b); GA
    NCIC Offense Code 5299
    State Offense Code 5261
        Severity Felony

Charge                    5
Charge Tracking Number 88420106563-005
    Charge Literal AGGRAVATED ASSAULT
        Statute 16-5-21; GA
    NCIC Offense Code 1315
    State Offense Code 1318
        Severity Felony

Charge                    6
Charge Tracking Number 88420106563-006
    Charge Literal TERRORISTIC THREATS AND ACTS
        Statute 16-11-37; GA
    NCIC Offense Code 1602
    State Offense Code 1386
        Severity Felony

********************** INDEX OF AGENCIES **************************

Agency          CLAYTON COUNTY POLICE DEPARTMENT; GA0310100;
                CHIEF
Address
                7911 NORTH MCDONOUGH STREET
                JONESBORO, GA 302360000

Agency          HENRY COUNTY SOLICITOR GENERAL; GA075023A;
                SOLICITOR
Address
                40 ATLANTA STREET SUITE 300
                MCDONOUGH, GA 302530000

Agency          HENRY COUNTY STATE COURT; GA075043J;
                JUDGE
Address
                ONE JUDICIAL CENTER SUITE 120
                MCDONOUGH, GA 302530000

Agency          HENRY COUNTY POLICE DEPARTMENT; GA0750500;
                CHIEF
Address
                108 SOUTH ZACK HINTON PARKWAY
                MCDONOUGH, GA 302530000

HILL_000040



\* \* \* END OF RECORD \* \* \*

Return-Path: tnetsystem@gofw.gbi.state.ga.us
Received: from TNET01 (TNET01 [127.0.0.1])
      by gofw.gbi.state.ga.us with ESMTP
      ; Mon, 9 Dec 2019 01:39:08 -0500
Message-ID: <12B13E54-1336-4DD9-BE5F-F84EE7C447F3@gofw.gbi.state.ga.us>
Date: Mon, 09 Dec 2019 01:39:08 -0500
From: tnetsystem@gofw.gbi.state.ga.us
Subject: Merged AFIS Rapsheets for GA-CCH TCN 93430009039998, Requesting ORI GA0310100
(Send), LSTCN 6049042321
To: ls604@gofw.gbi.state.ga.us

                 Georgia Crime Information Center
                 3121 Panthersville Road
                 Decatur, GA 30037
                 (404) 244-2639

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* CRIMINAL HISTORY RECORD \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* Introduction \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This rap sheet was produced in response to the following request:

FBI/UCN                 113977LB5
State Id Number         MD2038890 ()
Purpose Code            C
Attention               93430009039998

The information in this rap sheet is subject to the following caveats:

THIS RECORD IS PROVIDED IN RESPONSE TO YOUR REQUEST. IT IS BASED UPON
FINGERPRINT-SUPPORTED CRIMINAL HISTORY INFORMATION MAINTAINED BY THE
MARYLAND DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES. THE
MARYLAND CRIMINAL HISTORY RECORD INFORMATION SYSTEM IS OPERATED UNDER
THE AUTHORITY OF THE SECRETARY OF THE DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONAL SERVICES AND DOES NOT CONTAIN DATA PRIOR TO 1978. THIS IS
THE MOST CURRENT CRIMINAL HISTORY RECORD INFORMATION AVAILABLE. IF
THERE ARE ANY QUESTIONS OR NEED FOR CLARITY PLEASE CONTACT MD CJIS
CUSTOMER SERVICE AT 1-888-795-0011, OR THE DATA INTEGRITY UNIT AT
410-585-3652, 410-585-3634 OR 410-585-3636 FROM 8:00AM TO 4:30PM OR
EMAIL ANYTIME TO MDRAPsheet.issues@Maryland.gov (MD; )

WARNING: \*\*\* This individual is a multi-state offender \*\*\* (MD; )

WARNING: \* This individual has been convicted of a disqualifying crime
per Public Safety Article, Section 5-133, Annotated Code of Maryland
and shall not possess a regulated firearm. This information should be
verified with the Courts and the Maryland State Police. (MD; )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* IDENTIFICATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Subject Name(s)

PETERKIN, RAHEEM
PETERKEN, RAHEEM SALAAM  (AKA)
PETERKIN, RAHEEM SALAAM  (AKA)
PETERKIN, RAHEEM S (AKA)

HILL_000041

PETERLAIN, RAHEEM (AKA)
PETERKAN, RAHEEM (AKA)

Subject Description

FBI/UCN              State Id Number
113977LB5            MD2038890

Social Security Number
Redacted
Redacted

Sex                 Race
Male                Black

Height              Weight          Date of Birth
5'07"               200             1980-Redacted
                                    1800-01-01
                                    1960-12-26

Hair Color          Eye Color
                    Brown

Place of Birth
Maryland

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* CRIMINAL HISTORY \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

===================== OTN 996002135914 (Cycle 001 of 016) ================
Offender Tracking Number (OTN)          996002135914
Earliest Event Date                     1999-07-03

-----------------------------------------------------------------------
Arrest              (Cycle 001)
Arrest Date         1999-07-03
Case Number         CBF2000181630
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)          1999-07-03 ROR

Charge              01
    Charge Literal  ROBBERY
        Statute  CL; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Charge              02
    Charge Literal  ASSAULT-SEC DEGREE
        Statute  27012A; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Charge              03
    Charge Literal  ASSAULT-SEC DEGREE
        Statute  27012A; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate

HILL_000042



Magistrate Action    TURNED OVER COMMISSIONER

Charge            04
  Charge Literal  ASSAULT-SEC DEGREE
    Statute  27012A; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

-------------------------------------------------
Court Disposition    (Cycle 001)
Court Agency        MDBPD0000 BALTIMORE CITY PD

Charge            01
  Charge Literal  ROBBERY
    Statute  CL; MD
    Severity  MISDEMEANOR
    Disposition  NOLLE PROSEQUI (1999-08-04; )

Charge            02
  Charge Literal  ASSAULT-SEC DEGREE
    Statute  27012A; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (1999-08-04; )

Charge            03
  Charge Literal  ASSAULT-SEC DEGREE
    Statute  27012A; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (1999-08-04; )

Charge            04
  Charge Literal  ASSAULT-SEC DEGREE
    Statute  27012A; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (1999-08-04; )

===================== OTN 996064102644 (Cycle 002 of 016) ================
Offender Tracking Number (OTN)          996064102644
Earliest Event Date                1999-10-14

-------------------------------------------------
Arrest            (Cycle 002)
Arrest Date        1999-10-14
Case Number        CBF2000067100
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)        1999-10-15 ROR

Charge            01
  Charge Literal  DISORDERLY CONDUCT
    Statute  2701210; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

-------------------------------------------------
Court Disposition    (Cycle 002)
Court Agency        MDBPD0000 BALTIMORE CITY PD

Charge            01
  Charge Literal  DISORDERLY CONDUCT

HILL_000043

HILL_000044

Statute  270121000B; MD
Severity  MD CJIS CODES N/A AT CHARGED TIME
Disposition  NOLLE PROSEQUI (1999-12-01; )

===================== OTN 006063106346 (Cycle 003 of 016) ===============
Offender Tracking Number (OTN)            006063106346
Earliest Event Date                2000-07-01

------------------------------------------------------------
Arrest        (Cycle 003)
Arrest Date      2000-07-01
Case Number      CBF2000736630
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)      2000-07-02 ROR

Charge        01
  Charge Literal  CDS: POSSESSION-MARIHUANA
    Statute  2702870; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

------------------------------------------------------------
Court Disposition    (Cycle 003)
Court Agency      AGENCY NOT PROVIDED

Charge        01
  Charge Literal  CDS: POSSESSION-MARIHUANA
    Statute  270287000A; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  PRAYED JURY TRIAL (2000-10-10; )

------------------------------------------------------------
Court Disposition    (Cycle 003)
Case Number      00800284008
Court Agency      MD004015J 8TH CIR CRT BALTIMORE CITY

Charge        01
  Charge Literal  CDS:POSSESSION
    Statute  270287; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  STET (; )

===================== OTN 006065103181 (Cycle 004 of 016) ===============
Offender Tracking Number (OTN)            006065103181
Earliest Event Date                2000-11-22

------------------------------------------------------------
Arrest        (Cycle 004)
Arrest Date      2000-11-22
Case Number      CBF2001139680
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)      2000-11-22 ROR

Charge        01
  Charge Literal  CDS:POSSESS-NOT MARIHUANA
    Statute  2702870; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

HILL_000045

HILL_000046

Court Disposition    (Cycle 004)
Court Agency         MDBPD0000 BALTIMORE CITY PD

Charge               01
    Charge Literal  CDS:POSSESS-NOT MARIHUANA
        Statute 270287000A; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  GUILTY (2001-04-11; )
        Comment 2001-02-26 FAILURE TO APPEAR ISSUED

Sentencing          (Cycle 004)
Sentence Date        2001-04-11
Sentencing Agency    MDBPD0000 BALTIMORE CITY PD

    Charge Literal  CDS:POSSESS-NOT MARIHUANA
        Severity
        Sentence  Confinement: 00Y06M000DL
            Suspended: 00Y06M000DS
            Probation: 01Y00M000DS
            SUPERVISED PROBATION
            Begin Date: 2001-04-11

==================== OTN 006001172715 (Cycle 005 of 016) ================
Offender Tracking Number (OTN)         006001172715
Earliest Event Date           2000-12-05

Arrest              (Cycle 005)
Arrest Date          2000-12-05
Case Number          CBF2001170290
Arresting Agency     MDBPD0000 BALTIMORE CITY PD
Comment(s)           2000-12-06 ROR

Charge               01
    Charge Literal  CDS: POSSESSION-MARIHUANA
        Statute 2702870; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Court Disposition    (Cycle 005)
Court Agency         MDBPD0000 BALTIMORE CITY PD

Charge               01
    Charge Literal  CDS: POSSESSION-MARIHUANA
        Statute 270287000A; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (2001-03-29; )

==================== OTN 016002101102 (Cycle 006 of 016) ================
Offender Tracking Number (OTN)         016002101102
Earliest Event Date           2001-01-08

Arrest              (Cycle 006)
Arrest Date          2001-01-08
Case Number          CBF2001206170
Arresting Agency     MDBPD0000 BALTIMORE CITY PD

HILL_000047

HILL_000048

Charge | 01
Charge Literal  CHARGE NOT FOUND. CALL MD CJIS
Severity

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

===================== OTN 980001164833 (Cycle 007 of 016) ===============
Offender Tracking Number (OTN)        980001164833
Earliest Event Date            2001-03-03

---------------------------------------------------------------
Arrest | (Cycle 007)
Arrest Date  |    2001-03-03
Case Number       258189
Arresting Agency    MD0030100 BALTIMORE CNTY PD TELETYPE HDQ
Comment(s) |    2001-03-03 HELD

Charge | 01
Charge Literal  THEFT:LESS $500 VALUE
Statute 270342; MD
Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

---------------------------------------------------------------
Court Disposition    (Cycle 007)
Court Agency    MD0030100 BALTIMORE CNTY PD TELETYPE HDQ

Charge | 01
Charge Literal  THEFT:LESS $500 VALUE
Statute 270342; MD
Severity  MD CJIS CODES N/A AT CHARGED TIME
Disposition  NOLLE PROSEQUI (2002-02-28; )
Comment 2001-07-18 FAILURE TO APPEAR ISSUED
2001-12-05 FAILURE TO APPEAR ISSUED

---------------------------------------------------------------
Corrections |    (Cycle 007)
Corrections Agency    MD003013C BALTIMORE COUNTY DETENTION CEN

Supervision Date 2001-03-03
Correction Action UNKNOWN

===================== OTN 011001646364 (Cycle 008 of 016) ===============
Offender Tracking Number (OTN)        011001646364
Earliest Event Date            2001-12-21

---------------------------------------------------------------
Arrest | (Cycle 008)
Arrest Date |    2001-12-21
Case Number    CBF0003835920
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)|    2001-12-21 HELD

Charge | 01
Charge Literal  ASSAULT-SEC DEGREE
Statute 27012A; MD
Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

HILL_000049

Charge          02
      Charge Literal  ASSAULT-SEC DEGREE
          Statute  27012A; MD
          Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action      TURNED OVER TO COMMISSIONER

Charge          03
      Charge Literal  DEADLY WEAPON-INT/INJURE
          Statute  270036; MD
          Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action      TURNED OVER TO COMMISSIONER

---------------------------------------------------------------

Court Disposition      (Cycle 008)
Court Agency         AGENCY NOT PROVIDED

Charge          01
      Charge Literal  ASSAULT-SEC DEGREE
          Statute  27012A; MD
          Severity  MD CJIS CODES N/A AT CHARGED TIME
      Disposition  PRAYED JURY TRIAL (2002-01-22; )

Charge          02
      Charge Literal  ASSAULT-SEC DEGREE
          Statute  27012A; MD
          Severity  MD CJIS CODES N/A AT CHARGED TIME
      Disposition  NOLLE PROSEQUI (2002-01-22; )

Charge          03
      Charge Literal  DEADLY WEAPON-INT/INJURE
          Statute  270036; MD
          Severity  MD CJIS CODES N/A AT CHARGED TIME
      Disposition  NOLLE PROSEQUI (2002-01-22; )

---------------------------------------------------------------

Court Disposition      (Cycle 008)
Case Number         00802022032
Court Agency         MD004015J 8TH CIR CRT BALTIMORE CITY

Charge          01
      Charge Literal  ASSAULT-SEC DEGREE
          Statute  27012A; MD
          Severity  MD CJIS CODES N/A AT CHARGED TIME
      Disposition  PROBATION BEFORE JUDGEMENT (; )

---------------------------------------------------------------

Sentencing          (Cycle 008)
Sentence Date        2002-01-23
Sentencing Agency     MD004015J 8TH CIR CRT BALTIMORE CITY

      Charge Literal  ASSAULT-SEC DEGREE
          Severity
          Sentence  Probation: 01Y00M000DS
                SUPERVISED PROBATION
                Begin Date: 2002-01-23

===================== OTN 036060102713 (Cycle 009 of 016) ================
Offender Tracking Number (OTN)          036060102713

HILL_000050



Earliest Event Date                     3-04-04

```
------------------------------------------------
Arrest           (Cycle 009)
Arrest Date         2003-04-04
Case Number         CBF2003015740
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)          2003-04-05 HELD

Charge              01
    Charge Literal  DIST. COCAINE
        Severity  MISDEMEANOR

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Charge              02
    Charge Literal  DIST. COCAINE
        Severity  MISDEMEANOR

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Charge              03
    Charge Literal  DIST. COCAINE
        Severity  MISDEMEANOR

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

------------------------------------------------
Court Disposition   (Cycle 009)
Court Agency        MDBPD0000 BALTIMORE CITY PD

Charge              01
    Charge Literal  CDS:POSSESS-NOT MARIHUANA
        Statute  CR00050601; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  BOUND OVER (2003-05-13; )

Charge              02
    Charge Literal  CDS:P W/I DIST:NARC
        Statute  CR00050602; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  BOUND OVER (2003-05-13; )

Charge              03
    Charge Literal  CDS MANUF/DIST-NARC
        Statute  CR00050602; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  BOUND OVER (2003-05-13; )

------------------------------------------------
Court Disposition   (Cycle 009)
Case Number         00103128028
Court Agency        MD004015J 8TH CIR CRT BALTIMORE CITY

Charge              01
    Charge Literal  CDS-MANUF/DISTRIB/DISPENS-NARC
        Statute  CR00050602; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  CRIM JEOPARDY OTHER CONVICTION (; )
```

HILL_000051



Charge          02
  Charge Literal  CDS-MANUF/DISTRIB/DISPENS-NARC
    Statute  CR00050602; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
  Disposition  CRIM JEOPARDY OTHER CONVICTION (; )

Charge          03
  Charge Literal  CDS: POSS W/INT MANF/DISTR/DIS
    Statute  CR00050602; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
  Disposition  PROBATION BEFORE JUDGEMENT (; )

Charge          04
  Charge Literal  CDS-UNLAWFUL POSSESSION ETC
    Statute  CR00050601; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
  Disposition  CRIM JEOPARDY OTHER CONVICTION (; )

Charge          05
  Charge Literal  VOP
    Statute  CL0910; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
  Disposition  GUILTY (; )

---------------------------------------------------

Sentencing          (Cycle 009)
Sentence Date       2003-11-06
Sentencing Agency     MD004015J 8TH CIR CRT BALTIMORE CITY

  Charge Literal  CDS: POSS W/INT MANF/DISTR/DIS
    Severity
    Sentence  Probation: 03Y00M000DS
      SUPERVISED PROBATION
      Begin Date: 2003-11-06

  Charge Literal  VOP
    Severity
    Sentence  Confinement: 01Y00M000DL
      NO SUPERVISION DESCRIPTION
      DEFINITE
      Begin Date: 2004-10-13

---------------------------------------------------

Corrections          (Cycle 009)
Corrections Agency    MD004A15C METROPOLITAN TRANSITION CENTER

Correctional Id Number 535916
  Supervision Date
  Correction Action  PAROLE
    Release Date  2005-01-11

---------------------------------------------------

Corrections          (Cycle 009)
Corrections Agency    MD004175G P AND P REISTERSTOWN ROAD BALT

Correctional Id Number 2986582
  Supervision Date  2003-11-06
  Correction Action  UNKNOWN
    Release Date  2004-10-15

---------------------------------------------------

Corrections          (Cycle 009)
Corrections Agency    MD004011C CITY JAIL BALTIMORE

HILL_000052

Correctional Id Number  535916
    Supervision Date  2004-10-13
    Correction Action  UNKNOWN

---------------------------------------------------------
Corrections          (Cycle 009)
Corrections Agency    MD004305G MD PAR & PROB HDQTRS TERM I BA

Correctional Id Number  1707805
    Supervision Date  2005-01-11
    Correction Action  UNKNOWN
    Release Date  2005-11-07

==================== OTN 036003139185 (Cycle 010 of 016) ===============
Offender Tracking Number (OTN)          036003139185
Earliest Event Date                2003-08-27

---------------------------------------------------------
Arrest          (Cycle 010)
Arrest Date          2003-08-27
Case Number          CBF2002830520
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)          2003-08-28 ROR

Charge          01
    Charge Literal  TRESSPASSING
        Severity  MISDEMEANOR

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

---------------------------------------------------------
Court Disposition    (Cycle 010)
Court Agency          MDBPD0000 BALTIMORE CITY PD

Charge          01
    Charge Literal  TRESPASS-POSTED PROPERTY
        Statute  CR00060402; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (2003-09-18; )

==================== OTN 046023116296 (Cycle 011 of 016) ===============
Offender Tracking Number (OTN)          046023116296
Earliest Event Date                2004-06-22

---------------------------------------------------------
Arrest          (Cycle 011)
Arrest Date          2004-06-22
Case Number          CBF2004207630
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)          2004-06-22 HELD

Charge          01
    Charge Literal  HOME INVATION
        Statute  1 1420; MD
        Severity  FELONY

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

Charge          02
    Charge Literal  HOME INVATION

HILL_000053

Statute  1 1415; MD
Severity  MISDEMEANOR

Magistrate
Magistrate Action        TURNED OVER TO COMMISSIONER

Charge                03
Charge Literal  HOME INVATION
Statute  2 3030; MD
Severity  MISDEMEANOR

Magistrate
Magistrate Action        TURNED OVER TO COMMISSIONER

Charge                04
Charge Literal  HOME INVATION
Statute  1 5200; MD
Severity  MISDEMEANOR

Magistrate
Magistrate Action        TURNED OVER TO COMMISSIONER

Charge                05
Charge Literal  HOME INVATION
Statute  3 4025; MD
Severity  MISDEMEANOR

Magistrate
Magistrate Action        TURNED OVER TO COMMISSIONER

Charge                06
Charge Literal  HOME INVATION
Statute  2 3000; MD
Severity  FELONY

Magistrate
Magistrate Action        TURNED OVER TO COMMISSIONER

Charge                07
Charge Literal  HOME INVATION
Statute  2 3020; MD
Severity  FELONY

Magistrate
Magistrate Action        TURNED OVER TO COMMISSIONER

----------------------------------------------------

Court Disposition      (Cycle 011)
Court Agency           MDBPD0000 BALTIMORE CITY PD

Charge                01
Charge Literal  ASSAULT-FIRST DEGREE
Statute  CR00030202; MD
Severity  MD CJIS CODES N/A AT CHARGED TIME
Disposition  NOLLE PROSEQUI (2004-07-22; )

Charge                02
Charge Literal  ASSAULT-SEC DEGREE
Statute  CR00030203; MD
Severity  MD CJIS CODES N/A AT CHARGED TIME
Disposition  NOLLE PROSEQUI (2004-07-22; )

Charge                03

HILL_000054

Charge Literal  BURGLARY-FOURTH DEGREE
    Statute  CR00060205; MD
    Severity  MD CJIS CODES N/A AT CHARGED TIME
Disposition  NOLLE PROSEQUI (2004-07-22; )

Charge            04
    Charge Literal  DEADLY WEAPON-INT/INJURE
        Statute  CR00040101; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (2004-07-22; )

Charge            05
    Charge Literal  MAL DEST PROP/VALU - $500
        Statute  CR00060301; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (2004-07-22; )

Charge            06
    Charge Literal  BURGLARY-FIRST DEGREE
        Statute  CR00060202; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (2004-07-22; )

Charge            07
    Charge Literal  BURGLARY-THIRD DEGREE
        Statute  CR00060204; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  NOLLE PROSEQUI (2004-07-22; )

===================== OTN 046063120541 (Cycle 012 of 016) ===============
Offender Tracking Number (OTN)          046063120541
Earliest Event Date                     2004-09-21

---------------------------------------------------------
Arrest          (Cycle 012)
Arrest Date     2004-09-21
Case Number     CBF2004599050
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)      2004-09-22 HELD

Charge            01
    Charge Literal  POSS W/INTENT MARIHUANA
        Statute  1 0573; MD
        Severity  MISDEMEANOR

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

Charge            02
    Charge Literal  POSS W/INTENT MARIHUANA
        Statute  2A3550; MD
        Severity  MISDEMEANOR

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

---------------------------------------------------------
Court Disposition    (Cycle 012)
Court Agency     MDBPD0000 BALTIMORE CITY PD

Charge            01
    Charge Literal  CDS: POSSESSION-MARIHUANA
        Statute  1 0573; MD

HILL_000055

Severity  MISDEMEANOR
Disposition  PRAYED JURY TRIAL (2004-10-21; )

Charge          02
    Charge Literal  ATT-CDS MANUF/DISTRIBUTE
        Statute  2A3550; MD
        Severity  MISDEMEANOR
    Disposition  PRAYED JURY TRIAL (2004-10-21; )

------------------------------------------------------

Court Disposition      (Cycle 012)
Case Number        00804296023
Court Agency        MD004015J 8TH CIR CRT BALTIMORE CITY

Charge          01
    Charge Literal  CDS:POSSESSION
        Statute  CR5601C2; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
    Disposition  GUILTY (; )

Charge          02
    Charge Literal  ATT-CDS MANUF/DISTRIBUTE
        Statute  CL; MD
        Severity  MISDEMEANOR
    Disposition  CRIM JEOPARDY OTHER CONVICTION (; )

------------------------------------------------------

Sentencing          (Cycle 012)
Sentence Date        2004-10-25
Sentencing Agency      MD004015J 8TH CIR CRT BALTIMORE CITY

    Charge Literal  CDS:POSSESSION
        Severity
        Sentence  Confinement: 00Y02M000DL
            NO SUPERVISION DESCRIPTION
            DEFINITE
            Begin Date: 2004-09-21

------------------------------------------------------

Corrections          (Cycle 012)
Corrections Agency    MD004A15C METROPOLITAN TRANSITION CENTER

Correctional Id Number  535916
    Supervision Date
    Correction Action  PAROLE
        Release Date 2005-01-11

------------------------------------------------------

Corrections          (Cycle 012)
Corrections Agency    MD004011C CITY JAIL BALTIMORE

Correctional Id Number  535916
    Supervision Date  2004-10-13
    Correction Action  UNKNOWN

============================ OTN 056002115374 (Cycle 013 of 016) ================
Offender Tracking Number (OTN)          056002115374
Earliest Event Date              2005-04-23

------------------------------------------------------

Arrest          (Cycle 013)
Arrest Date          2005-04-23
Case Number        CBF2005151440

HILL_000056

Arresting Agency    MDBPD0000 B##IMORE CITY PD
Comment(s)          2005-04-25 HELD

Charge              01
    Charge Literal  TRESPASS-POSTED PROPERTY
        Statute     CR6402; MD
        Severity    MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Charge              02
    Charge Literal  CDS:POSSESS-NOT MARIHUANA
        Statute     CR5601C; MD
        Severity    MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

Charge              03
    Charge Literal  CDS:P W/I DIST:NARC
        Statute     CR56022; MD
        Severity    MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action       TURNED OVER TO COMMISSIONER

------------------------------------------------------

Court Disposition       (Cycle 013)
Court Agency        MDBPD0000 BALTIMORE CITY PD

Charge              01
    Charge Literal  TRESPASS-POSTED PROPERTY
        Statute     2 2210; MD
        Severity    MISDEMEANOR
    Disposition     BOUND OVER (2005-05-24; )

Charge              02
    Charge Literal  CDS:POSSESS-NOT MARIHUANA
        Statute     4 3550; MD
        Severity    MISDEMEANOR
    Disposition     BOUND OVER (2005-05-24; )

Charge              03
    Charge Literal  CDS:P W/I DIST:NARC
        Statute     3 0233; MD
        Severity    FELONY
    Disposition     BOUND OVER (2005-05-24; )

------------------------------------------------------

Court Disposition       (Cycle 013)
Case Number         00105139032
Court Agency        MD004015J 8TH CIR CRT BALTIMORE CITY

Charge              01
    Charge Literal  TRESPASS-POSTED PROPERTY
        Statute     CR6402; MD
        Severity    MISDEMEANOR
    Disposition     NOLLE PROSEQUI (; )

------------------------------------------------------

Court Disposition       (Cycle 013)
Case Number         00105139031

HILL_000057

Court Agency    MD004015J 8TH CIR CRT BALTIMORE CITY

Charge          01
    Charge Literal  CDS: POSS W/INT MANF/DISTR/DIS
        Statute  CR5602; MD
        Severity  FELONY
        Disposition  GUILTY (; )

Charge          02
    Charge Literal  CDS-UNLAWFUL POSSESSION ETC
        Statute  CR5601C1; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
        Disposition  CRIM JEOPARDY OTHER CONVICTION (; )

Charge          03
    Charge Literal  VOP
        Statute  CL0910; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME
        Disposition  DISMISSED BY STATE (; )
        Comment  2006-11-03 BENCH WARRANT ISSUED
                 2007-05-04 BENCH WARRANT SERVED

-----------------------------------------------------------------

Sentencing          (Cycle 013)
Sentence Date       2005-11-16
Sentencing Agency   MD004015J 8TH CIR CRT BALTIMORE CITY

    Charge Literal  CDS: POSS W/INT MANF/DISTR/DIS
        Severity
        Sentence  Confinement: 05Y00M000DL
            Suspended: 04Y11M000D
            Probation: 02Y00M000DS
            SUPERVISED PROBATION
            DEFINITE
            Begin Date: 2005-11-13

-----------------------------------------------------------------

Corrections         (Cycle 013)
Corrections Agency   MD004075G PAR & PROB MT ROYAL AVE TERM I

Correctional Id Number  1719048
    Supervision Date  2005-11-16
    Correction Action  UNKNOWN

-----------------------------------------------------------------

Corrections         (Cycle 013)
Corrections Agency   MD004011C CITY JAIL BALTIMORE

Correctional Id Number  992038890
    Supervision Date  2007-05-04
    Correction Action  OTHER
        Release Date  2007-06-03

-----------------------------------------------------------------

Corrections         (Cycle 013)
Corrections Agency   MD004011C CITY JAIL BALTIMORE

Correctional Id Number  992038890
    Supervision Date  2007-05-04
    Correction Action  RELEASED TO BAIL BOND
        Release Date  2007-06-18

================= OTN 091001151662 (Cycle 014 of 016) =================

HILL_000058

Offender Tracking Number (OTN)        091001151662
Earliest Event Date              2009-08-12

------------------------------------------------------

Arrest              (Cycle 014)
Arrest Date          2009-08-12
Arresting Agency
Comment(s)          2009-08-15 OTHERS

Charge              01
    Charge Literal  VIOLATE EXPARTE/PROT ORDER
        Statute  FL4509; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action      TURNED OVER TO COMMISSIONER

Charge              02
    Charge Literal  BURGLARY-FOURTH DEGREE
        Statute  CR6205A; MD
        Severity  MD CJIS CODES N/A AT CHARGED TIME

Magistrate
Magistrate Action      TURNED OVER TO COMMISSIONER

------------------------------------------------------

Court Disposition      (Cycle 014)
Court Agency          AGENCY NOT PROVIDED

Charge              01
    Charge Literal  VIOLATE EXPARTE/PROT ORDER
        Statute  2 0254; MD
        Severity  MISDEMEANOR
        Disposition  NOLLE PROSEQUI (2009-10-30; )

Charge              02
    Charge Literal  BURGLARY-FOURTH DEGREE
        Statute  2 3030; MD
        Severity  MISDEMEANOR
        Disposition  NOLLE PROSEQUI (2009-10-30; )

------------------------------------------------------

Corrections          (Cycle 014)
Corrections Agency      MD004011C CITY JAIL BALTIMORE

Correctional Id Number  992038890
    Supervision Date  2009-08-15
    Correction Action  RELEASED TO BAIL BOND
    Release Date  2009-08-23

==============  OTN 000292272PAA (Cycle 015 of 016) ===============
Offender Tracking Number (OTN)        000292272PAA
Earliest Event Date              2010-12-03

------------------------------------------------------

Arrest              (Cycle 015)
Arrest Date          2010-12-03
Arresting Agency      MDBPD0000 BALTIMORE CITY PD

Charge              02
    Charge Literal  FAILURE TO APPEAR
        Statute  1 0077; MD
        Severity  MISDEMEANOR

HILL_000059

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

==================+=========== OTN 111002031825 (Cycle 016 of 016) ================
Offender Tracking Number (OTN)         111002031825
Earliest Event Date            2015-06-29

---------------------+---------------------------------------------------
Arrest         (Cycle 016)
Arrest Date         2015-06-29
Arresting Agency    MDBPD0000 BALTIMORE CITY PD
Comment(s)         2015-06-30 OTHERS

Charge         02
    Charge Literal  CHILD ABUSE: 2ND DEG -CUST
        Statute  1 0173; MD
        Severity  FELONY

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

Charge         03
    Charge Literal  CHILD ABUSE: 2ND DEG -CUST
        Statute  1 0173; MD
        Severity  FELONY

Magistrate
Magistrate Action    TURNED OVER TO COMMISSIONER

---------------------+---------------------------------------------------
Court Disposition    (Cycle 016)
Court Agency         MDBPD0000 BALTIMORE CITY PD

Charge         01
    Charge Literal  CHILD ABUSE: 2ND DEG -CUST
        Statute  1 0173; MD
        Severity  FELONY
        Disposition  NOLLE PROSEQUI (2015-07-28; )

Charge         02
    Charge Literal  CHILD ABUSE-2ND DEGREE: HOUSE
        Statute  1 3802; MD
        Severity  FELONY
        Disposition  NOLLE PROSEQUI (2015-07-28; )

Charge         03
    Charge Literal  ASSAULT-SEC DEGREE
        Statute  1 1415; MD
        Severity  MISDEMEANOR
        Disposition  NOLLE PROSEQUI (2018-07-30; )
        Comment  2015-11-25 FAILURE TO APPEAR ISSUED

---------------------+---------------------------------------------------
Corrections    (Cycle 016)
Corrections Agency    MD004X05C DIV PRETRIAL DET SERV CNT BOOK

    Supervision Date 2015-06-30
    Correction Action UNKNOWN

---------------------+---------------------------------------------------
Corrections    (Cycle 016)
Corrections Agency    MD004011C CITY JAIL BALTIMORE

HILL_000060



DEFENDANT'S
EXHIBIT
3
4/30/25  MKC
PENGAD 800-631-0989



00202301

Page # 1 of 2.
## IN THE MAGISTRATE COURT OF CLAYTON COUNTY
### STATE OF GEORGIA

Identify Co-Defendants

### WARRANTLESS ARREST PROBABLE CAUSE AFFIDAVIT

Defendant's Name:   Peterkin, Raheem _____  DOB [Redacted] 1980  Race  B  Gender  M
Last, First Middle Initial

Social Security Number/GA OLN  [Redacted] OLN GA   Height  507  Weight  185  Hair  BLD  Eye  BRO

Comes now the arresting peace officer  F.Georges 26608 _____ , who on oath says that, to the best of his/her

knowledge and belief, that the Defendant did on the  8  day of  December , 2019, in Clayton County, Georgia at

[Redacted] _____ (location) and at approximately  0023  AM did commit the following
violations of Georgia Law:

| O.C.G.A. | CHARGE | MISD/ FELONY | MAGISTRATE CT. CASE NO. | Judge's Review |
|---|---|---|---|---|
| 16-05-21 | Aggravated Assault | F | 2019WA21259 | Approved  SS |
| 16-11-37 | Terroristic Threats | F | 2019WA21260 | Approved  SL |
| 16-10-24 | Obstruction | M | 2019WA21261 | Approved  SL |
| 16-11-131 | Possession Of A Firearms By Convicted Felon | F | 2019WA21262 | Approved  SL |

In that said offender did  On 12/8/2019 the offender threatens to cause bodily harm to the victim. The offender did so by stating "today gonna be the day you die", while pointing an Ozzie type firearm; with an extended magazine as described by the victim (Bell). The victim advised that the offender held the firearm to the head of the victim (Bell, Jonathan DOB: 12-28-1975) while making his threats of causing bodily harm. During this altercation, the offender had Bell and another victim (Jackson, Frank DOB:09-06-1987) at gun point. Bell showed me where on his body the gun was pointed at. Using his index finger, Bell pointed at his forehead and advised at that point he was in fear for his life. . I arrived on the scene and observed the offender with his hands together in a cupping position at the driver side window of Bells vehicle. When the offender saw me, he placed his hands towards his left side. The offender turned to his left at which time I observed a magazine of a firearm protruding from his left pocket. I told the offender to stop walking away that I was the police.
(and _____ such other description as is set forth in the attached incident report which is hereby incorporated by reference to this affidavit), contrary to the laws of this State and this officer makes this affidavit in support of the warrantless arrest of the offender and asks that the Defendant be held in the common jail of Clayton County unless otherwise having posted Bond or having been released by a Judge of the Magistrate Court of Clayton County. This Defendant was taken into custody by me on 8 / December /2019 at 0153 AM.

Is the Defendant on Probation or Parole? NO   Other Bond Factors: _____

For felony cases, I request that the preliminary hearing be set at 0800 hours on TUES on 17 / December /2019 (pick a date 7-10 days from date of arrest).

Arresting Officer  F.Georges   Agency Name  C.C.P.D.  Employee #  26608   Police Case No.  19066887

Arresting Officer Signature  _____26608_____  Date  12/08/2019

Sworn to and Subscribed before me this  8th  day of  December , 2019

Notary Public  _____   My commission expires  02-09-2022

### ORDER
After having considered the sworn statement of the officer set forth above concerning the arrest of this defendant, I find that probable cause exists for the continued detention of this Defendant and ORDER that he/she be committed to this Court to be dealt with as the law directs for the offense(s) indicated above. The Defendant was brought before the Court pursuant to U.M.C.R. 25.1 and fully informed of his/her rights and the charge(s). The preliminary hearing in this matter [____] has been waived by the Defendant [ ✓ ] is set for  1-14-20 at 8:00 (am/pm in Courtroom  202  of the Clayton County Courthouse. No preliminary hearing will be held if the Defendant is released on bond prior to the preliminary hearing. Bond is set by SEPARATE ORDER or BOND SCHEDULE.

So ORDERED this  9th  day of  Dec , 2019

Make Bond: Y/N   HOA/CAA/PRO SE _____   Judge, Clayton County Magistrate Court

SHERIFF: Enter the LE NUMBER of this Defendant  LE#  822246

☐-Court      ☐-Magistrate Clerk      ☐-Arresting Officer

HILL_000013

DD2D23D1

Page # 2 of 2.

**IN THE MAGISTRATE COURT OF CLAYTON COUNTY**
**STATE OF GEORGIA**

**WARRANTLESS ARREST PROBABLE CAUSE AFFIDAVIT**

Identify Co-Defendants

Defendant's Name:   Peterkin, Raheem          DOB Redacted 1980   Race   B   Gender   M
                    Last, First Middle Initial

Social Security Number/GA OLN   Redacted OLN   Height  507  Weight  185  Hair  BLD  Eye  BRO

Comes now the arresting peace officer   F.Georges   26608                , who on oath says that, to the best of his/her

knowledge and belief, that the Defendant did on the   8   day of   December   , 2019,  in Clayton County, Georgia at

Redacted
violations of Georgia Law:                    (location) and at approximately   0023   AM did commit the following

| O.C.G.A. | CHARGE | MISD/FELONY | MAGISTRATE CT. CASE NO. | |
|---|---|---|---|---|
| 16-5-21 | Aggravated Assault | F | 2019WA21263 | **Judge's Review** |
| 16-11-37 | Terroristic Threats | F | 2019WA21264 | Approved ___ |
| | | | | Approved ___ |
| | | | | Approved |
| | | | | Approved |

~~In that said offender did~~   The offender disobeyed and ran into the residence and locked the door. While checking with
the GCIC operator, I was advised that the offender was a convicted felon. The offender also did advise that he was a convicted felon.

(and _____ such other description as is set forth in the attached incident report which is hereby incorporated by reference to this affidavit),
contrary to the laws of this State and this officer makes this affidavit in support of the warrantless arrest of the offender and asks that the
Defendant be held in the common jail of Clayton County unless otherwise having posted Bond or having been released by a Judge of the
Magistrate Court of Clayton County. This Defendant was taken into custody by me on **8** / **December** /**2019** at AM.

Is the Defendant on Probation or Parole? NO    Other Bond Factors:

For felony cases, I request that the preliminary hearing be set at 0800 hours on TUES on **17** / **December** /**2019**  (pick a date 7-10 days from date of arrest).

Arresting Officer   F.Georges          Agency Name  C.C.P.D.   Employee #   26608   Police Case No.   19066887

Arresting Officer Signature: _____ 26608                Date   12/08/2019

Sworn to and Subscribed before me this ___ day of Decem ___ ,2019

Notary Public: _____          My commission expires   02/09/2022

**ORDER**

After having considered the sworn statement of the officer set forth above concerning the arrest of this defendant, I find that probable cause
exists for the continued detention of this Defendant and ORDER that he/she be committed to this Court to be dealt with as the law directs for
the offense(s) indicated above. The Defendant was brought before the Court pursuant to U.M.C.R. 25.1 and fully informed of his/her rights
and the charge(s). The preliminary hearing in this matter [____] has been waived by the Defendant [✓] is set for   11-14-20
at _____ __.m. in courtroom _____ of the Clayton County Courthouse. No preliminary hearing will be held if the Defendant is
released on bond prior to the preliminary hearing. Bond is set by SEPARATE ORDER or BOND SCHEDULE.

So ORDERED this ___ 9th ___ day of ___ Dec ___ , 20 19

Make Bond: Y/N   HOA/CAA/PRO SE                Judge, Clayton County Magistrate Court

SHERIFF: Enter the LE NUMBER of this Defendant   LE# 1822246

☐-Court          ☐-Magistrate Clerk          ☐-Arresting Officer

HILL_000015



DEFENDANT'S EXHIBIT

4

4/30/25 MKC

PENGAD 800-631-6989

GOVERNMENT EXHIBIT

48

PENGAD 800-631-6989

GOVERNMENT
EXHIBIT
49





This email originated from inside your organization; however, email links or attachments could still be unsafe – exercise caution. If you are concerned about any email contact the IT Service Desk at x83728.

| Inmate's Name | Inmate Raheem Peterkin |
|---|---|
| Date of Arrest | 12/08/2019 |
| Arresting Agency/Ofc | CCPD Officer F. Georges |
| Charges | Aggravated Assault X 2, Terroristic Threats X 2, Obstruction, Possession of a Firearm by a Convicted Felon |
| Court/Court Date | Magistrate Court/ 1st Appearance on 12/09/2019 |
| Holds | System Down |
| Bond Amount | No Bond |
| Inmate's Address | Redacted |
| Comments | On 12/08/2019, Sheriff V. Hill entered Intake to speak with Inmate Peterkin. Afterwards he advised to place Inmate Peterkin in the Safety Restraint chair for his actions and prevent him from harming himself or someone else. Inmate Peterkin sat in the chair willingly and without any force being used. Officer K. Isaac and SRT Operator K. Clayborn placed him in the Restraint Chair. Inmate Peterkin was checked by Nurse M. Miller. He will receive three (3) days of Special Management meals. |



69°F    6:54 PM 6/28/2021



DEFENDANT'S
EXHIBIT
5
PENGAD 800-631-6989
4/30/25  MKC

HILL_000273

CCSO_00001250